# EXHIBIT A
# (Part 1)

**12-Person Jury**

Return Date: No return date scheduled
Hearing Date: 8/3/2021 10:00 AM - 10:00 AM
Courtroom Number: 2510
Location: District 1 Court
       Cook County, IL

FILED
4/2/2021 10:15 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH01601

12819117

Chancery Division Civil Cover Sheet
General Chancery Section

(12/01/20) CCCH 0623

FILED DATE: 4/2/2021 10:15 PM  2021CH01601

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

Michal Twardowski, et al., on behalf of a class

                               Plaintiff

              v.

POLMAX LOGISTICS, LLC, et al.

                              Defendant

Case No: **2021CH01601**

## CHANCERY DIVISION CIVIL COVER SHEET
## GENERAL CHANCERY SECTION

A Chancery Division Civil Cover Sheet - General Chancery Section shall be filed with the initial complaint in all actions filed in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the box in front of the appropriate category which best characterizes your action being filed.

**Only one (1) case type may be checked with this cover sheet.**

0005 ☐ Administrative Review
0001 ☑ Class Action
0002 ☐ Declaratory Judgment
0004 ☐ Injunction

0007 ☐ General Chancery
0010 ☐ Accounting
0011 ☐ Arbitration
0012 ☐ Certiorari
0013 ☐ Dissolution of Corporation
0014 ☐ Dissolution of Partnership
0015 ☐ Equitable Lien
0016 ☐ Interpleader

0017 ☐ Mandamus
0018 ☐ Ne Exeat
0019 ☐ Partition
0020 ☐ Quiet Title
0021 ☐ Quo Warranto
0022 ☐ Redemption Rights
0023 ☐ Reformation of a Contract
0024 ☐ Rescission of a Contract
0025 ☐ Specific Performance
0026 ☐ Trust Construction
0050 ☐ Internet Take Down Action (Compromising Images)

☐ Other (specify) _____

⦿ Atty. No.: 56618     ○ Pro Se 99500

Atty Name: McGuire Law, P.C.

Atty. for: Plaintiffs

Address: 55 West Wacker Drive, 9th Floor

City: Chicago          State: IL

Zip: 60601

Telephone: (312)-893-7002

Primary Email: aheldut@mcgpc.com

Pro Se Only: ☐ I have read and agree to the terms of the Clerk's Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

Email: _____

Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois
cookcountyclerkofcourt.org
Page 1 of 1

FILED DATE: 4/2/2021 10:15 PM   2021CH01601

## CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| MICHAL TWARDOWSKI and MICHAL KOMORSKI, individually and on behalf of all similarly situated individuals, )<br><br>*Plaintiffs*, )<br><br>v. )<br><br>POLMAX LOGISTICS, LLC, an Illinois limited liability company, POLMAX FLEET, LLC, an Illinois limited liability company, )<br><br>*Defendants*. ) | No. 2021CH01601<br><br>Hon. |

## CLASS ACTION COMPLAINT & JURY DEMAND

Plaintiffs, Michal Twardowski and Michal Komorski, by and through their undersigned attorneys, bring this Class Action Complaint against Defendants, Polmax Logistics, LLC d/b/a Experior Logistics and Polmax Fleet, LLC (collectively, "Experior" or "Defendants"). Plaintiffs allege as follows based on personal knowledge as to their own acts and experiences, and as to all other matters, upon information and belief, including an investigation by their attorneys.

### NATURE OF THE ACTION

1.      This case is a putative class action brought to stop Defendants from improperly misclassifying their truck driver employees as independent contractors, and thereby depriving their employees of compensation and fundamental protections guaranteed under Illinois law.

2.      In addition to carrying out a scheme to deny benefits to their employees, Defendants also made unlawful and excessive deductions from Plaintiffs' and the putative class members' wages.

1

FILED DATE: 4/2/2021 10:15 PM    2021CH01601

3.    By intentionally misclassifying their employees and making unlawful wage deductions, wage withholdings, and payroll reversals, Defendants have violated the Illinois Wage Payment and Collection Act, 820 ILCS 115, *et seq*. and Illinois common law.

4.    Accordingly, in order to redress these harms, Plaintiffs bring this action on their own behalf and on behalf of a class of similarly situated individuals defined below. On their own behalf and on behalf of the putative class members, Plaintiffs seek an award of compensatory damages, including pre-judgment interest from the date this action was filed, restitution of any wages or other amounts that have been unjustly withheld, and an award of reasonable attorneys' fees and costs.

## PARTIES

5.    Plaintiff Michal Twardowski is a natural person and at all relevant times has been a resident of Cook County, Illinois.

6.    Plaintiff Michal Komorski is a natural person and at all relevant times has been a resident of Cook County, Illinois.

7.    Defendant Polmax Logistics, LLC is a limited liability company organized under the laws of Illinois. Polmax Logistics, LLC conducts substantial business throughout Illinois, including in Cook County, and is registered with the Illinois Secretary of State to transact business in Illinois.

8.    Defendant Polmax Fleet, LLC is a limited liability company organized under the laws of Illinois. Polmax Fleet, LLC conducts substantial business throughout Illinois, including in Cook County, and is registered with the Illinois Secretary of State to transact business Illinois.

## JURISDICTION AND VENUE

9.    This Court may assert personal jurisdiction over Defendants pursuant to 735 ILCS

2

FILED DATE: 4/2/2021 10:15 PM   2021CH01601

5/2-209 in accordance with the Illinois Constitution and the Constitution of the United States, because Defendants are headquartered in Illinois and are doing business within Illinois, and because Plaintiffs' claims arise out of Defendants' unlawful in-state actions.

10.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, because Defendants are doing business in Cook County and thus reside there under § 2-102.

## COMMON ALLEGATIONS OF FACT

11.     Operating under the name Experior, Defendants are engaged in the trucking, logistics, and transportation business, and they provide trucking and transportation services to clients in Illinois as well as several other states.

12.     Defendants manage their national trucking business primarily from their main facility and headquarters located in Alsip, Illinois, along with other related entities located there. Defendants transport truck loads to and from their warehouses in Illinois, Texas, and New Jersey, and to and from their customers' facilities throughout North America.

13.     Defendants employ drivers who are integrated into Defendants' regular business operations and are essential to Defendants' day-to-day operations. Plaintiffs and the other members of the putative class who work(ed) as drivers perform work that is in the usual course of Defendants' business – they carry out delivery services as drivers to facilitate Defendants' business of providing delivery services to their customers.

14.     Defendants' drivers typically lease a freight truck from Defendants or are otherwise provided with a truck by Defendants to move cargo for Defendants on a regular basis. These trucks prominently bear "Experior" labeling, and the drivers who drive the trucks are required to use them to work exclusively for Defendants on a long-term basis.

15.     The cargo that drivers transport belongs to Defendants' customers, who do not deal

3

FILED DATE: 4/2/2021 10:15 PM    2021CH01601

directly with drivers. The cargo is transported and kept inside large containers bearing the name "Experior." During transport, the containers are placed atop a wheeled trailer or undercarriage called a chassis, which are then pulled by the trucks. Defendants supply the drivers with the chassis and the containers, both of which are essential to the movement of cargo.

16.     As a condition of working for Defendants, Plaintiffs and other drivers were required to sign an Independent Contractor Agreement ("IC Contract"). Defendants' IC Contracts are nonnegotiable contracts of adhesion based on forms or templates that Defendants unilaterally draft and prepare with no input from drivers.

17.     While the IC Contract defines drivers as independent contractors and purportedly provides them with autonomy in determining their manner and means of work, in actual practice, Defendants exert significant control over virtually all aspects of the work performed by drivers.

18.     The IC Contract specifies that the drivers' trucks (whether leased or provided by Defendants) shall be used for Defendants' business only, and drivers may not earn revenue by using the trucks for other purposes or other work.

19.     In particular, the behavioral and financial control exerted over the drivers by Experior demonstrates that the drivers are in fact Defendants' employees. Plaintiff and putative class members are and/or were required to report to facilities maintained by Defendants in Illinois, respond to Experior dispatch (giving them instructions), complete and file paperwork generated by Experior, and submit to supervision by Experior management (which has the ability to discipline and terminate them).

20.     Defendants impose minimal driving and licensing qualifications on drivers. No special skills aside from the ability to drive a commercial truck are required. However, Defendants utilize an application process that enables them to control drivers' conduct. For instance, for each

4

FILED DATE: 4/2/2021 10:15 PM    2021CH01601

driver, Defendants perform a background check and employment eligibility verification, including a credit check, a criminal history check, an employment check, and a drug test.

21.    Defendants control the assignment and dissemination of loads to each driver, and direct the manner of drivers' work. Plaintiffs and the other putative class members were required to use Experior's communication and tracking system when transporting loads. Defendants send dispatch instructions to drivers through emails, calls, and text messages, with all communications cut-off between the broker and the driver, so that Defendants are able to have maximum control over the drivers.

22.    Drivers are subject to discipline, including verbal reprimands and *de facto* suspensions, if they try to reject a load assigned by Defendants, consume too much gasoline on the road, or consider terminating their employment with Experior to work elsewhere.

23.    Defendants unilaterally set drivers' pay rates, which are non-negotiable, contrary to what would be expected in a true independent contractor relationship. Moreover, Defendants' drivers, including Plaintiffs and the other members of the putative class, were not allowed to negotiate directly with Defendants' customers regarding the rates charged for their services. Nor did they enter contracts with Defendants' customers independently.

24.    Drivers are not allowed to engage in a separate business or profession, and instead must work exclusively for Defendants on a long-term basis, rather than periodically. Drivers also regularly work for Defendants at least 5 days per week. As such, drivers working for Defendants are dependent on Defendants for their livelihood because they are prohibited from performing delivery services for anyone else while under contract with Defendants.

25.    Defendants' IC Contracts purportedly require drivers to obtain certain types of insurance and specific coverage levels on all trucks and cargo transported by drivers as a condition

FILED DATE: 4/2/2021 10:15 PM   2021CH01601

for working for Defendants. In actuality, however, Defendants obtain and provide the insurance coverage and charge the costs to drivers, by taking those costs directly out of their pay.

26.     Defendants determine the days and hours that drivers work at their sole discretion. To obtain work each day, drivers are required to check in with Defendants' dispatchers at the start of the drivers' shift, at which time the driver is provided an initial load assignment. Throughout the course of the workday, the driver must continually contact Defendants' dispatch to receive further instructions on assignments, and they are expected to continue working until all cargo loads have been pulled. Drivers may be reprimanded and/or denied further assignments if they stop working.

27.     Defendants' dispatchers continuously communicate with drivers throughout the workday, and drivers are required to be available at all times by mobile phone for receiving load instructions. Additionally, on information and belief, Defendants also use electronic tracking devices issued to drivers to monitor, in real time, the location, movement, and status of drivers.

28.     Defendants strictly impose various policies, instructions, and rules, under which they discipline drivers, including through reprimands, warnings, suspensions, and immediate termination. Defendants maintain the right to terminate and can easily terminate drivers at any time for seemingly insignificant grounds at their discretion.

29.     The forms of discipline for drivers include (i) withholding wages earned, (ii) cutting drivers' earned wages and/or deducting additional business expenses, (iii) cutting drivers' rate per mile, (iv) reversing wages submitted to Defendants' payroll company, and/or (v) immediately firing drivers

30.     In addition to deducting gas expenses from drivers' pay, Defendants also publish a "bottom 3" list, which is a publicly displayed list of drivers who consume the most gasoline on the

6

FILED DATE: 4/2/2021 10:15 PM   2021CH01601

job. Defendants' punitive measures have forced some drivers to turn their trucks off during overnight assignments and sleep in cold temperatures due to fears of being reprimanded for using too much gasoline.

31.     Defendants strictly require drivers to do daily truck inspections, and to perform other maintenance inspections, subject to suspension and even termination for disobedience. Drivers are also subjected to mandatory drug and alcohol tests.

32.     Defendants compel Plaintiffs and other putative class members to bear certain expenses that would normally be borne by an employer. Plaintiff and the putative class members were expected to pay for these expenses out-of-pocket, or otherwise Defendants would deduct those expenses from Plaintiffs' and the putative class members' paychecks.

33.     Defendants also deduct certain expenses directly from Plaintiffs' and the putative members' paychecks without authorization at the time such deductions are made, including deductions for truck lease payments, insurance, and administrative costs.

34.     Defendants' excessive deductions often amounted to over 25% of the total wages owed to the employee after each pay period.

35.     Through its unlawful misclassification scheme, Defendants avoid the costs of providing workers with adequate compensation and occupational accident insurance, denying such employees much needed protection in the event of work-related injuries or illnesses. Defendants also unlawfully pass on their operational costs in the form of administrative fees, including highway duty tax and registration plate fees, late fees (as a direct result of Defendants' own mismanagement of routes and dispatching routines), delivery charges, and lumper fees.

36.     Despite Defendants' significant level of control over the means, manner, and methods by which drivers perform their work, Defendants have willfully misclassified drivers as

7

FILED DATE: 4/2/2021 10:15 PM 2021CH01601

independent contractors in order to minimize costs and maximize profits at the expense of their primary workforce.

37.     Defendants' unlawful conduct of misclassifying drivers also allows Defendants to deprive Plaintiffs and other drivers of fundamental employment rights, such as the right to a minimum wage and the right to workers' compensation protection, guaranteed to employees under Illinois Law.

## FACTS SPECIFIC TO PLAINTIFF MICHAL TWARDOWSKI

38.     Michal Twardowski worked as a driver for Defendants from 2015 through 2020.

39.     In order to begin work, Plaintiff Twardowski was required to sign an Independent Contractor Operating Contract with Defendants on June 15, 2015.

40.     Plaintiff Twardowski's pay, or rate per mile, was non-negotiable and set by Defendants.

41.     Before Plaintiff Twardowski was allowed to drive for Defendants, Defendants performed a background check and employment eligibility verification, including a credit check, a criminal history check, an employment check, and a drug test.

42.     To carry out transportation services as a driver for Defendants, Plaintiff Twardowski received a fully-functional truck owned by Defendants. The cargo he was delivering was kept inside large containers bearing only Defendants' name.

43.     Plaintiff Twardowski had no discretion in setting his routes and was sent by Defendants' dispatchers to various locations around the country. He received assignments through text messages, emails, and constant calls from Defendants' dispatchers. However, his communication with any broker was cut-off and he could not negotiate with the broker for his services.

8

FILED DATE: 4/2/2021 10:15 PM   2021CH01601

44.     Plaintiff Twardowski was on immediate call seven-days per week by Defendants' dispatcher, giving him little or no possibility of rejecting a load to deliver. In fact, Plaintiff Twardowski worked over 5-days per week exclusively for Defendants.

45.     Plaintiff Twardowski worked on average more than 100 hours per week at the sole direction and control of Defendants.

46.     Throughout Plaintiff Twardowski's employment, Defendants sometimes deducted from Plaintiff's Pay Statement various fees usually covered by Defendants as part of their operational expenses, including lumper fees (charges to the carrier when a shipper utilizes third-party workers to help load or unload the trailer contents) and other delivery charges incurred by Defendants, such as fees for when Defendants hired a local driver to allow Plaintiff Twardowski to more expediently deliver other parts of the load. Further, Plaintiff Twardowski was charged certain late fees as well, when in fact Defendants fully controlled Plaintiff's schedule. Plaintiff Twardowski was often charged for Defendants' own mismanagement and time-constraints.

47.     Other fees imposed on Plaintiff Twardowski were registration plate fees when in fact Defendants owned the equipment.

48.     Additionally, Defendants deducted occupational insurance and non-trucking liability expenses from Plaintiff's pay, when in fact it was Defendants—not Plaintiff—that secured such insurance.

49.     In 2020, Michal Twardowski notified Defendants that he was leaving the company. Defendants then immediately moved to deduct more business-operational expenses which should have been covered by the company, deducting over $700 from Plaintiff Twardowski's final pay. This was done without any explanation.

FILED DATE: 4/2/2021 10:15 PM   2021CH01601

## FACTS SPECIFIC TO PLAINTIFF MICHAL KOMORSKI

50.     Plaintiff Michal Komorski worked as a driver for Defendants from September 2020 through November 2020.

51.     In order to begin work, Plaintiff Komorski was forced to immediately sign an Independent Contractor Operating Contract with Defendants on September 15, 2020. Plaintiff Komorski asked if he could take the contract home with him, so he could review it, but Defendants refused and required him to sign the contract on the spot.

52.     Before Plaintiff Komorski was allowed to drive for Defendants, Defendants performed a background check and employment eligibility verification, including a credit check, a criminal history check, an employment check, and a drug test.

53.     Plaintiff Komorski's pay for each route was non-negotiable and set by Defendants. Plaintiff Komorski had no control in setting his routes and was sent by Defendants' dispatcher to various locations around the country. The cargo he was delivering was kept inside large containers bearing only Defendants' name.

54.     Plaintiff Komorski received assignments through text messages, emails, and constant phone calls from Defendants' dispatchers. However, his communication with any broker was cut-off, and he could not negotiate with the broker for his services.

55.     Plaintiff Komorski was on immediate call seven-days per week by Defendants' dispatcher, giving him little or no possibility of rejecting a load to deliver. Plaintiff Komorski worked over 5-days per week exclusively for Defendants.

56.     Throughout the term of Plaintiff Komorski's employment, Defendants deducted various fees from Plaintiff's Pay Statement that were usually covered by Defendants as part of their operational expenses, including lumper fees (charges to the carrier when a shipper utilizes

10

FILED DATE: 4/2/2021 10:15 PM 2021CH01601

third-party workers to help load or unload the trailer contents) and other delivery charges incurred by the Defendants, such as fees for when Defendants hired a local driver, so that Plaintiff Komorski can more expediently deliver other parts of the load. Further, Plaintiff Komorksi was charged certain late fees as well, when in fact Defendants fully controlled Plaintiff's schedule. Plaintiff Komorski was often charged for Defendants' own mismanagement and time-constraints.

57.     Defendants also charged Plaintiff Komorski for registration plate fees when in fact Defendants owned the equipment.

58.     Plaintiff Komorski worked on average 100 hours per week at the direction and control of Defendants.

59.     Further, Defendants deducted occupational insurance and non-trucking liability expenses from Plaintiff's pay, when in fact it was Defendants—not Plaintiff—that secured such insurance.

60.     Plaintiff Komorski decided to lease a truck from Defendants, with the lease payments deducted from his weekly pay pursuant to a separate agreement. However, the truck provided to Plaintiff Komorski had no power, so he immediately notified Defendants that the truck was not drivable. Plaintiff Komorski then received a replacement truck for the time being while the leased truck was being fixed. The company performing the truck repairs (also located at the same site as Defendants' main facility) billed $10,574.77 to Plaintiff Komorski for the vehicle repairs (in addition to the lease payments being deducted from his pay), but did little to fix the leased truck. Plaintiff Komorski complained, but only received mixed responses from the company owner, Thomas Dulian, who told Plaintiff Komorski that if he would drive more then he wouldn't have any problems paying the repair bill.

61.     Toward the end of November 2020, Plaintiff Komorski notified Defendants that he

11

would be leaving the company.

62.     In the beginning of December 2020, Plaintiff Komorski was paid around $2,500 for his last week of work.

63.     However, Defendants later informed their payroll company that Plaintiff Komorski's final wages were sent by error.

64.     On December 14, 2020, Plaintiff Komorski, who had already spent some of his hard-earned money on living costs and various Christmas purchases, was unconscionably forced into overdraft through his bank, resulting in a negative balance of $1,361.73.

65.     After an investigation by Plaintiff's bank, Plaintiff Komorski learned that it was in fact a payroll reversal unilaterally imposed by Defendants.

66.     He immediately reported this to Defendants, but received no response. Plaintiff Komorski later filed a police report for wage theft.

## CLASS ACTION ALLEGATIONS

67.     Pursuant to 735 ILCS 5/2-801, Plaintiffs bring this action on behalf themselves and a Class with one Subclass defined as follows:

Class: All individuals who, within the applicable statute of limitations, (1) entered into Independent Contractor Agreements or similar agreements with Defendants; (2) personally performed services as a driver for Defendants in Illinois during the limitations period; (3) were not classified as employees of Defendants; and (4) had amounts deducted from their paychecks.

Subclass: All members of the Class who, within the applicable limitations period, had their final compensation withheld and/or reversed by Defendants.

68.     Excluded from the Class and Subclass are any members of the judiciary assigned to preside over this matter; any officer or director of Defendants; and any immediate family member of such officer or director.

69.     Upon information and belief, there are hundreds of members of the Class and

FILED DATE: 4/2/2021 10:15 PM   2021CH01601

12

Subclass, making the putative class members so numerous that joinder of all members is impracticable. Although the exact number of members of the Class and Subclass is unknown to Plaintiffs, the members can easily be ascertained and identified through Defendants' personnel records.

70. Plaintiffs' claims are typical of the claims of the members of the Class and Subclass Plaintiffs seek to represent, because the factual and legal bases of Defendants' liability to Plaintiffs and the other Class and Subclass members are the same, and because Defendants' conduct has resulted in similar injuries to Plaintiffs and the other Class and Subclass members. As alleged herein, Plaintiffs and the other Class and Subclass members have all suffered damages in the form of unpaid wages and benefits as a result of Defendants' scheme to misclassify their drivers.

71. There are many questions of law and fact common to Plaintiffs' and the other Class and Subclass members' claims, and those questions predominate over any questions that may affect individual members. Common questions for the Class and Subclass include, but are not limited to, the following:

      a. Whether Plaintiff and the other Class members are "employees" as defined in the IWPCA;

      b. Whether Defendants misclassified their driver employees as independent contractors;

      c. Whether Defendants failed to pay Plaintiff and the other Class members the compensation they have earned and which is due and owing to them;

      d. Whether Defendants unlawfully deducted amounts from their drivers' paychecks for fees that Defendants should have paid;

      e. Whether Defendants unlawfully withheld final compensation from their employees

FILED DATE: 4/2/2021 10:15 PM    2021CH01601

FILED DATE: 4/2/2021 10:15 PM  2021CH01601

at the time of termination; and

f.   Whether Plaintiffs and the other putative Class and Subclass members were denied the rights and benefits provided under the IWPCA.

72.   Absent a class action, most members of the Class and Subclass would find the cost of litigating their claims to be prohibitively expensive and would thus have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions in that it conserves the resources of the courts and the litigants and promotes consistency of adjudication.

73.   Plaintiffs will adequately represent and protect the interests of the members of the Class and Subclass. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class and have the financial resources to do so. Neither Plaintiffs nor Plaintiff's counsel have any interest adverse to those of the other members of the Class and Subclass.

74.   Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the Class and Subclass, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and Subclass and making injunctive or corresponding declaratory relief appropriate for the Class and Subclass as a whole.

## COUNT I
## VIOLATION OF THE ILLINOIS WAGE AND PAYMENT COLLECTION ACT, 820 ILCS 115, *et seq.*
### (on behalf of Plaintiffs and the members of the Class)

75.   Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth herein.

14

FILED DATE: 4/2/2021 10:15 PM   2021CH01601

76.     Defendants violated the IWPCA, 820 ILCS 115/1 *et seq.*, by causing Plaintiffs and the putative class members to incur expenses that should have been borne by Defendants, and thus failing to properly compensate Plaintiffs and the members of the putative Class for all hours worked.

77.     Defendants violated the IWPCA, 820 ILCS 115/9, by making unlawful deductions from Plaintiffs and the putative class members' pay.

78.     Defendant violated the IWPCA, 820 ILCS 115/9, by routinely deducting greater than 25% of the net amount of Plaintiffs and the putative class members' payments.

79.     Plaintiffs and the putative class members suffered and will continue to suffer damages including, but not limited to, loss of money incurred as a result of Defendants' misclassification and compensation deduction practices.

80.     Plaintiffs, on behalf of himself and the putative class members, seeks all unpaid wages as well as reimbursement for all unlawful deductions taken by Defendants from their and the putative class members' pay.

81.     WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for the following relief:

A.  Entry of an order certifying the Class and Subclass proposed above, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

B.  Restitution for all deductions taken from Plaintiffs and the Class members' pay;

C.  Restitution for all of Defendants' operating expenses that Plaintiffs and the Class were forced to bear;

D.  Statutory damages pursuant to the formula set forth in 820 ILCS 115/14(a);

E.  Prejudgment interest;

15

FILED DATE: 4/2/2021 10:15 PM   2021CH01601

F. An award of reasonable attorneys' fees and costs; and

G. Any other relief to which the Plaintiffs and the Class members may be entitled.

## COUNT II
## COMMON LAW CONVERSION
### (on behalf of Plaintiffs and the members of the Class and Subclass)

82. Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth herein.

83. Plaintiffs and the members of the Class and Subclass had a right to retain their earned wages. Defendants have intentionally (i) withheld wages earned from Plaintiffs and Class and Subclass members, (ii) cut earned wages and/or deducted more business expenses from Plaintiffs and Class and Subclass members, and (iii) cut the rate per mile the Plaintiffs and other Class and Subclass members earned.

84. Plaintiffs and the other members of the Class and Subclass did not consent to Defendants cutting their earned wages as described above and thus Plaintiffs and the Class and Subclass members were harmed through the unauthorized amounts withheld and/or deducted.

85. WHEREFORE, Plaintiffs, on behalf of themselves and the Class and Subclass, pray for the following relief:

A. An order certifying the Class and Subclass as defined above, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

B. An award of actual or compensatory damages in an amount to be determined at trial; and

C. Granting such other relief as this Court deems just and proper.

### JURY DEMAND

Plaintiffs request a trial by jury for all claims that can be so tried.

Dated: April 2, 2021     Respectfully Submitted,

           MICHAL TWARDOWSKI & MICHAL
           KOMORSKI, individually and on behalf of a class
           of similarly situated individuals

           By: /s/ Andrew T. Heldut
           One of Plaintiff's Attorneys

Myles McGuire
Paul Geske
Andrew T. Heldut
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
pgeske@mcgpc.com
aheldut@mcgpc.com

*Attorneys for Plaintiff and the Putative Class*

17

Return Date: No return date scheduled
Hearing Date: 8/3/2021 10:00 AM - 10:00 AM
Courtroom Number: 2510
Location: District 1 Court
        Cook County, IL

FILED DATE: 4/20/2021 10:17 AM   2021CH01601

FILED
4/20/2021 10:17 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH01601

13015720

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |
|---|---|
| MICHAEL TWARDOWSKI and MICHAEL KOMORSKI, individually and on behalf of all similarly situated individuals, | |
| *Plaintiffs*, | Case No. 2021 CH 01601 |
| v. | Honorable Michael T. Mullen |
| POLMAX LOGISTICS, LLC, an Illinois limited liability company, and POLMAX FLEET, LLC, an Illinois limited liability company, | |
| *Defendants*. | |

## <u>APPEARANCE AND JURY DEMAND</u>

Andrew J. Butcher, Charles Andrewscavage and Jared S. Kramer of **SCOPELITIS GARVIN LIGHT HANSON & FEARY, P.C.** enter their Appearances, on behalf of Defendants, POLMAX LOGISTICS, LLC and POLMAX FLEET, LLC.

Respectfully submitted,

**SCOPELITIS GARVIN LIGHT HANSON & FEARY, P.C.**

By: */s/ Andrew J. Butcher*
        Attorney for Polmax Logistics, LLC
        and Polmax Fleet, LLC

FILED DATE: 4/20/2021 10:17 AM   2021CH01601

Andrew J. Butcher
Charles Andrewscavage
Jared S. Kramer
Scopelitis, Garvin, Light, Hanson & Feary, P.C. (Firm Id. 35986)
30 West Monroe Street, Suite 1600
Chicago, IL 60603
Telephone: (312) 255-7200
abutcher@scopelitis.com
candrewscavage@scopelitis.com
jskramer@scopelitis.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing has been filed through the Court's electronic filing system with copies served upon the following counsel of record electronically and by First Class United States Mail, postage prepaid, this 20th day of April 2021.

Andrew T. Heldut
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
aheldut@mcgpc.com

*/s/ Andrew J. Butcher*
Andrew J. Butcher
4822-1624-0613, v. 1

FILED DATE: 4/20/2021 10:17 AM   2021CH01601

Return Date: No return date scheduled
Hearing Date: 8/3/2021 10:00 AM - 10:00 AM
Courtroom Number: 2510
Location: District 1 Court
        Cook County, IL

FILED
4/20/2021 11:49 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH01601

FILED DATE: 4/20/2021 11:49 AM   2021CH01601

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

|  |  |
|---|---|
| MICHAEL TWARDOWSKI and MICHAEL KOMORSKI, individually and on behalf of all similarly situated individuals, | 13019356 |
| *Plaintiffs*, | Case No. 2021 CH 01601 |
| v. | Honorable Michael T. Mullen |
| POLMAX LOGISTICS, LLC, an Illinois limited liability company, and POLMAX FLEET, LLC, an Illinois limited liability company, |  |
| *Defendants*. |  |

### UNOPPOSED ROUTINE MOTION FOR EXTENSION OF TIME

Defendants, Polmax Logistics, LLC and Polmax Fleet, LLC (Defendants), by and through their undersigned counsel, respectfully request an extension of thirty (30) days within which to file their responsive pleading to Plaintiffs' Complaint. In support of their motion, Defendants state as follows:

1.     On April 2, 2021, Plaintiffs Michael Twardowski and Michael Komorski filed their complaint in this matter.

2.     Plaintiffs served Defendants Polmax Logistics, LLC and Polmax Fleet, LLC, on April 5, 2021.

3.     Under the current schedule, Defendants' responsive pleading is due on May 5, 2021.

FILED DATE: 4/20/2021 11:49 AM   2021CH01601

4.     The Parties have agreed to a 30-day extension of the date by which Defendants must file their responsive pleading.

5.     This motion is brought in good faith and without the intent to delay these proceedings.

WHEREFORE, Defendants, Polmax Logistics, LLC and Polmax Fleet, LLC, respectfully request this Court strike the current responsive pleading date of May 5, 2021, and allow them until June 4, 2021 to file their responsive pleading to Plaintiffs' Complaint, and for any further relief this Court deems just and reasonable.

Respectfully submitted,

SCOPELITIS GARVIN LIGHT HANSON & FEARY, P.C.

By: */s/ Andrew J. Butcher*
     Attorney for Polmax Logistics, LLC
     and Polmax Fleet, LLC

Andrew J. Butcher
Charles Andrewscavage
Jared S. Kramer
SCOPELITIS GARVIN LIGHT HANSON
& FEARY, P.C.
 30 West Monroe Street, Suite 1600
Chicago, Illinois 60603
Telephone: (312) 255-7200
Facsimile: (312) 422-1224
abutcher@scopelitis.com
candrewscavage@scopelitis.com
jskramer@scopelitis.com
Firm No. 35986

FILED DATE: 4/20/2021 11:49 AM   2021CH01601

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing has been filed through the Court's electronic filing system with copies served upon the following counsel of record electronically and by First Class United States Mail, postage prepaid, this 20th day of April 2021.

Andrew T. Heldut
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
aheldut@mcgpc.com

*/s/ Andrew J. Butcher*
Andrew J. Butcher

4829-5827-3510, v. 1

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| MICHAEL TWARDOWSKI and MICHAEL KOMORSKI, individually and on behalf of all similarly situated individuals, | |
| *Plaintiffs,* | Case No. 2021 CH 01601 |
| v. | Honorable Michael T. Mullen |
| POLMAX LOGISTICS, LLC, an Illinois limited liability company, and POLMAX FLEET, LLC, an Illinois limited liability company, | |
| *Defendants.* | |

## [PROPOSED] AGREED ORDER

This matter is before the Court on Defendants' Unopposed Motion for Extension of Time to File Responsive Pleading to Plaintiffs' Complaint. For good cause shown, the Court Orders the following:

a. Defendants' current May 5, 2021 responsive pleading date is stricken.

b. Defendants must file their responsive pleading by June 4, 2021.

DATE: _____          ENTERED:

_____
The Honorable Michael T. Mullen

FILED DATE: 4/20/2021 11:49 AM  2021CH01601

FILED DATE: 4/20/2021 11:49 AM    2021CH01601

Prepared By:

Andrew J. Butcher
Charles Andrewscavage
Jared S. Kramer
SCOPELITIS GARVIN LIGHT HANSON
& FEARY, P.C.
 30 West Monroe Street, Suite 1600
Chicago, Illinois 60603
abutcher@scopelitis.com
candrewscavage@scopelitis.com
jskramer@scopelitis.com
Telephone:(312) 255-7200
Fax: (312) 422-1224
Firm No. 35986

4821-7200-3557, v. 2

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

MICHAEL TWARDOWSKI and
MICHAEL KOMORSKI, individually and
on behalf of all similarly situated
individuals,

*Plaintiffs,*

v.

POLMAX LOGISTICS, LLC, an Illinois
limited liability company, and POLMAX
FLEET, LLC, an Illinois limited liability
company,

*Defendants.*

Case No. 2021 CH 01601

Honorable Michael T. Mullen

## AGREED ORDER

This matter is before the Court on Defendants' Unopposed Motion for Extension of Time to File Responsive Pleading to Plaintiffs' Complaint. For good cause shown, the Court Orders the following:

a.  Defendants' current May 5, 2021 responsive pleading date is stricken.

b.  Defendants must file their responsive pleading by June 4, 2021.

DATE: _____

ENTERED:

/s/ Michael T. Mullen
The Honorable Michael T. Mullen

Judge Michael T. Mullen

APR 2 9 2021

Circuit Court - 2084

Prepared By:

Andrew J. Butcher
Charles Andrewscavage
Jared S. Kramer
SCOPELITIS GARVIN LIGHT HANSON
& FEARY, P.C.
 30 West Monroe Street, Suite 1600
Chicago, Illinois 60603
abutcher@scopelitis.com
candrewscavage@scopelitis.com
jskramer@scopelitis.com
Telephone:(312) 255-7200
Fax: (312) 422-1224
Firm No. 35986

4821-7200-3557, v. 2

2

FILED
6/4/2021 2:52 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH01601

13574498

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

Firm No. 45983

## CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| MICHAL TWARDOWSKI and MICHAL KOMORSKI, individually and on behalf of all similarly situated individuals, Plaintiffs, v. POLMAX LOGISTICS, LLC, an Illinois limited liability company, POLMAX FLEET, LLC, an Illinois limited liability company, Defendants. | Case No. 2021 CH 01601 |

## ANSWER TO COMPLAINT

Defendants Polmax Logistics, LLC d/b/a Experior Logistics and Polmax Fleet, LLC (collectively, "Defendants") respectfully submit their Answer and Affirmative Defenses to Plaintiffs' Class Action Complaint (the "Complaint").

## NATURE OF THE ACTION

1.    This case is a putative class action brought to stop Defendants from improperly misclassifying their truck driver employees as independent contractors, and thereby depriving their employees of compensation and fundamental protections guaranteed under Illinois law.

**ANSWER: Defendants admit that Plaintiffs purport to bring this action on behalf of themselves and others as a putative class action. Defendants deny that this case is suitable to be tried as a class action, deny**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**that Defendants are liable to Plaintiffs for any of the claims asserted in the Complaint or that Plaintiffs are entitled to any of the relief sought, and deny the remaining allegations contained in paragraph 1 of the Complaint.**

2.     In addition to carrying out a scheme to deny benefits to their employees, Defendants also made unlawful and excessive deductions from Plaintiffs' and the putative class members' wages.

**ANSWER:   Defendants deny the allegations contained in paragraph 2 of the Complaint.**

3.     By intentionally misclassifying their employees and making unlawful wage deductions, wage withholdings, and payroll reversals, Defendants have violated the Illinois Wage Payment and Collection Act, 820 ILCS 115, et seq. and Illinois common law.

**ANSWER:   Defendants deny the allegations contained in paragraph 3 of the Complaint.**

4.     Accordingly, in order to redress these harms, Plaintiffs bring this action on their own behalf and on behalf of a class of similarly situated individuals defined below. On their own behalf and on behalf of the putative class members, Plaintiffs seek an award of compensatory damages, including pre-judgment interest from the date this action was filed, restitution of any wages or other amounts that have been unjustly withheld, and an award of reasonable attorneys' fees and costs.

**ANSWER:  Defendants admit that Plaintiffs purport to bring this action on behalf of themselves and others as a putative class action.**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**Defendants deny that this case is suitable to be tried as a class action, deny that Defendants are liable to Plaintiffs for any of the claims asserted in the Complaint or that Plaintiffs are entitled to any of the relief sought, and deny the remaining allegations contained in paragraph 4 of the Complaint.**

<u>**PARTIES**</u>

5.      Plaintiff Michal Twardowski is a natural person and at all relevant times has been a resident of Cook County, Illinois.

**ANSWER:  Defendants admit that Plaintiff Michal Twardowski is a natural person but are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 of the Complaint regarding his residency and therefore deny those allegations.**

6.      Plaintiff Michal Komorski is a natural person and at all relevant times has been a resident of Cook County, Illinois.

**ANSWER:  Defendants admit that Plaintiff Michal Komorski is a natural person but are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6 of the Complaint regarding his residency and therefore deny those allegations.**

7.      Defendant Polmax Logistics, LLC is a limited liability company organized under the laws of Illinois. Polmax Logistics, LLC conducts substantial business throughout Illinois, including in Cook County, and is registered with the Illinois Secretary of State to transact business in Illinois.

3

**ANSWER: Defendants admit that Polmax Logistics, LLC is a limited liability company organized under the laws of Illinois and that it is registered with the Illinois Secretary of State to transact business in Illinois. Defendants deny the remaining allegations contained in paragraph 7 of the Complaint.**

8.      Defendant Polmax Fleet, LLC is a limited liability company organized under the laws of Illinois. Polmax Fleet, LLC conducts substantial business throughout Illinois, including in Cook County, and is registered with the Illinois Secretary of State to transact business Illinois.

**ANSWER: Defendants admit that Polmax Fleet, LLC is a limited liability company organized under the laws of Illinois and that it is registered with the Illinois Secretary of State to transact business in Illinois. Defendants deny the remaining allegations contained in paragraph 8 of the Complaint.**

## <u>JURISDICTION AND VENUE</u>

9.      This Court may assert personal jurisdiction over Defendants pursuant to 735 ILCS 5/2-209 in accordance with the Illinois Constitution and the Constitution of the United States, because Defendants are headquartered in Illinois and are doing business within Illinois, and because Plaintiffs' claims arise out of Defendants' unlawful in-state actions.

4

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**ANSWER: Defendants admit that they are headquartered and conduct business within Illinois and that jurisdiction is proper in this Court. Defendants deny the remaining allegations contained in paragraph 9 of the Complaint.**

10.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, because Defendants are doing business in Cook County and thus reside there under § 2-102.

**ANSWER:   Defendants admit that venue is proper in this Court, and deny the remaining allegations contained in paragraph 10 of the Complaint.**

<u>**COMMON ALLEGATIONS OF FACT**</u>

11.     Operating under the name Experior, Defendants are engaged in the trucking, logistics, and transportation business, and they provide trucking and transportation services to clients in Illinois as well as several other states.

**ANSWER:   Defendants deny the allegations contained in paragraph 11 of the Complaint.**

12.     Defendants manage their national trucking business primarily from their main facility and headquarters located in Alsip, Illinois, along with other related entities located there. Defendants transport truck loads to and from their warehouses in Illinois, Texas, and New Jersey, and to and from their customers' facilities throughout North America.

**ANSWER:   Defendants deny the allegations contained in paragraph 12 of the Complaint.**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

13.     Defendants employ drivers who are integrated into Defendants' regular business operations and are essential to Defendants' day-to-day operations. Plaintiffs and the other members of the putative class who work(ed) as drivers perform work that is in the usual course of Defendants' business - they carry out delivery services as drivers to facilitate Defendants' business of providing delivery services to their customers.

**ANSWER:   Defendants deny the allegations contained in paragraph 13 of the Complaint.**

14.     Defendants' drivers typically lease a freight truck from Defendants or are otherwise provided with a truck by Defendants to move cargo for Defendants on a regular basis. These trucks prominently bear "Experior" labeling, and the drivers who drive the trucks are required to use them to work exclusively for Defendants on a long-term basis.

**ANSWER:   Defendants deny the allegations contained in paragraph 14 of the Complaint.**

15.     The cargo that drivers transport belongs to Defendants' customers, who do not deal directly with drivers. The cargo is transported and kept inside large containers bearing the name "Experior." During transport, the containers are placed atop a wheeled trailer or undercarriage called a chassis, which are then pulled by the trucks. Defendants supply the drivers with the chassis and the containers, both of which are essential to the movement of cargo.

6

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**ANSWER**:   **Defendants deny the allegations contained in paragraph 15 of the Complaint.**

16.     As a condition of working for Defendants, Plaintiffs and other drivers were required to sign an Independent Contractor Agreement ("IC Contract"). Defendants' IC Contracts are nonnegotiable contracts of adhesion based on forms or templates that Defendants unilaterally draft and prepare with no input from drivers.

17.     While the IC Contract defines drivers as independent contractors and purportedly provides them with autonomy in determining their manner and means of work, in actual practice, Defendants exert significant control over virtually all aspects of the work performed by drivers.

**ANSWER:   Defendants deny the allegations contained in paragraph 16 of the Complaint.**

18.     The IC Contract specifies that the drivers' trucks (whether leased or provided by Defendants) shall be used for Defendants' business only, and drivers may not earn revenue by using the trucks for other purposes or other work.

**ANSWER:   Defendants deny the allegations contained in paragraph 18 of the Complaint.**

19.     In particular, the behavioral and financial control exerted over the drivers by Experior demonstrates that the drivers are in fact Defendants' employees. Plaintiff and putative class members are and/or were required to report to facilities maintained by Defendants in Illinois, respond to Experior dispatch (giving them instructions), complete and file paperwork generated by Experior, and submit to

7

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

supervision by Experior management (which has the ability to discipline and terminate them).

**ANSWER:   Defendants deny the allegations contained in paragraph 19 of the Complaint.**

20.    Defendants impose minimal driving and licensing qualifications on drivers. No special skills aside from the ability to drive a commercial truck are required. However, Defendants utilize an application process that enables them to control drivers' conduct. For instance, for each driver, Defendants perform a background check and employment eligibility verification, including a credit check, a criminal history check, an employment check, and a drug test.

**ANSWER:   Defendants deny the allegations contained in paragraph 20 of the Complaint.**

21.    Defendants control the assignment and dissemination of loads to each driver, and direct the manner of drivers' work. Plaintiffs and the other putative class members were required to use Experior's communication and tracking system when transporting loads. Defendants send dispatch instructions to drivers through emails, calls, and text messages, with all communications cut-off between the broker and the driver, so that Defendants are able to have maximum control over the drivers.

**ANSWER:   Defendants deny the allegations contained in paragraph 21 of the Complaint.**

22.    Drivers are subject to discipline, including verbal reprimands and de facto suspensions, if they try to reject a load assigned by Defendants, consume too much

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

gasoline on the road, or consider terminating their employment with Experior to work elsewhere.

**ANSWER:   Defendants deny the allegations contained in Paragraph 22 of the Complaint.**

23.    Defendants unilaterally set drivers' pay rates, which are non-negotiable, contrary to what would be expected in a true independent contractor relationship. Moreover, Defendants' drivers, including Plaintiffs and the other members of the putative class, were not allowed to negotiate directly with Defendants' customers regarding the rates charged for their services. Nor did they enter contracts with Defendants' customers independently.

**ANSWER:   Defendants deny the allegations contained in paragraph 23 of the Complaint.**

24.    Drivers are not allowed to engage in a separate business or profession, and instead must work exclusively for Defendants on a long-term basis, rather than periodically. Drivers also regularly work for Defendants at least 5 days per week. As such, drivers working for Defendants are dependent on Defendants for their livelihood because they are prohibited from performing delivery services for anyone else while under contract with Defendants.

**ANSWER:   Defendants deny the allegations contained in paragraph 24 of the Complaint.**

25.    Defendants' IC Contracts purportedly require drivers to obtain certain types of insurance and specific coverage levels on all trucks and cargo transported by

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

drivers as a condition for working for Defendants. In actuality, however, Defendants obtain and provide the insurance coverage and charge the costs to drivers, by taking those costs directly out of their pay.

**ANSWER:** **Defendants deny the allegations contained in paragraph 25 of the Complaint.**

26. Defendants determine the days and hours that drivers work at their sole discretion. To obtain work each day, drivers are required to check in with Defendants' dispatchers at the start of the drivers' shift, at which time the driver is provided an initial load assignment. Throughout the course of the workday, the driver must continually contact Defendants' dispatch to receive further instructions on assignments, and they are expected to continue working until all cargo loads have been pulled. Drivers may be reprimanded and/or denied further assignments if they stop working.

**ANSWER:** **Defendants deny the allegations contained in paragraph 26 of the Complaint.**

27. Defendants' dispatchers continuously communicate with drivers throughout the workday, and drivers are required to be available at all times by mobile phone for receiving load instructions. Additionally, on information and belief, Defendants also use electronic tracking devices issued to drivers to monitor, in real time, the location, movement, and status of drivers.

**ANSWER:** **Defendants deny the allegations contained in paragraph 27 of the Complaint.**

10

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

28.     Defendants strictly impose various policies, instructions, and rules, under which they discipline drivers, including through reprimands, warnings, suspensions, and immediate termination. Defendants maintain the right to terminate and can easily terminate drivers at any time for seemingly insignificant grounds at their discretion.

**ANSWER:   Defendants deny the allegations contained in paragraph 28 of the Complaint.**

29.     The forms of discipline for drivers include (i) withholding wages earned, (ii) cutting drivers' earned wages and/or deducting additional business expenses, (iii) cutting drivers' rate per mile, (iv) reversing wages submitted to Defendants' payroll company, and/or (v) immediately firing drivers

**ANSWER:   Defendants deny the allegations contained in paragraph 29 of the Complaint.**

30.     In addition to deducting gas expenses from drivers' pay, Defendants also publish a "bottom 3" list, which is a publicly displayed list of drivers who consume the most gasoline on the job. Defendants' punitive measures have forced some drivers to turn their trucks off during overnight assignments and sleep in cold temperatures due to fears of being reprimanded for using too much gasoline.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 30 of the Complaint.**

31.     Defendants strictly require drivers to do daily truck inspections, and to perform other maintenance inspections, subject to suspension and even termination for disobedience. Drivers are also subjected to mandatory drug and alcohol tests.

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**ANSWER**: **Defendants admit that the Federal Motor Carrier Safety Administration, pursuant to 49 C.F.R. Part 382, has controlled substance and alcohol requirements for commercial motor vehicle drivers. Defendants deny the remaining allegations contained in paragraph 31 of the Complaint.**

32.     Defendants compel Plaintiffs and other putative class members to bear certain expenses that would normally be borne by an employer. Plaintiff and the putative class members were expected to pay for these expenses out-of-pocket, or otherwise Defendants would deduct those expenses from Plaintiffs' and the putative class members' paychecks.

**ANSWER:** **Defendants deny the allegations contained in paragraph 32 of the Complaint.**

33.     Defendants also deduct certain expenses directly from Plaintiffs' and the putative members' paychecks without authorization at the time such deductions are made, including deductions for truck lease payments, insurance, and administrative costs.

**ANSWER**: **Defendants deny the allegations contained in paragraph 33 of the Complaint.**

34.     Defendants' excessive deductions often amounted to over 25% of the total wages owed to the employee after each pay period.

**ANSWER**: **Defendants deny the allegations contained in paragraph 34 of the Complaint.**

12

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

35.     Through its unlawful misclassification scheme, Defendants avoid the costs of providing workers with adequate compensation and occupational accident insurance, denying such employees much needed protection in the event of work-related injuries or illnesses. Defendants also unlawfully pass on their operational costs in the form of administrative fees, including highway duty tax and registration plate fees, late fees (as a direct result of Defendants' own mismanagement of routes and dispatching routines), delivery charges, and lumper fees.

**ANSWER**: **Defendants deny the allegations contained in paragraph 35 of the Complaint.**

36.     Despite Defendants' significant level of control over the means, manner, and methods by which drivers perform their work, Defendants have willfully misclassified drivers as independent contractors in order to minimize costs and maximize profits at the expense of their primary workforce.

**ANSWER**: **Defendants deny the allegations contained in paragraph 36 of the Complaint.**

37.     Defendants' unlawful conduct of misclassifying drivers also allows Defendants to deprive Plaintiffs and other drivers of fundamental employment rights, such as the right to a minimum wage and the right to workers' compensation protection, guaranteed to employees under Illinois Law.

**ANSWER**: **Defendants deny the allegations contained in paragraph 37 of the Complaint.**

13

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## FACTS SPECIFIC TO PLAINTIFF MICHAL TWARDOWSKI

38.     Michal Twardowski worked as a driver for Defendants from 2015 through 2020.

**ANSWER:  Defendants admit that for a period of time, Polmax Fleet, LLC contracted with Plaintiff Twardowski under the terms of an Independent Contractor Agreement, and that Polmax Fleet, LLC also contracted with a company—MTTM Transport—owned by Plaintiff Twardowski. Defendants deny the remaining allegations contained in paragraph 38 of the Complaint.**

39.     In order to begin work, Plaintiff Twardowski was required to sign an Independent Contractor Operating Contract with Defendants on June 15, 2015.

**ANSWER:  Defendants deny the allegations contained in paragraph 39 of the Complaint.**

40.     Plaintiff Twardowski's pay, or rate per mile, was non-negotiable and set by Defendants.

**ANSWER:  Defendants deny the allegations contained in paragraph 40 of the Complaint.**

41.     Before Plaintiff Twardowski was allowed to drive for Defendants, Defendants performed a background check and employment eligibility verification, including a credit check, a criminal history check, an employment check, and a drug test.

14

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**ANSWER**:   **Defendants deny the allegations contained in paragraph 41 of the Complaint.**

42.    To carry out transportation services as a driver for Defendants, Plaintiff Twardowski received a fully-functional truck owned by Defendants. The cargo he was delivering was kept inside large containers bearing only Defendants' name.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 42 of the Complaint.**

43.    Plaintiff Twardowski had no discretion in setting his routes and was sent by Defendants' dispatchers to various locations around the country. He received assignments through text messages, emails, and constant calls from Defendants' dispatchers. However, his communication with any broker was cut-off and he could not negotiate with the broker for his services.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 43 of the Complaint.**

44.    Plaintiff Twardowski was on immediate call seven-days per week by Defendants' dispatcher, giving him little or no possibility of rejecting a load to deliver. In fact, Plaintiff Twardowski worked over 5-days per week exclusively for Defendants.

**ANSWER:**   **Defendants deny the allegations contained in paragraph 44 of the Complaint.**

45.    Plaintiff Twardowski worked on average more than 100 hours per week at the sole direction and control of Defendants.

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**ANSWER**:   **Defendants deny the allegations contained in paragraph 45 of the Complaint.**

46.     Throughout Plaintiff Twardowski's employment, Defendants sometimes deducted from Plaintiffs Pay Statement various fees usually covered by Defendants as part of their operational expenses, including lumper fees (charges to the carrier when a shipper utilizes third party workers to help load or unload the trailer contents) and other delivery charges incurred by Defendants, such as fees for when Defendants hired a local driver to allow Plaintiff Twardowski to more expediently deliver other parts of the load. Further, Plaintiff Twardowski was charged certain late fees as well, when in fact Defendants fully controlled Plaintiffs schedule. Plaintiff Twardowski was often charged for Defendants' own mismanagement and time-constraints.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 46 of the Complaint.**

47.     Other fees imposed on Plaintiff Twardowski were registration plate fees when in fact Defendants owned the equipment.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 47 of the Complaint.**

48.     Additionally, Defendants deducted occupational insurance and non-trucking liability expenses from Plaintiff's pay, when in fact it was Defendants-not Plaintiff-that secured such insurance.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 48 of the Complaint.**

FILED DATE: 6/4/2021 2:52 PM 2021CH01601

49. In 2020, Michal Twardowski notified Defendants that he was leaving the company. Defendants then immediately moved to deduct more business-operational expenses which should have been covered by the company, deducting over $700 from Plaintiff Twardowski's final pay. This was done without any explanation.

**ANSWER: Defendants admit that in 2020, Plaintiff Twardowski terminated the Independent Contractor Agreement between his company, MTTM Transport and Polmax Fleet, LLC. Defendants deny the remaining allegations contained in paragraph 49 of the Complaint.**

## FACTS SPECIFIC TO PLAINTIFF MICHAL KOMORSKI

50. Plaintiff Michal Komorski worked as a driver for Defendants from September 2020 through November 2020.

**ANSWER: Defendants admit that for a period of time, Polmax Fleet, LLC contracted with a company Plaintiff Komorski owned—Michael Logistics—under the terms of an Independent Contractor Agreement. Defendants deny the remaining allegations contained in paragraph 50 of the Complaint.**

51. In order to begin work, Plaintiff Komorski was forced to immediately sign an Independent Contractor Operating Contract with Defendants on September 15, 2020. Plaintiff Komorski asked if he could take the contract home with him, so he could review it, but Defendants refused and required him to sign the contract on the spot.

**ANSWER: Defendants deny the allegations contained in paragraph 51 of the Complaint.**

17

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

52.     Before Plaintiff Komorski was allowed to drive for Defendants, Defendants performed a background check and employment eligibility verification, including a credit check, a criminal history check, an employment check, and a drug test.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 52 of the Complaint.**

53.     Plaintiff Komorski's pay for each route was non-negotiable and set by Defendants. Plaintiff Komorski had no control in setting his routes and was sent by Defendants' dispatcher to various locations around the country. The cargo he was delivering was kept inside large containers bearing only Defendants' name.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 53 of the Complaint.**

54.     Plaintiff Komorski received assignments through text messages, emails, and constant phone calls from Defendants' dispatchers. However, his communication with any broker was cut-off, and he could not negotiate with the broker for his services.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 54 of the Complaint.**

55.     Plaintiff Komorski was on immediate call seven-days per week by Defendants' dispatcher, giving him little or no possibility of rejecting a load to deliver. Plaintiff Komorski worked over 5-days per week exclusively for Defendants.

**ANSWER**:   **Defendants deny the allegations contained in Paragraph 55 of the Complaint.**

18

FILED DATE: 6/4/2021 2:52 PM  2021CH01601

56.     Throughout the term of Plaintiff Komorski's employment, Defendants deducted various fees from Plaintiffs Pay Statement that were usually covered by Defendants as part of their operational expenses, including lumper fees (charges to the carrier when a shipper utilizes third-party workers to help load or unload the trailer contents) and other delivery charges incurred by the Defendants, such as fees for when Defendants hired a local driver, so that Plaintiff Komorski can more expediently deliver other parts of the load. Further, Plaintiff Komorksi was charged certain late fees as well, when in fact Defendants fully controlled Plaintiff's schedule. Plaintiff Komorski was often charged for Defendants' own mismanagement and time-constraints.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 56 of the Complaint.**

57.     Defendants also charged Plaintiff Komorski for registration plate fees when in fact Defendants owned the equipment.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 57 of the Complaint.**

58.     Plaintiff Komorski worked on average 100 hours per week at the direction and control of Defendants.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 58 of the Complaint.**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

59.     Further, Defendants deducted occupational insurance and non-trucking liability expenses from Plaintiff's pay, when in fact it was Defendants-not Plaintiff-that secured such insurance.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 59 of the Complaint.**

60.     Plaintiff Komorski decided to lease a truck from Defendants, with the lease payments deducted from his weekly pay pursuant to a separate agreement. However, the truck provided to Plaintiff Komorski had no power, so he immediately notified Defendants that the truck was not drivable. Plaintiff Komorski then received a replacement truck for the time being while the leased truck was being fixed. The company performing the truck repairs (also located at the same site as Defendants' main facility) billed $10,574.77 to Plaintiff Komorski for the vehicle repairs (in addition to the lease payments being deducted from his pay), but did little to fix the leased truck. Plaintiff Komorski complained, but only received mixed responses from the company owner, Thomas Dulian, who told Plaintiff Komorski that if he would drive more then he wouldn't have any problems paying the repair bill.

**ANSWER:**   **Defendants deny the allegations contained in paragraph 60 of the Complaint.**

61.     Toward the end of November 2020, Plaintiff Komorski notified Defendants that he would be leaving the company.

**ANSWER**: **Defendants admit that on or about November of 2020, Plaintiff Komorski terminated the Independent Contractor Agreement**

20

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

**entered into between his company, Michael Logistics, and Polmax Fleet, LLC. Defendants deny the remaining allegations contained in paragraph 61 of the Complaint.**

62.     In the beginning of December 2020, Plaintiff Komorski was paid around $2,500 for his last week of work.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 62 of the Complaint.**

63.     However, Defendants later informed their payroll company that Plaintiff Komorski's final wages were sent by error.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 63 of the Complaint.**

64.     On December 14, 2020, Plaintiff Komorski, who had already spent some of his hard-earned money on living costs and various Christmas purchases, was unconscionably forced into overdraft through his bank, resulting in a negative balance of $1,361.73.

**ANSWER**: **Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 64 of the Complaint regarding Plaintiff Komorski's financial status and therefore deny those allegations. Defendants deny the remaining allegations contained in paragraph 64 of the Complaint.**

65.     After an investigation by Plaintiff's bank, Plaintiff Komorski learned that it was in fact a payroll reversal unilaterally imposed by Defendants.

21

FILED DATE: 6/4/2021 2:52 PM  2021CH01601

**ANSWER**:   **Defendants deny the allegations contained in paragraph 65 of the Complaint.**

66.     He immediately reported this to Defendants, but received no response. Plaintiff Komorski later filed a police report for wage theft.

**ANSWER**: **Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 66 of the Complaint regarding whether Plaintiff made a report of theft to the police and therefore deny those allegations. Defendants deny the remaining allegations contained in paragraph 65 of the Complaint.**

## CLASS ACTION ALLEGATIONS

67.     Pursuant to 735 ILCS 5/2-801, Plaintiffs bring this action on behalf themselves and a Class with one Subclass defined as follows:

Class: All individuals who, within the applicable statute of limitations, (1) entered into Independent Contractor Agreements or similar agreements with Defendants; (2) personally performed services as a driver for Defendants in Illinois during the limitations period; (3) were not classified as employees of Defendants; and (4) had amounts deducted from their paychecks.

Subclass: All members of the Class who, within the applicable limitations period, had their final compensation withheld and/or reversed by Defendants.

**ANSWER:   Defendants admit that Plaintiffs purport to bring this case as a class action but deny that this case is suitable to be tried as a class action and deny the remaining allegations contained in paragraph 67 of the Complaint.**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

68.    Excluded from the Class and Subclass are any members of the judiciary assigned to preside over this matter; any officer or director of Defendants; and any immediate family member of such officer or director.

**ANSWER:   Defendants admit that Plaintiffs purport to bring this case as a class action and that Plaintiffs seek to exclude the individuals described in paragraph 68 from the class they seek to represent. Defendants deny that this case is suitable to be tried as a class action and deny the remaining allegations contained in paragraph 68 of the Complaint.**

69.    Upon information and belief, there are hundreds of members of the Class and Subclass, making the putative class members so numerous that joinder of  all members is impracticable. Although the exact number of members of the Class and Subclass is unknown to Plaintiffs, the members can easily be ascertained and identified through Defendants' personnel records.

**ANSWER:   Defendants deny the allegations contained in paragraph 69 of the Complaint.**

70.    Plaintiffs' claims are typical of the claims of the members of the Class and Subclass Plaintiffs seek to represent, because the factual and legal bases of Defendants' liability to Plaintiffs and the other Class and Subclass members are the same, and because Defendants' conduct has resulted in similar injuries to Plaintiffs and the other Class and Subclass members. As alleged herein, Plaintiffs and the other Class and Subclass members have all suffered damages in the form of unpaid wages and benefits as a result of Defendants' scheme to misclassify their drivers.

23

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**ANSWER**:   **Defendants deny the allegations contained in paragraph 70 of the Complaint.**

71. There are many questions of law and fact common to Plaintiffs' and the other Class and Subclass members' claims, and those questions predominate over any questions that may affect individual members. Common questions for the Class and Subclass include, but are not limited to, the following:

a.   Whether Plaintiff and the other Class members are "employees" as defined in the IWPCA;

b.   Whether Defendants misclassified their driver employees as independent contractors;

c.   Whether Defendants failed to pay Plaintiff and the other Class members the compensation they have earned and which is due and owing to them;

d.   Whether Defendants unlawfully deducted amounts from their drivers' paychecks for fees that Defendants should have paid;

e.   Whether Defendants unlawfully withheld final compensation from their employees at the time of termination; and

f.   Whether Plaintiffs and the other putative Class and Subclass members were denied the rights and benefits provided under the IWPCA.

**ANSWER**:   **Defendants deny the allegations contained in paragraph 71 of the Complaint.**

72.   Absent a class action, most members of the Class and Subclass would find the cost of litigating their claims to be prohibitively expensive and would thus have no

24

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions in that it conserves the resources of the courts and the litigants and promotes consistency of adjudication.

**ANSWER**: **Defendants deny the allegations contained in paragraph 72 of the Complaint.**

73. Plaintiffs will adequately represent and protect the interests of the members of the Class and Subclass. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class and have the financial resources to do so. Neither Plaintiffs nor Plaintiff's counsel have any interest adverse to those of the other members of the Class and Subclass.

**ANSWER**: **Defendants deny the allegations contained in paragraph 73 of the Complaint.**

74. Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the Class and Subclass, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and Subclass and making injunctive or corresponding declaratory relief appropriate for the Class and Subclass as a whole.

**ANSWER**: **Defendants deny the allegations contained in paragraph 74 of the Complaint.**

25

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## COUNT I
## VIOLATION OF THE ILLINOIS WAGE AND PAYMENT COLLECTION ACT,
### 820 ILCS 115, et seq.
### (on behalf of Plaintiffs and the members of the Class)

75.     Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth herein.

**ANSWER: Defendants incorporate by reference their answers to paragraphs 1 through 74 of the Complaint as if fully set forth herein.**

76.     Defendants violated the IWPCA, 820 ILCS 115/1 et seq., by causing Plaintiffs and the putative class members to incur expenses that should have been borne by Defendants, and thus failing to properly compensate Plaintiffs and the members of the putative Class for all hours worked.

**ANSWER:   Defendants deny the allegations contained in paragraph 76 of the Complaint.**

77.     Defendants violated the IWPCA, 820 ILCS 115/9, by making unlawful deductions from Plaintiffs and the putative class members' pay.

**ANSWER:   Defendants deny the allegations contained in paragraph 77 of the Complaint.**

78.     Defendant violated the IWPCA, 820 ILCS 115/9, by routinely deducting greater than 25% of the net amount of Plaintiffs and the putative class members' payments.

**ANSWER:   Defendants deny the allegations contained in paragraph 78 of the Complaint.**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

79.     Plaintiffs and the putative class members suffered and will continue to suffer damages including, but not limited to, loss of money incurred as a result of Defendants' misclassification and compensation deduction practices.

**ANSWER:   Defendants deny the allegations contained in paragraph 79 of the Complaint.**

80.     Plaintiffs, on behalf of himself and the putative class members, seeks all unpaid wages as well as reimbursement for all unlawful deductions taken by Defendants from their and the putative class members' pay.

**ANSWER:   Defendants admit that Plaintiffs purport to seek the relief described in paragraph 80 of the Complaint but deny that Plaintiffs are entitled to any such relief, deny that Defendants owe any unpaid wages or reimbursement for deductions to Plaintiffs or any of the individuals they seek to represent, and deny the remaining allegations contained in paragraph 80 of the Complaint.**

81.     WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for the following relief:

A.     Entry of an order certifying the Class and Subclass proposed above, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

B.     Restitution for all deductions taken from Plaintiffs and the Class members' pay;

27

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

C.    Restitution for all of Defendants' operating expenses that Plaintiffs and the Class were forced to bear;

D.    Statutory damages pursuant to the formula set forth in 820 ILCS l 15/14(a);

E.    Prejudgment interest;

F.    An award of reasonable attorneys' fees and costs; and

G.    Any other relief to which the Plaintiffs and the Class members may be entitled.

**ANSWER:   Defendants admit that Plaintiffs purport to seek the relief described in paragraph 81 of the Complaint but deny that Plaintiffs are entitled to any such relief and deny the remaining allegations contained in paragraph 81 of the Complaint.**

**COUNT II**
**COMMON LAW CONVERSION**
**(on behalf of Plaintiffs and the members of the Class and Subclass)**

82.    Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth herein.

**ANSWER: Defendants incorporate by reference their answers to paragraphs 1 through 81 of the Complaint as if fully set forth herein.**

83.    Plaintiffs and the members of the Class and Subclass had a right to retain their earned wages. Defendants have intentionally (i) withheld wages earned from Plaintiffs and Class and Subclass members, (ii) cut earned wages and/or deducted more

28

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

business expenses from Plaintiffs and Class and Subclass members, and (iii) cut the rate per mile the Plaintiffs and other Class and Subclass members earned.

**ANSWER**: **Defendants deny the allegations contained in paragraph 83 of the Complaint.**

84.     Plaintiffs and the other members of the Class and Subclass did not consent to Defendants cutting their earned wages as described above and thus Plaintiffs and the Class and Subclass members were harmed through the unauthorized amounts withheld and/or deducted.

**ANSWER**: **Defendants deny the allegations contained in paragraph 84 of the Complaint.**

85.     WHEREFORE, Plaintiffs, on behalf of themselves and the Class and Subclass, pray for the following relief:

A.     An order certifying the Class and Subclass as defined above, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

B.     An award of actual or compensatory damages in an amount to be determined at trial; and

C.     Granting such other relief as this Court deems just and proper.

**ANSWER**: **Defendants admit that Plaintiffs purport to seek the relief described in paragraph 85 of the Complaint but deny that Plaintiffs are entitled to any such relief and deny the remaining allegations contained in paragraph 85 of the Complaint.**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## AFFIRMATIVE DEFENSES

Defendants POLMAX LOGISTICS, LLC and POLMAX FLEET, LLC state the following facts supporting affirmative defenses to Plaintiffs' Complaint:

1.      Defendants incorporate by reference, as if fully set forth herein, their answers to the allegations in paragraphs 1 through 85 of the Complaint.

2.      In June of 2015, Plaintiff Michal Twardowski executed an Independent Contractor Agreement with Polmax Fleet, LLC. A copy of that agreement is attached as <u>Exhibit A</u>.

3.      In November of 2019, after Plaintiff Twardowski formed MTTM Transport Inc., MTTM Transport entered into an Independent Contractor Agreement with Polmax Fleet, LLC. A copy of that agreement is attached as <u>Exhibit B</u>. Plaintiff Twardowski worked as a truck driver for MTTM Transport to fulfill the transportation services it contracted to provide.

4.      In September of 2020, Plaintiff Michal Komorski's company, Michael Logistics Inc., entered into an Independent Contractor Agreement with Polmax Fleet, LLC. A copy of that agreement is attached as <u>Exhibit C</u>. Plaintiff Komorski worked as a truck driver for Michael Logistics to fulfill the transportation services it contracted to provide.

5.      The Independent Contractor Agreements attached as Exhibits A through C dictated the services provided by Plaintiffs and their respective companies, as well as the terms and conditions of payment for those services.

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

6.      Plaintiff Twardowski, MTTM Transport Inc. and Michael Logistics Inc. were paid in accordance with their respective contractual agreements.

7.      As part of their respective agreements with Polmax Fleet, LLC, Plaintiff Twardowski, MTTM Transport Inc. and Michael Logistics Inc. agreed to bear the cost of operational expenses and authorized Polmax Fleet, LLC to take certain deductions from their compensation.

8.      Both Plaintiffs were aware of what settlement deductions would be taken from them or their respective business entities' compensation under the terms of the Independent Contractor Agreements those entities entered into and consented to such settlement deductions.

9.      Both Plaintiffs were aware of the contractual settlement compensation rate they or their respective companies received under the terms of the Independent Contractor Agreements their companies entered into, accepted pay through their respective companies for the services provided at the time they entered into the agreements, and continued to accept pay under the terms of the respective agreements throughout the period of time that their companies provided services to Polmax Fleet, LLC.

10.      At all times that they provided transportation services to Polmax Fleet, LLC, Plaintiffs were free from the control and direction over the performance of their work. Because Plaintiffs, on behalf of their respective business entities, performed their work driving throughout much of the United States, Plaintiffs performed their work outside Defendants' places of business.

31

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

11.     As drivers qualified to perform transportation services under the terms of the applicable Independent Contractor Agreements, Plaintiffs were trained and licensed to drive commercial motor vehicles.

12.     Plaintiffs owned their own businesses. MTTM Transport Inc. was incorporated on June 3, 2019, before it entered into an Independent Contractor Agreement with Polmax Fleet, LLC in November of 2019.

13.     Similarly, Michael Logistics Inc. was incorporated on January 2, 2019, before it entered into an Independent Contractor Agreement with Polmax Fleet, LLC in September of 2020.

14.     Both entities remain registered with the Illinois Secretary of State as active corporations.

15.     Neither Plaintiff, nor any company they owned, ever contracted with or provided transportation services to Polmax Logistics, LLC.

16.     Plaintiffs were not employees of either Defendant under the IWPCA.

17.     Defendants incorporate its answers contained in paragraphs 1 through 85, as well as its factual pleading contained in paragraphs 1 through 16 of its Affirmative Defenses above, into each of the Affirmative Defenses set forth below, as follows:

## FIRST AFFIRMATIVE DEFENSE

18.     Plaintiffs' claims must be dismissed because they were not employed by either Defendant.

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## SECOND AFFIRMATIVE DEFENSE

19.     Plaintiffs' claims based on the allegation they were misclassified as independent contractors must be reduced by the doctrine of set off, rescission, and/or restitution.  The amounts that have been paid to them covered both the expenses of providing a truck and a qualified driver and, to the extent Plaintiffs seek to be re-classified as employees instead of independent contractors, they in effect seek to rescind their contracts and be compensated as employees. This requires that the parties be put back into the position they were in before they entered into the contracts, with Plaintiffs only being entitled to restitution for driving services they provided.

## THIRD AFFIRMATIVE DEFENSE

20.     Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' failure to mitigate their damages.

## FOURTH AFFIRMATIVE DEFENSE

21.     Plaintiffs' claims for improper deductions are barred, in whole or in part, because Plaintiffs gave Defendants written authorization to take the deductions from their settlement compensation.

## FIFTH AFFIRMATIVE DEFENSE

22.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands and/or the doctrine of waiver.

## SIXTH AFFIRMATIVE DEFENSE

23.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

FILED DATE: 6/4/2021 2:52 PM  2021CH01601

### SEVENTH AFFIRMATIVE DEFENSE

24. Plaintiffs' claims are barred, in whole or in part, by the doctrines of ratification and acquiescence.

### EIGHTH AFFIRMATIVE DEFENSE

25. Plaintiffs' claims are barred, in whole or in part, by the doctrine of avoidable consequences.

### NINTH AFFIRMATIVE DEFENSE

26. Plaintiffs' claims are barred, in whole or in part, because Plaintiffs consented to the alleged conduct of Defendants.

### TENTH AFFIRMATIVE DEFENSE

27. Plaintiffs' claims are barred, in whole or in part, because the recovery requested would not be a reasonable estimate of any actual damages but would instead amount to a disparate penalty akin to punitive damages for strict liability, given that Plaintiff and the putative class members have not suffered any injury or incurred any harm to warrant such relief.

### ELEVENTH AFFIRMATIVE DEFENSE

28. Plaintiffs' claims are barred, in whole or in part, because Defendants have paid Plaintiffs in full.

### TWELFTH AFFIRMATIVE DEFENSE

29. Plaintiffs' claims are barred, in whole or in part, because they have been fully compensated for any wages or expenses owed, and, by accepting the payments made to them, have effectuated an accord and satisfaction of their claims.

34

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## THIRTEENTH AFFIRMATIVE DEFENSE

30. Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

## FOURTEENTH AFFIRMATIVE DEFENSE

31. Plaintiffs' claims are barred, in whole or in part, because any award of statutory or punitive damages would constitute an unconstitutional penalty under the circumstances of this case, in violation of due process and equal protection guarantees.

## FIFTEENTH AFFIRMATIVE DEFENSE

32. Plaintiffs' claims are barred, in whole or in part, because the deductions were for Plaintiffs' benefit.

## SIXTEENTH AFFIRMATIVE DEFENSE

33. Plaintiffs' claims are barred, in whole or in part, because their independent contractor agreements are governed by the Illinois Leasing Regulations, 92 Ill. Admin. Code Part 1360, which authorize the deductions at issue.

## SEVENTEENTH AFFIRMATIVE DEFENSE

34. Plaintiffs' claims are barred, in whole or in part, to the extent they seek recovery related to work performed outside the state of Illinois because Illinois law does not apply to work or activities performed outside the state.

## EIGHTEENTH AFFIRMATIVE DEFENSE

35. To the extent that Plaintiffs lack standing, their claims should be dismissed.

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## NINETEENTH AFFIRMATIVE DEFENSE

36.     Plaintiffs' claims for pre-judgment interest may not be granted because the damages claimed by Plaintiffs are not sufficiently certain to allow an award of pre-judgment interest.

## TWENTIETH AFFIRMATIVE DEFENSE

37.     Plaintiffs' claims regarding Defendants' alleged misclassification of Plaintiffs and the class they seek to represent under Illinois law are preempted under the Supremacy Clause of the U.S. Constitution, U.S. CONST. art. VI, cl. 2, because they affect Defendants' prices, routes, and services within the meaning of the express preemption provision of the Federal Aviation Administration Authorization Act.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

38.     Plaintiffs' claims to recover deductions they specifically authorized in their federally regulated leases are preempted by the federal leasing regulations, 49 C.F.R. Part 376.

## APPLICATION OF DEFENSES IN EVENT OF CERTIFICATION

39.     Without waiving its ability to oppose class certification and explicitly asserting its opposition to the propriety of class treatment, if the Court does certify a class in this case over Defendants' objections, then Defendants asserts the affirmative defenses set forth above against each and every member of the certified class.

40.     Defendants will rely on all defenses lawfully available to it at the time of trial and reserve the right to amend its answer and affirmative defenses to include additional defenses after the completion of discovery.

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

WHEREFORE, Defendants POLMAX LOGISTICS, LLC, and POLMAX FLEET, LLC, respectfully request that Plaintiffs take nothing by way of their Class Action Complaint, for costs of this action, attorney fees, and all other appropriate relief.

Dated: June 4, 2021                    Respectfully submitted,

                                        _/s/ Andrew J. Butcher_____
                                       Andrew J. Butcher
                                       Chip Andrewscavage
                                       James S. Kramer
                                       SCOPELITIS, GARVIN, LIGHT, HANSON
                                       & FEARY, P.C.
                                       30 W. Monroe Street, Suite 1600
                                       Chicago, IL 60603
                                       Telephone: 312-255-7200
                                       abutcher@scopelitis.com
                                       candrewscavage@scopelitis.com
                                       jskramer@scopelitis.com

                                       *Attorneys for Defendants Polmax Logistics,
                                       LLC d/b/a Experior Logistics and Polmax
                                       Fleet, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing has been filed through the Court's electronic filing system with copies served upon the following counsel of record electronically and by United States Priority Mail, postage prepaid, this 4th day of June, 2021:

Myles McGuire
Paul Geske
Andrew T. Heldut
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, IL 60601

*/s/ Andrew J. Butcher*
Andrew J. Butcher
SCOPELITIS, GARVIN, LIGHT,
HANSON
 & FEARY, P.C.
30 West Monroe Street, Suite 1600
Chicago, IL 60603
Telephone: (312) 255-7200
abutcher@scopelitis.com

4833-9445-2965, v. 11

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

FILED
6/4/2021 2:52 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH01601
13574498

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

# VERIFICATION

Konrad Szczepaniec states that he is an authorized agent of Polmax Logistics, LLC and Polmax Fleet, LLC for the purpose of executing this Verification to Defendants' Answer to Plaintiff's Complaint ("Answer"). The Answer was prepared with the assistance of records available to the undersigned and the assistance of Polmax Logistics, LLC and Polmax Fleet LLC employees and representatives. The Answer is based on and necessarily limited by the records and information available at this time. Subject to inadvertent or undiscovered errors, and subject to the withholding of privileged matters, the responses disclaiming knowledge are true and correct. Under penalties as provided by law pursuant to §1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that he believes the above to be true. While the undersigned does not have personal knowledge of all the facts recited in the foregoing, the information contained therein has been collected and made available to him by others from sources usually searched to secure the necessary information or data; and therefore the foregoing allegations pertaining to Polmax Logistics, LLC and Polmax Fleet, LLC's lack of knowledge in the Answer are verified.

_____
Konrad Szczepaniec

Dated: June 4, 2021

4813-7407-3581, v. 4

Return Date: No return date scheduled
Hearing Date: 8/3/2021 10:00 AM - 10:00 AM
Courtroom Number: 2510
Location: District 1 Court
   Cook County, IL

FILED
6/4/2021 2:52 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH01601

13574498

FILED DATE: 6/4/2021 2:52 PM 2021CH01601

# EXHIBIT A

**POLMAX FLEET**
**INDEPENDENT CONTRACTOR AGREEMENT**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

Polmax ___ Fleet, LLC. ("CARRIER"), an authorized motor carrier, and *MICHAL INDRZYKOWSKI* ("CONTRACTOR"), in consideration of the covenants and agreements contained herein and pursuant to the federal leasing regulations under 49 C.F.R. Part 376, enter into this Independent Contractor Agreement ("Agreement") on *JUNE 6*, 20*15*.

1. **PROVISION OF SERVICES AND EQUIPMENT.** During the term of this Agreement, CONTRACTOR shall provide CARRIER professional truck driving services, other incidental transportation related services, and the use of the equipment set forth below or in an appendix (the "Equipment"). CONTRACTOR represents and warrants that CONTRACTOR has title to or is authorized to contract the Equipment and services to CARRIER, and such Equipment is used primarily for the transportation of property. CARRIER has not, as a condition of retaining CONTRACTOR's services, specified the person or entity from which the Equipment is to be leased or purchased. Upon taking possession of the Equipment from CONTRACTOR, CARRIER shall furnish to CONTRACTOR a receipt for Equipment, which shall constitute the receipt required by 49 C.F.R. § 376.11(b). Upon termination of this Agreement, CONTRACTOR shall execute a similar receipt for equipment as the written receipt for the return of the Equipment by CARRIER to CONTRACTOR; provided, however, that the Agreement and CARRIER's obligations thereunder shall expire upon the written notice of termination regardless of whether CONTRACTOR submits the receipt required under this provision.

| Year | Make | Serial No. | Unit # |
|------|------|-----------|--------|
| 2015 | FREIGHTLINER | 3AKGGLDS1FSG K4642 | 1036 |
|  |  |  |  |

2. **DURATION OF AGREEMENT AND TERMINATION.** This Agreement shall begin on the date set forth above and end exactly one (1) year thereafter. Either party may terminate this Agreement for any reason by giving fifteen (15) days written notice to that effect to the other party either personally, by mail, by fax machine at the address or fax number shown at the end of this Agreement, or by appropriate electronic means as outlined in Appendix C. The ability of either party to terminate this Agreement shall in no way be interpreted as an at-will employment provision and shall not otherwise affect CONTRACTOR's status as an independent contractor under this Agreement. The effective date and time of termination shall be as set forth in the written notice or the receipt for Equipment issued by CONTRACTOR, whichever date is earlier. CONTRACTOR shall, upon the termination of this Agreement, remove all CARRIER identification from the Equipment and return it to CARRIER, via hand delivery or certified mail, together with all of CARRIER's property, including trailers, paperwork, load securement equipment and freight, to CARRIER's nearest terminal. If CONTRACTOR fails to return CARRIER's property or freight to CARRIER or remove and return all CARRIER identification from the Equipment upon termination of this Agreement, CONTRACTOR shall pay CARRIER, all collections costs incurred by CARRIER, including reasonable attorney fees, and CARRIER may pursue all other remedies allowed by law or authorized in the Agreement against CONTRACTOR.

3. **COMPENSATION.** It is expressly understood and agreed that CONTRACTOR's compensation shall be as set forth in Appendix A, and such compensation shall constitute the total compensation for everything furnished, provided, or done by CONTRACTOR in connection with this Agreement, including driver's services. All mileage computations shall be based on the most recent edition of CARRIER's Mileage Guide. Although CARRIER shall use reasonable efforts to make shipments available to CONTRACTOR for transportation during the term of this Agreement, CONTRACTOR acknowledges and agrees that CARRIER does not guarantee any specific number of shipments or amount of revenue to CONTRACTOR during the term of this Agreement. CONTRACTOR shall be free to reject loads and may refuse any specific shipment offered by CARRIER. CONTRACTOR is not required to perform services, or be available to perform services, at specific times or according to a schedule or for a number of hours

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

specified by CARRIER, provided that pickup or delivery times specified by a shipper or receiver shall not be deemed specified by CARRIER, and CARRIER shall be free to communicate to CONTRACTOR any shipper, consignor or consignee requirements for lawful transit times, pickup times and scheduled deliveries without any effect on CONTRACTOR's status as an independent contractor. CONTRACTOR has the right to terminate the Agreement as provided in Section 2 above, without incurring any legal or equitable liability to CARRIER other than liability for damage to the property being carried or damage or injury caused as a result of the operation of the Equipment, and thereafter CONTRACTOR has the right to perform the same or similar services, on whatever basis and whenever he or she chooses, for persons or entities other than CARRIER. CONTRACTOR is not prohibited from entering into separate agreements to provide equipment and other professional truck drivers not identified as Equipment above or in an attachment and drivers not used to service this Agreement, to other motor carriers.

**4.    SETTLEMENT PERIOD.**  CARRIER shall settle with CONTRACTOR with respect to services provided under this Agreement within 15 calendar days after CONTRACTOR's submission, in proper form, of those documents necessary for CARRIER to secure payment from its customers, including the signed freight bill, delivery receipt or bill of lading, and properly completed logs as required by the U.S. Department of Transportation ("DOT"). Where CONTRACTOR is paid a percentage of revenue, CARRIER will provide CONTRACTOR with a copy of the rated freight bill (or a computed-generated summary) before or at the time of settlement. CONTRACTOR may examine CARRIER's tariffs, or other contracts or documents, if any, from which charges and rates are computed; provided, however, only that information that would appear on a rated freight bill will be disclosed by CARRIER. CARRIER shall have the right, but not as a condition of settlement and payment, to review all of CONTRACTOR's documents and records relating to the use of the Equipment and the services provided under this Agreement and CONTRACTOR agrees to provide CARRIER with access to such documents and records upon reasonable notice. With respect to final settlement upon termination of this Agreement, the failure on the part of CONTRACTOR to remove and return to CARRIER all identification devices of CARRIER or a letter certifying their removal shall entitle CARRIER to withhold any payments owed to CONTRACTOR until such obligation is met.

**5.    CHARGE BACK.**  CARRIER shall deduct from CONTRACTOR's compensation, at the time of payment to or settlement with CONTRACTOR, any liability or expense CARRIER has incurred or paid that, under this Agreement or any addendum to this Agreement, CONTRACTOR is obligated to bear. Such expenses shall be deducted from the amount of CONTRACTOR's settlement compensation and shall include those expenses set forth in Appendix A of this Agreement.   The amount of each item to be charged back to CONTRACTOR shall be computed based on the actual cost or expense incurred by CARRIER and any administrative fee or mark-up disclosed in Appendix A or elsewhere in this Agreement or any addendum thereto. CARRIER shall provide CONTRACTOR written itemization and documentation of all charge backs where such documentation is necessary to verify the validity of the charge.

**6.    INSURANCE.**  The respective obligations of the parties shall be as set forth in Appendix B. CARRIER shall maintain public liability, property damage and cargo insurance in such amounts as are required by the DOT and applicable state regulatory agencies.  CARRIER shall maintain insurance coverage for the protection of the public pursuant to 49 U.S.C. § 13906.  CARRIER's possession of legally required insurance shall in no way restrict CARRIER's right of indemnification from CONTRACTOR as provided under this Agreement.  It shall be considered a material breach of this Agreement where CONTRACTOR is determined by CARRIER or CARRIER's insurer to be uninsurable for any reason.

**7.    COMPLIANCE WITH PERTINENT LAWS AND REGULATIONS BY CONTRACTOR.** CONTRACTOR recognizes that CARRIER's separate and distinct business of providing motor carrier freight transportation service to the public is subject to regulation by the federal government acting through the DOT, and by various other federal, state, local, and foreign governing bodies.  As such, CONTRACTOR hereby acknowledges that he/she possesses full and complete understanding and knowledge of the DOT's CSA program (including, but not necessarily limited to, driver violations and

FILED DATE: 6/4/2021 2:52 PM 2021CH01601

ranking criteria). CONTRACTOR shall adhere to the following provisions of this Agreement to aid CARRIER in discharging its legal duties:

(a) **Drivers.** CONTRACTOR shall provide competent professional drivers who meet CARRIER's minimum driver qualification standards and all of the requirements of the DOT, including but not limited to, familiarity and compliance with state and federal motor carrier safety laws and regulations. As part of the driver qualification process, CONTRACTOR, and CONTRACTOR's drivers, shall authorize CARRIER to access applicable driver files, Driver Safety Measurement System ("DSMS") safety scores, and any other driver data or information available as part of DOT's CSA Driver Information Resource System ("DIRS"). The parties agree that CARRIER shall have the right to disqualify any driver provided by CONTRACTOR in the event that the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law or the criteria established by the DOT's CSA DIRS, in violation of CARRIER's minimum qualification standards, or in violation of any policies of CARRIER's customers. Drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet CARRIER's minimum qualification standards. Upon a driver's disqualification by CARRIER, CONTRACTOR shall be obligated to furnish another competent, reliable and qualified professional driver that meets the minimum qualification standards established by CARRIER. For all qualified drivers, CONTRACTOR agrees to provide CARRIER with updated DSMS and DIRS driver rankings on a monthly basis.

(b) **Paperwork Requirements.** CONTRACTOR shall submit to CARRIER, on a timely basis, all driver logs and supporting documents (including original toll receipts for CARRIER's reproduction), physical examination certificates, accident reports, and any other required data, documents or reports, including any documentary evidence that CARRIER requests proving CONTRACTOR has paid all taxes legally due and owing to any government body. As required by 49 C.F.R. § 376.12(l), CARRIER will keep the original of this Agreement with a copy to be maintained by CONTRACTOR, and a second copy to be carried in the Equipment during the term of this Agreement.

(c) **Shipping Documents.** CONTRACTOR agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of CARRIER, or as authorized by CARRIER, and shall indicate that the property transported is under the responsibility of CARRIER or a carrier with which the Equipment has been subcontracted.

(d) **Drug and Alcohol Testing.** CONTRACTOR and its drivers shall, as required by 49 C.F.R. § 382.103, comply with CARRIER's Drug and Alcohol Policy, including participation in CARRIER's random drug and alcohol testing program, and any addendums or revisions thereto.

(e) **Safe Operations.** CONTRACTOR agrees to operate the Equipment in a safe and prudent manner at all times so as to avoid endangering the public, the driver, and/or the property being transported and in accordance with this Agreement, the laws of the various jurisdictions in which the Equipment will be operated and pursuant to the operating authorities of CARRIER, and in accordance with all rules related to traffic safety, highway protection and road requirements. Moreover, CONTRACTOR agrees that all drivers and/or workers employed by CONTRACTOR will comply with the terms of this Agreement, including the requirement of safe operations, while operating the Equipment on behalf of CONTRACTOR. CONTRACTOR agrees that any driver utilized by CONTRACTOR will comply with CARRIER's policies and procedures and any subsequent revisions thereto, which will be provided by CARRIER.

(f) **CSA Compliance.** Beginning on the date the FMCSA makes its CSA Program effective as to CARRIER's and CONTRACTOR's operations under this Agreement, CONTRACTOR shall ensure that CONTRACTOR, and any drivers of CONTRACTOR, and CONTRACTOR's Equipment shall at all times meet CSA safety standards sufficient to enable CARRIER to (a)

3



FILED DATE: 6/4/2021 2:52 PM  2021CH01601

achieve and maintain a "fit" or similar rating that enables CARRIER to operate without FMCSA intervention or restriction pertaining to driver, equipment, and other CSA performance measures; (b) obtain insurance coverage without increased costs associated with driver, equipment, or other performance measures under CSA; and (c) be and remain competitive with similarly situated carriers with regard to safety performance measures under CSA. CONTRACTOR further agrees to notify CARRIER in writing within two (2) business days of receiving notification from the FMCSA that CONTRACTOR or any of its drivers have been deemed "unfit" or "marginal" based on their safety and compliance performance.

8.  **OPERATIONAL EXPENSES**.

(a)  **Operating Expenses**.  CONTRACTOR shall, at its sole cost and expense, provide all the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, state base plates and shall furnish all necessary oil, fuel, tires, and other parts, supplies and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment, including repairs for the operation of such Equipment.  CONTRACTOR shall pay all expenses incident to the operation of the Equipment, including, but not limited to, empty mileage, lumper expenses, highway use taxes, weight taxes, state property or indefinite situs taxes, fuel taxes, registration fees, ferry and toll charges, and detention and accessorial charges not collected by CARRIER because of CONTRACTOR's failure to provide the required documentation.

(b)  **Maintenance and Inspection**.  CONTRACTOR, at its sole cost and expense, shall maintain the Equipment in safe condition and in complete compliance with all laws and regulations of the states in which CONTRACTOR operates and the DOT.  In order to ensure compliance with all DOT regulations, CONTRACTOR shall, at its sole cost and expense, make the Equipment available for inspection by CARRIER upon reasonable request by CARRIER. CONTRACTOR shall, at its sole cost and expense, have the Equipment inspected annually, as required by 49 C.F.R. § 396.17, at CARRIER's maintenance facility or at another maintenance facility which CARRIER may, in its sole discretion, authorize.  CONTRACTOR shall, as directed by CARRIER, forward to CARRIER all inspection, maintenance and repair records for the Equipment.

(c)  **Fines**.  CONTRACTOR or its drivers (as professional drivers engaged in a separate and distinct profession) agree to pay all fines, including but not limited to parking and traffic fines and penalties, imposed for violation of any law or regulation by the state or any locality in which CONTRACTOR operates, or the DOT, where such violation results, at least partially, from the acts or omissions of CONTRACTOR.

(d)  **Overweight and Oversized Shipments**.  CONTRACTOR or CONTRACTOR's drivers (as professional drivers engaged in a separate and distinct profession) shall have the duty to determine that all shipments are in compliance with the size and weight laws of the states in which or through which the Equipment will travel and to notify CARRIER if the vehicle is overweight, oversized or in need of permits before commencing the haul.   Except when the violation results from the acts or omissions of CONTRACTOR, CARRIER shall assume the risks and costs of fines for overweight and oversize trailers when such trailers are preloaded and sealed, or the load is containerized, or for improperly permitted oversized and overweight loads, or the trailer or lading is otherwise outside of CONTRACTOR's control.  CONTRACTOR shall pay, or reimburse CARRIER, for any costs or penalties due to CONTRACTOR's failure to weigh each shipment or to notify CARRIER that the vehicle is overweight, oversized or in need of permits.

(e)  **License Plates**.  If CONTRACTOR elects, by initialing **OPTION 1** below, to obtain CONTRACTOR's own base plate under the International Registration Plan ("IRP") for use by CONTRACTOR, CONTRACTOR shall be solely responsible for the cost of such plate.  If

CONTRACTOR does not so elect, instead initialing **OPTION 2** below, then CARRIER shall obtain such base plate, and CARRIER will chargeback to CONTRACTOR the full actual cost of the plate, which amount shall be deducted from CONTRACTOR's compensation. CONTRACTOR shall remove and return such plate to CARRIER upon the termination of this Agreement and, in the event CONTRACTOR fails or refuses to do so, CARRIER shall, and is hereby authorized to, deduct the full cost of the plate from CONTRACTOR's final settlement and escrow funds. If CARRIER receives a refund or credit for an IRP plate registered in the name of CARRIER or such base plate is authorized by CONTRACTOR to be resold by CARRIER to another contractor, CARRIER shall refund to CONTRACTOR a pro-rata share of the amount received by CARRIER. CONTRACTOR shall not be entitled to reimbursement for any unused portion of a base plate, however, unless CARRIER is able to reuse or resale the plate to another contractor.

| **CONTRACTOR OPTIONS** | **CONTRACTOR INITIALS (CHOOSE ONLY ONE)** |
| --- | --- |
| **OPTION 1:** CONTRACTOR shall obtain his or her own base plate under the International Registration Plan ("IRP") for use by CONTRACTOR at CONTRACTOR's expense. | |
| **OPTION 2:** CARRIER shall obtain the base plate and. CONTRACTOR shall pay CARRIER the full cost of the plate. | |

(f)    <u>Fuel Taxes</u>. **(i)** <u>**CONTRACTOR elects responsibility for fuel taxes**</u>. If CONTRACTOR elects, by initialing **OPTION 1** below, to obtain CONTRACTOR's own IFTA Fuel Tax Permit and perform CONTRACTOR's own fuel and mileage tax reporting, CONTRACTOR shall be solely responsible for calculating, reporting, and paying all fuel taxes owed for the operation of the Equipment; and shall indemnify, defend, and hold CARRIER harmless against all claims arising out of or relating to such fuel tax reporting and payment.

**(ii)** <u>**CONTRACTOR does not elect responsibility for fuel taxes**</u>. If CONTRACTOR does not so elect, instead initialing **OPTION 2** below, then CARRIER shall be deemed the motor carrier with respect to the Equipment and shall submit, in its own name, all required reports and payments of fuel use taxes owed with respect to the Equipment under this Agreement. To assist in CARRIER's computing and payment of fuel taxes, it shall issue CONTRACTOR a limited-purpose credit card issued by a third-party financial-services company and made available by CARRIER ("CARRIER Fuel Card") that CONTRACTOR may use for fuel purchases. CONTRACTOR and CONTRACTOR's drivers are free not to use CARRIER Fuel Card but, to the extent they choose not to, CONTRACTOR shall provide CARRIER promptly with all properly completed driver logs, original fuel receipts (each to be submitted with the corresponding log indicating the fuel purchase for which the receipt was obtained), original toll receipts, and an accurate accounting of all fuel purchases and miles traveled by state. Excess fuel taxes owed with respect to CONTRACTOR's Equipment will be calculated on a per unit basis and deducted without mark-up.

| **CONTRACTOR OPTIONS** | **CONTRACTOR INITIALS (CHOOSE ONLY ONE)** |
| --- | --- |
| **OPTION 1:** CONTRACTOR shall obtain IFTA permit and perform all fuel and mileage tax reporting with respect to the Equipment at CONTRACTOR's expense; **OR** | |
| **OPTION 2:** CARRIER shall obtain the IFTA permit, and CARRIER shall perform all fuel and mileage tax reporting services, with respect to the Equipment. CONTRACTOR shall be liable for excess taxes on a per-unit basis. | _____ |

FILED DATE: 6/4/2021 2:52 PM  2021CH01601

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**9.    CARGO CLAIMS.**  CONTRACTOR shall immediately report all cargo claims, including all shortages, overages or other exceptions to the cargo, to CARRIER.  CONTRACTOR shall be liable for, and CARRIER shall charge back to CONTRACTOR, the first $2,500 of each cargo claim, including but not limited to, delay, shortages, misdelivery, and any direct damage claim relating to lost, damaged or contaminated loads, arising out of, or in connection with CONTRACTOR's services.  The dollar limit in this paragraph shall not apply to damages arising out of or in connection with such claims if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') gross negligence, willful misconduct, breach of this Agreement, or other culpable acts or omissions. Before deducting any cargo claim from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization for each such claim.

**10.    USE OF CARRIER'S TRAILER.**  CONTRACTOR agrees to return any trailer, trailer equipment of any kind or purpose, or chassis provided for its use by CARRIER in the same good condition as received by CONTRACTOR, reasonable wear and tear excepted, along with any and all other equipment and property belonging to CARRIER immediately upon CARRIER's request or upon termination of this Agreement.  In the event the trailer is not in as good as condition as it was delivered by CARRIER, CONTRACTOR hereby authorizes CARRIER to restore the trailer to proper condition and to charge back to CONTRACTOR the costs of such repairs or reconditioning.  In the event CONTRACTOR for any reason fails to comply with this provision and return CARRIER's trailer, CONTRACTOR agrees to reimburse CARRIER for all reasonable expense and costs, including attorney fees, incurred by CARRIER in recovery of its trailer or property from CONTRACTOR or its drivers.  CONTRACTOR agrees that in the event it is necessary for CARRIER to enter upon private property or remove private property in order to recover its trailer and property, CONTRACTOR does hereby irrevocably grant CARRIER or its duly authorized agents, permission to do so and further agrees to indemnify and hold harmless CARRIER, and its duly authorized agents, from any form of liability whatsoever in connection with such repossession.  CONTRACTOR shall be liable for, and pay, the entire amount for each incident involving direct, indirect and consequential damage, including but not limited to, towing charges, replacement costs for a total loss, arising out of, or in connection with, CONTRACTOR's use of CARRIER's trailers, CARRIER's customer's trailers, other CARRIER equipment, or equipment of any other carrier. Before deducting any such damage from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization of such damage. CONTRACTOR agrees and warrants that any trailer provided for use by CARRIER will only be used by CONTRACTOR and its drivers to transport shipments tendered to CONTRACTOR by CARRIER.

**11.    ACCIDENTS AND CLAIMS.**  CONTRACTOR shall immediately report any accident or potential claim to CARRIER involving operations under this Agreement.  CONTRACTOR and its drivers shall cooperate fully with CARRIER with respect to any legal action, regulatory hearing or other similar proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder. CONTRACTOR shall, upon CARRIER's request and at CONTRACTOR's sole expense, provide written reports or affidavits, attend hearings and trials and assist in securing evidence or obtaining the attendance of witnesses.  CONTRACTOR shall provide CARRIER with any assistance as may be necessary for CARRIER or CARRIER's representatives or insurers to investigate, settle or litigate any accident, claim or potential claim by or against CARRIER.

**12.    HOLD HARMLESS.**  Except to the extent CONTRACTOR's acts or omissions are covered under the parties' respective insurance policies as set forth in Appendix B with no expense to CARRIER, CONTRACTOR agrees to defend, indemnify and hold harmless CARRIER from any direct, indirect and consequential loss, damage, fine, expense, including reasonable attorney's fees, action, claim for injury to persons, including death, and damage to property which CARRIER may incur arising out of or in connection with the operation of the Equipment, CONTRACTOR's obligations under this Agreement, or any breach by CONTRACTOR of the terms of this Agreement.  CONTRACTOR's liability under this provision may be capped in Appendix A.  This provision shall remain in full force and effect both during and after the termination of this Agreement.

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**13.**   **CARRIER RESPONSIBILITIES.**

**(a)**   **Exclusive Possession and Responsibility.**  The Equipment shall be for CARRIER's exclusive possession, control, and use for the duration of this Agreement.   As such, CONTRACTOR shall not operate the Equipment for any other motor carrier or entity during the term of this Agreement without prior written consent from CARRIER.  CARRIER shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement. This subparagraph is set forth solely to conform with DOT regulations and shall not be used for any other purposes, including any attempt to classify CONTRACTOR as an employee of CARRIER.  Nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether CONTRACTOR or its drivers are an independent contractor or an employee of CARRIER.  An independent contractor relationship may exist when a carrier complies with 49 U.S.C.  §  14102  and  attendant  administrative  requirements.   Notwithstanding the above, Contractor is not prohibited from providing transportation services for other common or contract carriers or any other person or entity, provided that Contractor complies with the trip lease requirements set forth under federal law in 49 C.F.R. Part 376.  CONTRACTOR may trip lease or subcontract the Equipment to a third party upon receiving prior authorization from CARRIER. CARRIER assumes no responsibility for the collection of freight charges or payment to CONTRACTOR for any trip-lease or subcontract related revenue.  During the term of any trip lease or subcontract, CONTRACTOR will remove or cover up all of CARRIER's identification on the Equipment and display instead the trip-lease carrier's identification and, as between CONTRACTOR and CARRIER, CARRIER will have no responsibility for, and CONTRACTOR will fully indemnify CARRIER regarding, the operation of the Equipment.

**(b)**   **Identification of Equipment.**  CARRIER shall identify the Equipment in accordance with the requirements of the DOT and appropriate state regulatory agencies.  CARRIER shall have the right to place and maintain on the Equipment CARRIER's name and any lettering, advertisement, slogans or designs as CARRIER may choose.  CONTRACTOR shall remove such identification at the termination of this Agreement or while operating such Equipment for any purpose other than conducting CARRIER's business.  At its discretion, CONTRACTOR may have the identification permanently painted on the Equipment.  CONTRACTOR further agrees to keep the Equipment in clean appearance and identified as described herein, at its sole cost and expense. CARRIER agrees that CONTRACTOR may display CONTRACTOR's name and address on the Equipment where required by applicable state law.

**14.**   **CONTRACTOR NOT EMPLOYEE OF CARRIER.**

**(a)**   **CONTRACTOR is an Independent Contractor.**  It is expressly understood and agreed that CONTRACTOR is an independent contractor for the Equipment and driver services provided pursuant to this Agreement.  CONTRACTOR agrees to defend, indemnify and hold CARRIER harmless for any claims, suits, or actions, including reasonable attorney's fees in protecting CARRIER's interests, brought by employees, any union, the public, or state or federal agencies, arising out of the operation of the Equipment or the providing of driver services under this Agreement.  CONTRACTOR also agrees to provide necessary documentation and apply for certification of its independent contractor status where mandated by applicable state law, including but not limited to, the State of South Dakota.  CONTRACTOR hereby assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, wages and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, workers' compensation, adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of CONTRACTOR's use or employment of drivers and laborers, and any and all other employees or agents of CONTRACTOR that CONTRACTOR may provide or use to perform any aspect of this Agreement.  CONTRACTOR shall be solely responsible for complying with any and all state and federal laws, rules and regulations that may be applicable to the terms and conditions of employment of CONTRACTOR's employees or applicants for employment, including, without

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of highway use tax being currently paid when the CONTRACTOR purchases its license; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and, other required withholdings for CONTRACTOR's employees.   CONTRACTOR's performance of these responsibilities shall be considered proof of its status as an independent contractor in fact.  Proof of such control and responsibility shall be submitted by CONTRACTOR to CARRIER as required by CARRIER and may include, but not be limited to, proof of highway use tax being currently paid, proof of income tax being currently paid, and proof of payment of payroll tax for CONTRACTOR's drivers.  For the purposes of this section, the term CONTRACTOR refers to the owner of the Equipment as well as drivers that may be operating the Equipment on behalf of the owner.  As required by law, CARRIER agrees to file information tax returns (Form 1099) on behalf of CONTRACTOR if CONTRACTOR is paid more than the statutory amount in compensation during a calendar year.

**(b)**     **CONTRACTOR-CARRIER Relationship**. CONTRACTOR either leases the equipment or holds title to the Equipment, and such Equipment is used primarily for the transportation of property. CONTRACTOR shall be free to reject loads tendered to CONTRACTOR by CARRIER. CARRIER has not, as a condition for retaining CONTRACTOR's services, specified the person or entity from which the Equipment is to be leased or purchased. As set forth in this Agreement, CONTRACTOR shall pay all costs of licensing and operating the Equipment (except when federal or State law or regulation requires CARRIER to pay). Such costs shall not be separately reimbursed by any other individual or entity. CONTRACTOR is not required by CARRIER to perform services, or be available to perform services, at specific times or according to a schedule or for a number of hours specified by CARRIER, provided that pickup or delivery times specified by a shipper or receiver shall not be deemed specified by CARRIER, and CARRIER shall be free to communicate to CONTRACTOR any shipper, consignor or consignee requirements for lawful transit times, pickup times and scheduled deliveries without any effect on CONTRACTOR's status as an contractor. CONTRACTOR shall at its expense maintain a separate business identity, offering or advertising his or her services to the public, by displaying its name and address on the Equipment or otherwise. CONTRACTOR shall at its expense maintain a separate business identity, offering or advertising his or her services to the public, by displaying its name and address on the Equipment or otherwise. CONTRACTOR has the right to terminate the Agreement as provided therein, without incurring any legal or equitable liability to CARRIER other than liability for damage to the property being carried or damage or injury caused as a result of the operation of the Equipment, and thereafter CONTRACTOR has the right to perform the same or similar services, on whatever basis and whenever he or she chooses, for persons or entities other than CARRIER.

**15.**     **BREACH.** Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated, at any time, by either party in the event of a party's actual or threatened commitment of a felony or intentional tort; violation of, or failure to comply fully with, the requirements of any applicable federal, state, local, and foreign authorities, including but not limited to DOT, state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"); material breach of this Agreement; or the occurrence of an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5, that, in CARRIER's reasonable judgment, was caused in whole or in part by CONTRACTOR's negligence, gross negligence, or willful misconduct, then the other party may elect to terminate the Agreement by giving immediate oral, followed by written, notice of termination to the offending party.  If, in CARRIER's judgment, CONTRACTOR has subjected CARRIER to liability because of CONTRACTOR's acts or omissions, CARRIER may take possession of the shipment entrusted to CONTRACTOR and complete performance.  In such event, CONTRACTOR shall waive any recourse against CARRIER for such action and CONTRACTOR shall reimburse CARRIER for all direct or indirect costs, expenses, or damages, including attorney's fees, incurred by CARRIER as a result of CARRIER's taking possession of the shipment and completing performance.

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**16.** <u>**CONTRACTOR NOT REQUIRED TO PURCHASE PRODUCTS, EQUIPMENT, OR SERVICES FROM CARRIER.**</u>  CONTRACTOR is not required to purchase or rent any products, equipment, or services from CARRIER as a condition of entering into this Agreement.  In the event CONTRACTOR elects to purchase or rent equipment from CARRIER or from any third party, for which the purchase or rental contract gives CARRIER the right to make deductions from CONTRACTOR's settlement, then the parties mutually agree to attach and incorporate each such contract, specifying all terms thereof, to this Agreement as a separate addendum.

**17.** <u>**PASSENGER AUTHORIZATION.**</u>  As required by 49 C.F.R. § 392.60, CONTRACTOR shall not allow any passengers to ride in the Equipment unless authorized in writing by CARRIER as required by law.  Before passenger authorization will be given by CARRIER, CONTRACTOR (or its driver) and the passenger requesting authorization shall submit a fully executed Passenger Authorization and Release of Liability form to CARRIER for prior approval together with evidence of Passenger Insurance meeting the requirements of <u>Appendix B</u>.

**18.** <u>**LOADING AND UNLOADING.**</u>  In the event the shipper or consignee does not assume loading and unloading responsibilities, CONTRACTOR shall be responsible for the loading or unloading of property transported on behalf of CARRIER at CONTRACTOR's expense.

**19.** <u>**CONFIDENTIALITY.**</u>  CONTRACTOR hereby recognizes and acknowledges that any list of CARRIER's customers, as it may exist now or from time to time, is a valuable, special and unique asset of the business of CARRIER.  CONTRACTOR agrees, during and after the term of this Agreement, not to disclose the list of CARRIER's customers or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever without CARRIER's prior written consent.  CONTRACTOR agrees to preserve as "Confidential Matters", all trade secrets, know how and information relating to CARRIER's business, forms, processes, developments, sales and promotional systems, prices and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, or other contractors, and other sources of any kind resulting from this Agreement.  CONTRACTOR agrees to regard such Confidential Matters as the sole property of CARRIER, and shall not publish, disclose or disseminate the same to others without the written consent of CARRIER.  In the event of any breach or threatened breach by CONTRACTOR of the provisions of this paragraph, CARRIER shall be entitled to an injunction, restraining CONTRACTOR from disclosing, in whole or in part, the list of CARRIER's customers, and all other Confidential Matters.  CONTRACTOR agrees that CARRIER will be irreparably damaged in the event of any breach of this provision by CONTRACTOR.  Accordingly, in addition to any other legal or equitable remedies that may be available to CARRIER, CONTRACTOR agrees that CARRIER will be able to seek and obtain immediate injunctive relief in the form of a temporary restraining order without notice, preliminary injunction, or permanent injunction against CONTRACTOR to enforce this confidentiality provision.  CARRIER shall not be required to post any bond or other security and shall not be required to demonstrate any actual injury or damage to obtain injunctive relief from the courts. Nothing hereunder shall be construed as prohibiting CARRIER from pursuing any remedies available to CARRIER at law or in equity for such breach, including the recovery of monetary damages from CONTRACTOR.

**20.** <u>**BENEFIT AND ASSIGNMENT.**</u>  This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors.  CONTRACTOR may not assign or subcontract all or a portion of its obligations to another party without the prior written consent of CARRIER.

**21.** <u>**NOTICE.**</u>  All notices required or permitted by this Agreement shall be in writing delivered personally, by postage prepaid, first class mail, by facsimile machine to the addresses or fax number shown at the end of this Agreement, or by appropriate electronic means as outlined in <u>Appendix D</u>.

**22.** <u>**NON-WAIVER.**</u>  The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement, or to exercise any right in any one or more instances or circumstances shall

9

not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a customary practice contrary to such provision or right.

**23.** **SEVERABILITY.** If any Agreement or its appendices is deemed invalid for any reason whatsoever, the Agreement shall be void only as to such provision, and this Agreement shall remain otherwise binding between the parties. Any provision voided by operation of the foregoing shall be replaced with provisions which shall be as close as the parties' original intent as permitted under applicable law.

**24.** **GOVERNING LAW AND CHOICE OF FORUM.** This Agreement is to be governed by the laws of the United States and of the State of Illinois, without regard to the choice-of-law rules of Illinois or any other jurisdiction. The parties further agree that any claim or dispute arising from or in connection with this Agreement or otherwise with respect to the overall relationship between the parties, whether under federal, state, local, or foreign law, shall be brought exclusively in state or federal courts located in Cook County, Illinois.

**25.** **COMPLETE AGREEMENT.** The Agreement (including the Appendices and any addendums) constitute the entire agreement between CARRIER and CONTRACTOR pertaining to the subject matter contained herein and fully replaces and supersedes all prior and contemporaneous agreements, representations, and understandings. No supplement, modification, or amendment to the Agreement shall be binding unless in writing and signed by both CARRIER and CONTRACTOR, except as otherwise provided with respect to deductions in Section 3 of Appendix A and insurance deductions in Section 6 of Appendix B. No waiver of any of the provisions of the Agreement shall constitute a waiver of any other provisions whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be deemed effective or binding upon the CONTRACTOR unless executed in writing by the party making the waiver.

*[Signatures On Next Page]*

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**IN WITNESS WHEREOF,** CARRIER and CONTRACTOR hereby sign this Agreement as of the date stated above.

**POLMAX FLEET, LLC., CARRIER:**

Fax: 708-843-8301
**12161 South Central**
Alsip, IL 60803
Address

By: _____

PAULINA FORTE
Printed Name

MICHAL TWAROWSKI
**CONTRACTOR:**

Fax: _____

5658 S NEWCASTLE Ave.
CHICAGO, IL 60638
Address

Phone: _____

Cell Phone: 224 7171 735

FEIN or SSN: 320 08 7581

E-Mail Address: twardy0714@gmail.com

By: _____

TWAROWSKI MICHAL
Printed Name

11

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## RECEIPT FOR POSSESSION OF CONTRACTED VEHICLE(S)

Received from CONTRACTOR the vehicle or vehicles described in this Agreement.

Equipment received at _12161 S. CENTRAL AVE_ on _June, 24th_, 20 _15_
at _9_ : _43_ o'clock _A_ .M.

By: _Paulina Forte_
(CARRIER Representative)

_PAULINA FORTE_
Printed Name

## RECEIPT FOR RETURN OF CONTRACTED VEHICLE(S)

Received from CARRIER the vehicle or vehicles described in this Agreement in good order.

Equipment received at _____ on _____, 20____
at ____:____ o'clock ____.M.

By: _____
(CONTRACTOR Representative)

_____
Printed Name

**RECEIPTS**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## Appendix A

### CONTRACTOR's Compensation

1.  **COMPENSATION.** CARRIER and CONTRACTOR shall agree in advance upon CONTRACTOR's compensation to be paid for services relating to shipments under this Agreement by both parties' signing an addendum to this Agreement, setting forth such agreed upon compensation prior to loading. Compensation set forth in such addendums shall constitute the entire compensation to which CONTRACTOR is entitled under this Agreement for all services performed with respect to the shipment(s) identified or referred to therein. CONTRACTOR shall EITHER manually sign the addendum and deliver it to CARRIER by hand, fax, or overnight delivery OR electronically sign it pursuant to Section 2 below. For electronic agreements, CARRIER shall deliver to CONTRACTOR for CONTRACTOR's files a paper copy of the executed addendum, which, if CONTRACTOR signed the addendum electronically, shall state in the signature block the date of CONTRACTOR's electronic approval. Copies of any fully-signed addendum pursuant to the provisions above shall be attached by CONTRACTOR and CARRIER to their respective copies of the Agreement. CONTRACTOR shall not load any shipment for CARRIER until CONTRACTOR has furnished CARRIER a manual or electronically signed addendum stating the compensation for such shipment.

2.  **Consent to Conduct Business Using Electronic Methods.** Pursuant to Regulatory Guidance Concerning Electronic Signatures and Documents, 74 Fed. Reg. 411 (Jan. 4, 2011) issued by the Federal Motor Carrier Safety Administration ("FMCSA"), CARRIER and CONTRACTOR hereby consent and agree to conduct business using facsimile transmissions of hardcopy signatures, or e-mail, text, or other electronic communications setting forth the agreement and stating the party's intent that the transmission constitutes the party's signature. This consent encompasses the use of electronic methods to effect the signature of CONTRACTOR and CARRIER on addendums containing their agreements to compensation to be paid for services relating to shipments under this Agreement pursuant to Section 1 above. CONTRACTOR agrees that the above electronic methods, which the parties have adopted to effect electronic signatures: (1) identifies and authenticates CONTRACTOR as the source of the electronic communication; (2) indicates CONTRACTOR's approval of the information contained in the electronic communication; and (3) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature. Either party may elect, with respect to any document, to use a manual/hardcopy signature, provided that such election shall not preclude the other party from applying an electronic signature to the same document.

3.  **Addendums.** Copies of any fully-signed addendum pursuant to Section 1 above shall be attached by CONTRACTOR and CARRIER to their respective copies of the Agreement.

4.  **CHARGE BACK ITEMS.** The following items shall be charged back and deducted from CONTRACTOR's compensation or from CONTRACTOR's escrow funds in the event that CONTRACTOR's compensation is insufficient:

| CHARGE BACK ITEM | COST | ADMINISTRATIVE CHARGE |
|---|---|---|
| Advances in Compensation | Actual | None |
| Fuel and Fuel Taxes | See Section 8(f) | See Section 8(f) |
| Other Operating Expenses (See Section 8) | Actual | None |
| IRP Plate | See Section 8(e) | See Section 8(e) |
| Cargo Claim | Actual up to $25,000 | None |
| C.O.D. Charges | Actual | None |
| Fines and Penalties | Actual | None |
| Trailer Damage | Actual up to $25,000 | None |

**APPENDIX A**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

| CHARGE BACK ITEM | COST | ADMINISTRATIVE CHARGE |
|---|---|---|
| Insurance Costs | See Appendix B | See Appendix B |
| Hold Harmless/Accident Claims | See Section 12 | None |

CONTRACTOR agrees that CARRIER may charge back to CONTRACTOR any other expenses or cost incurred by CARRIER for which CONTRACTOR is responsible for under this Agreement or as otherwise agreed to by the parties. CONTRACTOR hereby waives any objection to any charge back item unless CONTRACTOR notifies CARRIER of CONTRACTOR's disagreement with such charge back within thirty (30) days of the charge back.

5.  **CHANGES IN EXISTING DEDUCTION ITEMS.** If an item in any of the above columns will be changing, CONTRACTOR shall be so notified by personal delivery, fax, other written notice, or by appropriate electronic means as outlined in Appendix D. In any event, CONTRACTOR shall not be subject to any such change until ten (10) calendar days after such notice or such later time as is set forth in the notice. **CONTRACTOR's failure, by the end of ten calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's Settlement Compensation, beginning immediately after the ten-day period.** Such modified amounts shall replace and supersede those shown in the table in Section 2 above. If CONTRACTOR fails to notify CARRIER of CONTRACTOR's objection within the ten-day period – or if CONTRACTOR notifies CARRIER of CONTRACTOR's objection within the ten-day period and the parties are then unable to resolve the matter, the parties shall each have the right to terminate the Agreement immediately thereafter. Once the change becomes effective, CONTRACTOR still retains the right to terminate the Agreement in accordance with the procedures set forth in Section 2 of the Agreement (although CONTRACTOR shall remain subject to the change until the effective date and time of CONTRACTOR's termination).

THIS APPENDIX is agreed to by the undersigned parties as of the latest date set forth below.

POLMAX FLEET LLC., CARRIER:               CONTRACTOR:

By: _____          By: _____

PAULINA FORTE                          INARIDINSHIM
Printed Name                           Printed Name

Dated: ___6/24/2015___                 Dated: ___06/24/15___



FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## Appendix B

### INSURANCE AND ALLOCATION OF LIABILITY

1.    **CARRIER'S INSURANCE OBLIGATIONS**.   It shall be CARRIER's responsibility, pursuant to DOT regulations promulgated under 49 U.S.C. § 13906 and  pursuant to applicable state laws, to provide public liability, property damage, and cargo liability insurance for the Equipment at all times while the Equipment is being operated on behalf of CARRIER.  However, CARRIER's possession of such insurance shall in no way affect CARRIER's rights of indemnification against CONTRACTOR as provided for in this Agreement.

2.    **CONTRACTOR'S INSURANCE OBLIGATIONS**.  CONTRACTOR shall maintain, at its sole cost and expense, the following minimum insurance coverages during this Agreement:

(a)    **NON-TRUCKING LIABILITY** - CONTRACTOR shall procure, carry, and maintain public liability and property damage insurance which shall provide coverage to CONTRACTOR whenever the Equipment (as well as any CARRIER trailer) is not being operated on behalf of CARRIER (including, but not limited to, whenever the Equipment is being operated on behalf of others pursuant to a Trip Lease or whenever the Equipment is being operated on behalf of CONTRACTOR alone) in a combined single limit of not less than One Million Dollars ($1,000,000) for injury or death to any person or for damages to property in any one occurrence.   Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.  In addition, such coverage shall be primary to any other insurance that may be available from CARRIER. CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

(b)    **WORKERS' COMPENSATION/OCCUPATIONAL ACCIDENT INSURANCE**. CONTRACTOR shall provide workers' compensation insurance coverage for CONTRACTOR (if a natural person), all of its employees and agents, anyone driving the Equipment, and any other persons required to be covered under the worker's compensation law of any state that is reasonably likely to have jurisdiction over CONTRACTOR's business operations and in amounts not less than the statutory limits required by such applicable state law.  The worker's compensation insurance policy shall provide principal coverage in Illinois as well as the state in which the work is principally localized, and shall provide "other states coverage" that excludes only North Dakota, Ohio, Washington, and Wyoming.  As evidence of such coverage, CONTRACTOR shall provide CARRIER with a copy of the insurance policy declarations page for CARRIER's verification before operating the Equipment under this Agreement.  Such coverage shall be  no  less  comprehensive  than  the  coverage  CARRIER  will  facilitate  on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.  If (a) CONTRACTOR is the sole owner and the sole and exclusive operator of the Equipment and (b) the state in which the work is principally localized is not Colorado, Massachusetts, Nevada, New Hampshire, New Jersey, or North Carolina, then CONTRACTOR may, as an alternative to obtaining workers' compensation coverage, obtain occupational accident insurance policy that includes either an endorsement or a separate policy provision whereby the insurer provides, or agrees to provide, workers' compensation coverage that becomes effective for a claim by CONTRACTOR alleging employee status.  Such occupational accident insurance coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.

(c)    **PASSENGER INSURANCE**.  CONTRACTOR shall procure, carry, and maintain passenger liability insurance that shall provide coverage to CONTRACTOR whenever the Equipment is being operated (whether or not on behalf of CARRIER) in a combined

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

single limit of not less than One Hundred Thousand Dollars ($100,000) for injury or death to any person riding as a passenger in the Equipment or for damages to that person's property in any one occurrence. Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix. In addition, such coverage shall be primary to any other insurance that may be available from CARRIER. CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

**(d)** **OTHER INSURANCE.** In addition to the insurance coverages required under this Agreement, it is CONTRACTOR'S responsibility to procure, carry and maintain any fire, theft, uninsured and/or underinsured motorist, and physical damage (collision), or other insurance coverage that CONTRACTOR may desire for the Equipment or for CONTRACTOR's health care or other needs. As provided in this Agreement, CONTRACTOR holds CARRIER harmless with respect to loss of or damage to CONTRACTOR's Equipment, trailer, or other property, and CARRIER has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to CONTRACTOR's Equipment, trailer, or other property. CONTRACTOR acknowledges that CARRIER may, and CONTRACTOR hereby authorizes CARRIER to, waive and reject no-fault, uninsured, and underinsured motorist coverage from CARRIER's insurance policies to the extent allowed under Illinois law (or such other state law where the Equipment is principally garaged), and CONTRACTOR shall cooperate in the completion of all necessary documentation for such waiver, election, or rejection.

**3.** **REQUIREMENTS APPLICABLE TO ALL OF CONTRACTOR'S INSURANCE COVERAGES.** CONTRACTOR shall procure insurance policies providing the above-described coverages solely from insurance carriers that are A.M. Best "A"-rated, and CONTRACTOR shall not operate the Equipment under this Agreement unless and until CARRIER has determined that the policies are acceptable (CARRIER's approval shall not be unreasonably withheld). CONTRACTOR shall furnish to CARRIER written certificates obtained from CONTRACTOR's insurance carriers showing that all insurance coverages required above have been procured from A.M. Best "A" rated insurance carriers, that the coverages are being properly maintained, and that the premiums thereof are paid. Each insurance certificate shall specify the name of the insurance carrier, the policy number, and the expiration date; list CARRIER as an additional insured with primary coverage; and show that written notice of cancellation or modification of the policy shall be given to CARRIER at least thirty (30) days prior to such cancellation or modification.

**4.** **CONTRACTOR'S LIABILITY IF REQUIRED COVERAGES ARE NOT MAINTAINED.** In addition to CONTRACTOR's hold harmless/indemnity obligations to CARRIER under the Agreement, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that CARRIER may incur arising out of or in connection with CONTRACTOR'S failure to maintain the insurance coverages required by this Agreement. In addition, CONTRACTOR, on behalf of its insurer, expressly waives all subrogation rights against CARRIER, and, in the event of a subrogation action brought by CONTRACTOR's insurer, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from such claim.

**5.** **AVAILABILITY OF INSURANCE FACILITATED BY CARRIER.** CONTRACTOR may, if it so chooses by initialing one or more boxes in the right-hand column of the attached "CERTIFICATE OF INSURANCE," authorize CARRIER to facilitate, on CONTRACTOR'S behalf, the insurance coverages required or made optional by this Agreement. In any such case, CARRIER shall deduct, from CONTRACTOR settlement compensation, amounts reflecting all of CARRIER's expense and cost in obtaining and administering such coverage. In addition, if CONTRACTOR fails to provide proper evidence of the purchase or maintenance of the insurance required above, then CARRIER is authorized but not required to obtain such insurance at CONTRACTOR's expense and deduct, from CONTRACTOR's settlement compensation, amounts reflecting all of CARRIER's expense in obtaining

**APPENDIX B**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

and administering such coverage. CONTRACTOR recognizes that CARRIER is not in the business of selling insurance, and any insurance coverage requested by CONTRACTOR from CARRIER is subject to all of the terms, conditions, and exclusions of the actual policy issued by the insurance underwriter. CARRIER shall ensure that CONTRACTOR is provided with a certificate of insurance (as required by 49 C.F.R. § 376.12(j)(2)) for each insurance policy under which the CONTRACTOR has authorized CARRIER to facilitate insurance coverage from the insurance underwriter (each such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to CONTRACTOR for each type of coverage, and the deductible amount for each type of coverage for which CONTRACTOR may be liable), and CARRIER shall provide CONTRACTOR with a copy of each policy upon request.

6. **CHANGES IN COST OR OTHER DETAILS OF COVERAGES**. If CARRIER is facilitating any insurance coverages for CONTRACTOR pursuant to Section 5 of this Appendix and the cost to CONTRACTOR for, or other details of, a coverage changes from the information listed in the attached "CERTIFICATE OF INSURANCE", CONTRACTOR will be so notified by personal delivery, fax, other written notice, or by appropriate electronic means as outlined in Appendix D. In any event, CONTRACTOR shall not be subject to any such change until ten (10) calendar days after such notice or such later time as is set forth in the notice. **CONTRACTOR's failure, by the end of ten (10) calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's settlement compensation, beginning immediately after the 10-day period. Such modified amounts shall replace and supersede those shown in the Certificate of Insurance and CARRIER shall not have an obligation to also provide a revised Certificate of Insurance.** If CONTRACTOR fails to notify CARRIER of any objection within the 10-day period – or if CONTRACTOR notifies CARRIER of its objection within the 10-day period and CONTRACTOR and CARRIER are then unable to resolve the matter to their mutual satisfaction – CONTRACTOR and CARRIER shall each have the right to terminate this Agreement effective immediately upon the change becoming effective (although CONTRACTOR shall remain subject to the change until CONTRACTOR's termination's effective date and time).

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**POLMAX FLEET LLC., CARRIER:**

**CONTRACTOR:**

By: _____

By: _____

PAULINA  FORTE

INARIDJUSUI

Printed Name

Printed Name

Dated: 6/24/2015

Dated: 06/24/15

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## CERTIFICATE OF INSURANCE

CONTRACTOR hereby requests CARRIER, through its insurer, to facilitate on CONTRACTOR's behalf (if they are available) the insurance coverages CONTRACTOR has selected by placing CONTRACTOR's initials in the right-hand column below:

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| 1. **Non-Trucking Liability Insurance:** <br><br> *Name of Insurer:* American Hallmark Ins Co <br><br> *Policy No:* AHI-N3212-110269 <br><br> *Effective Date(s) of Coverage:* 4/21/13 – 4/21/14 <br><br> *Amount of Coverage:* $1,000,000 combined single limit <br><br> *Current Cost to CONTRACTOR:* $28 per unit of Equipment per month <br><br> *Deductible for Which CONTRACTOR Is Liable:* $1,000 per occurrence | _____ YES <br><br> _____ NO |
| 2. **Occupational Accident Insurance:** <br><br> *Name of Insurer:* OneBeacon Insurance Company <br><br> *Policy No:* 216-001-299 <br><br> *Effective Date(s) of Coverage:* 6/12/13 – 6/12/14 <br><br> *Amount of Coverage:* Varies, see coverage forms <br><br> *Current Cost to CONTRACTOR:* $146 per month <br><br> **[COVERAGE IS AVAILABLE ONLY TO A SOLE-PROPRIETOR CONTRACTOR WHO IS EXCLUSIVE DRIVER OF THE EQUIPMENT.]** <br><br> *Deductible for Which CONTRACTOR Is Liable:* n/a | _____ YES <br><br> _____ NO |

**APPENDIX C**

FILED DATE: 6/4/2021 2:52 PM 2021CH01601

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| 3. **Physical Damage Insurance on Tractor:** <br><br> *Name of Insurer:* Lexington Ins Co <br><br> *Policy No:* 012945359 <br><br> *Effective Date(s) of Coverage:* 3/22/13-3/22/14 <br><br> *Amount of Coverage:* Insured value, as specified by CONTRACTOR, of $_____ <br><br> *Current Cost to CONTRACTOR:* $_____ per month (based on model year of unit of Equipment covered) <br><br> *Deductible for Which CONTRACTOR Is Liable:* $25,000 per occurrence | _____ YES <br><br> _____ NO |

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**POLMAX FLEET LLC., CARRIER:**

By: _____

PAULINA FORTE

Printed Name

Dated: 6/24/15

**CONTRACTOR:**

By: _____

TWARDOWSKI

Printed Name

Dated: 06/24/15

**APPENDIX C**

Return Date: No return date scheduled
Hearing Date: 8/3/2021 10:00 AM - 10:00 AM
Courtroom Number: 2510
Location: District 1 Court
         Cook County, IL

FILED
6/4/2021 2:52 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH01601

13574498

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

# EXHIBIT B

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## INDEPENDENT CONTRACTOR AGREEMENT

Polmax Fleet, LLC ("CARRIER"), an authorized motor carrier, and _MT TM TRAWSPORT_ ("CONTRACTOR"), in consideration of the covenants and agreements contained herein and pursuant to the federal leasing regulations under 49 C.F.R. Part 376, enter into this Independent Contractor Agreement ("Agreement") on NOVEHBER 25TH, 20 19.

1.      **PROVISION OF SERVICES AND EQUIPMENT.**   During the term of this Agreement, CONTRACTOR shall provide CARRIER professional truck driving services, other incidental transportation related services, and the use of the equipment set forth below or in an appendix (the "Equipment"). CONTRACTOR represents and warrants that CONTRACTOR has title to or is authorized to contract the Equipment and services to CARRIER. Upon taking possession of the Equipment from CONTRACTOR, CARRIER shall furnish to CONTRACTOR a receipt for Equipment, which shall constitute the receipt required by 49 C.F.R. § 376.11(b). Upon termination of this Agreement, CONTRACTOR shall execute a similar receipt for equipment as the written receipt for the return of the Equipment by CARRIER to CONTRACTOR; provided, however, that the Agreement and CARRIER's obligations thereunder shall expire upon the written notice of termination regardless of whether CONTRACTOR submits the receipt required under this provision.

| Year | Make | Serial No. | Unit # |
|------|------|------------|--------|
| 2019 | FRHT |            |        |
|      |      |            |        |
|      |      |            |        |

2.      **DURATION OF AGREEMENT AND TERMINATION.**   This Agreement shall begin on the date set forth above and end exactly one (1) year thereafter. Either party may terminate this Agreement for any reason by giving fifteen (15) days written notice to that effect to the other party either personally, by mail, by fax machine at the address or fax number shown at the end of this Agreement, or by appropriate electronic means as outlined in Appendix D. The ability of either party to terminate this Agreement shall in no way be interpreted as an at-will employment provision and shall not otherwise affect CONTRACTOR's status as an independent contractor under this Agreement. The effective date and time of termination shall be as set forth in the written notice or the receipt for Equipment issued by CONTRACTOR, whichever date is earlier. CONTRACTOR shall, upon the termination of this Agreement, remove all CARRIER identification from the Equipment and return it to CARRIER, via hand delivery or certified mail, together with all of CARRIER's property, including trailers, paperwork, load securement equipment and freight, to CARRIER's nearest terminal. If CONTRACTOR fails to return CARRIER's property or freight to CARRIER or remove and return all CARRIER identification from the Equipment upon termination of this Agreement, CONTRACTOR shall pay CARRIER, all collections costs incurred by CARRIER, including reasonable attorney fees, and CARRIER may pursue all other remedies allowed by law or authorized in the Agreement against CONTRACTOR.

3.      **GROSS COMPENSATION.**   It is expressly understood and agreed that CONTRACTOR's gross compensation shall be as set forth in Appendix A, and such gross compensation shall constitute the total compensation for everything furnished, provided, or done by CONTRACTOR in connection with this Agreement, including driver's services, including but not limited to driving of the Equipment and all non-driving activities such as conducting pre- and post-trip inspections of the Equipment, waiting to load or unload (detention), loading or unloading if required, fueling, repairing and maintaining the Equipment, hooking and unhooking empty trailers, preparing logbooks and other paperwork, and other activities and services. **As indicated in this Agreement, CONTRACTOR – as an independent contractor, not an employee – agrees to pay all of CONTRACTOR's operating expenses (including but not limited to those that CARRIER initially advances and later charges back to CONTRACTOR) out of the gross compensation provided under this Paragraph and Appendix A and any other CONTRACTOR assets. Under no circumstances shall CARRIER be responsible for these operating expenses.** All mileage computations shall be based on the most recent edition of CARRIER's Mileage Guide. Although CARRIER

1

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

shall use reasonable efforts to make shipments available to CONTRACTOR for transportation during the term of this Agreement, CONTRACTOR acknowledges and agrees that CARRIER does not guarantee any specific number of shipments or amount of revenue to CONTRACTOR during the term of this Agreement. CONTRACTOR may refuse any specific shipment offered by CARRIER. CONTRACTOR is not prohibited from entering into separate agreements to provide equipment and other professional truck drivers not identified as Equipment above or in an attachment and drivers not used to service this Agreement, to other motor carriers.

**4.     SETTLEMENT PERIOD.**   CARRIER shall settle with CONTRACTOR with respect to services provided under this Agreement within 15 calendar days after CONTRACTOR's submission, in proper form, of those documents necessary for CARRIER to secure payment from its customers, including the signed freight bill, delivery receipt or bill of lading, and properly completed logs as required by the U.S. Department of Transportation ("DOT"). Where CONTRACTOR is paid a percentage of revenue, CARRIER will provide CONTRACTOR with a copy of the rated freight bill (or a computer-generated summary) before or at the time of settlement. CONTRACTOR may examine CARRIER's tariffs, or other contracts or documents, if any, from which charges and rates are computed; provided, however, only that information that would appear on a rated freight bill will be disclosed by CARRIER. The parties agree that all debit and credit entries detailed in each settlement statement are conclusively presumed to be correct and proper if not disputed by CONTRACTOR within 180 days of CARRIER's issuance of the settlement statement. CARRIER shall have the right, but not as a condition of settlement and payment, to review all of CONTRACTOR's documents and records relating to the use of the Equipment and the services provided under this Agreement and CONTRACTOR agrees to provide CARRIER with access to such documents and records upon reasonable notice. With respect to final settlement upon termination of this Agreement, the failure on the part of CONTRACTOR to remove and return to CARRIER all identification devices of CARRIER or a letter certifying their removal shall entitle CARRIER to withhold any payments owed to CONTRACTOR until such obligation is met. **All information from CARRIER's documents examined pursuant to this Paragraph shall be considered "Confidential Matters" protected from unauthorized disclosure by Paragraph 20 of this Agreement, provided that CONTRACTOR may disclose such information (but only if marked "CONFIDENTIAL – NOT FOR FURTHER DISCLOSURE" and accompanied by the text of this Paragraph making clear the information's confidentiality) to CONTRACTOR's attorney solely to aid in the attorney's counseling or representation of CONTRACTOR, or, under seal, to a court, administrative agency, or party in litigation pursuant to valid legal process.**

**5.     CHARGE BACK.**   CARRIER shall deduct from CONTRACTOR's compensation, at the time of payment to or settlement with CONTRACTOR, any liability or expense CARRIER has incurred or paid that, under this Agreement or any addendum to this Agreement, CONTRACTOR is obligated to bear. Such expenses shall be deducted from the amount of CONTRACTOR's settlement compensation and shall include those expenses set forth in Appendix A of this Agreement. The amount of each item to be charged back to CONTRACTOR shall be computed based on the actual cost or expense incurred by CARRIER and any administrative fee or mark-up disclosed in Appendix A or elsewhere in this Agreement or any addendum thereto. CARRIER shall provide CONTRACTOR written itemization and documentation of all charge backs where such documentation is necessary to verify the validity of the charge.

**6.     INSURANCE.**   The respective obligations of the parties shall be as set forth in Appendix B. CARRIER shall maintain public liability, property damage and cargo insurance in such amounts as are required by the DOT and applicable state regulatory agencies. CARRIER shall maintain insurance coverage for the protection of the public pursuant to 49 U.S.C. § 13906. Such insurance shall be maintained at Contractor's expense, as provided in Section 5 of Appendix A. CARRIER's possession of legally required insurance shall in no way restrict CARRIER's right of indemnification from CONTRACTOR as provided under this Agreement. It shall be considered a material breach of this Agreement where CONTRACTOR is determined by CARRIER or CARRIER's insurer to be uninsurable for any reason.

**7.     ESCROW FUND.**          CONTRACTOR authorizes CARRIER to establish and administer an escrow fund in accordance with the provisions of Appendix C.

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**8.** **COMPLIANCE WITH PERTINENT LAWS AND REGULATIONS BY CONTRACTOR.** CONTRACTOR recognizes that CARRIER's separate and distinct business of providing motor carrier freight transportation service to the public is subject to regulation by the federal government acting through the DOT, and by various other federal, state, local, and foreign governing bodies. As such, CONTRACTOR hereby acknowledges that he/she possesses full and complete understanding and knowledge of the DOT's CSA program. CONTRACTOR shall adhere to the following provisions of this Agreement to aid CARRIER in discharging its legal duties:

**(a)** **Contractor's Drivers.** CONTRACTOR shall provide competent professional drivers who meet CARRIER's minimum driver qualification standards and all of the requirements of the DOT, including but not limited to, familiarity and compliance with state and federal motor carrier safety laws and regulations. As part of the driver qualification process, CONTRACTOR, and CONTRACTOR's drivers, shall authorize CARRIER to access applicable driver files, Pre-Qualification Screening Program ("PSP") data from the DOT, and any other driver data or information available as part of DOT's CSA program. The parties agree that CARRIER shall have the right to disqualify any driver provided by CONTRACTOR in the event that the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law or the criteria established by the PSP, in violation of CARRIER's minimum qualification standards, or in violation of any policies of CARRIER's customers. Drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet CARRIER's minimum qualification standards. Upon a driver's disqualification by CARRIER, CONTRACTOR shall be obligated to furnish another competent, reliable and qualified professional driver that meets the minimum qualification standards established by CARRIER.

**(b)** **Paperwork Requirements.** CONTRACTOR shall submit to CARRIER, on a timely basis, all driver logs and supporting documents (including original toll receipts for CARRIER's reproduction), physical examination certificates, accident reports, and any other required data, documents or reports, including any documentary evidence that CARRIER requests proving CONTRACTOR has paid all taxes legally due and owing to any government body. As required by 49 C.F.R. § 376.12(l), CARRIER will keep the original of this Agreement with a copy to be maintained by CONTRACTOR, and a second copy to be carried in the Equipment during the term of this Agreement.

**(c)** **Shipping Documents.** CONTRACTOR agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of CARRIER, or as authorized by CARRIER, and shall indicate that the property transported is under the responsibility of CARRIER or a carrier with which the Equipment has been subcontracted.

**(d)** **Drug and Alcohol Testing.** CONTRACTOR and its drivers shall, as required by 49 C.F.R. § 382.103, comply with CARRIER's Drug and Alcohol Policy, including participation in CARRIER's random drug and alcohol testing program, and any addendums or revisions thereto.

**(e)** **Safe Operations.** CONTRACTOR agrees to operate the Equipment in a safe and prudent manner at all times so as to avoid endangering the public, the driver, and/or the property being transported and in accordance with this Agreement, the laws of the various jurisdictions in which the Equipment will be operated and pursuant to the operating authorities of CARRIER, and in accordance with all rules related to traffic safety, highway protection and road requirements. Moreover, CONTRACTOR agrees that all drivers and/or workers employed by CONTRACTOR will comply with the terms of this Agreement, including the requirement of safe operations, while operating the Equipment on behalf of CONTRACTOR. CONTRACTOR agrees that any driver utilized by CONTRACTOR will comply with CARRIER's policies and procedures and any subsequent revisions thereto, which will be provided by CARRIER.

**(f)** **CSA Compliance.** CONTRACTOR shall ensure that CONTRACTOR, and any drivers of CONTRACTOR, and CONTRACTOR's Equipment shall at all times meet CSA safety standards sufficient to enable CARRIER to (a) achieve and maintain a "satisfactory" or similar rating that

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

enables CARRIER to operate without FMCSA intervention or restriction pertaining to driver, equipment, and other CSA performance measures; (b) obtain insurance coverage without increased costs associated with driver, equipment, or other performance measures under CSA; and (c) be and remain competitive with similarly situated carriers with regard to safety performance measures under CSA. CONTRACTOR further agrees to notify CARRIER in writing within two (2) business days of receiving notification from the FMCSA that CONTRACTOR or any of its drivers have been deemed "unfit" or "marginal" based on their safety and compliance performance.

**(g)** **Duty to Notify.** CONTRACTOR has an ongoing duty to notify CARRIER's Safety Department immediately if (i) an adverse medical or physical condition develops or worsens, (ii) in accordance with 49 C.F.R. § 382.213(d), a new medication (whether prescription or over-the-counter), is taken, (iii) CONTRACTOR, or CONTRACTOR's driver, receives notice of criminal charge(s) brought against it and/or receives criminal conviction(s), and/or (iv) CONTRACTOR, or CONTRACTOR's driver, receives an adverse federal, state or local safety performance rating or report. At any time after CONTRACTOR notifies CARRIER of such information, CARRIER's Safety Department may suspend CONTRACTOR's carrier qualification to drive under CARRIER's motor carrier authority. If the information relates to subparts (i) or (ii) above, the suspension may remain, pending CARRIER obtaining from CONTRACTOR's physician or other licensed health care provider and/or from CARRIER's designated medical examiner (after, if CARRIER so requires, a new medical examination of CONTRACTOR by such medical examiner) of information on CONTRACTOR's medications and adverse physical conditions, including whether a medication or condition may adversely affect CONTRACTOR's ability to safely operate CONTRACTOR's commercial motor vehicle equipment and whether CONTRACTOR should continue to be qualified by CARRIER to drive the Equipment. CARRIER shall then decide whether to qualify, or restore the qualification of, CONTRACTOR to drive the Equipment and shall notify CONTRACTOR of the decision.

## 9. OPERATIONAL EXPENSES.

**(a)** **Operating Expenses.** CONTRACTOR shall, at its sole cost and expense, provide all the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, state base plates and shall furnish all necessary oil, fuel, tires, and other parts, supplies and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment, including repairs for the operation of such Equipment. CONTRACTOR shall pay all expenses incident to the operation of the Equipment, including, but not limited to, empty mileage, lumper expenses, highway use taxes, weight taxes, state property or indefinite situs taxes, fuel taxes, registration fees, ferry and toll charges, and detention and accessorial charges not collected by CARRIER because of CONTRACTOR's failure to provide the required documentation.

**(b)** **Maintenance and Inspection.** CONTRACTOR, at its sole cost and expense, shall maintain the Equipment in safe condition and in complete compliance with all laws and regulations of the states in which CONTRACTOR operates and the DOT. In order to ensure compliance with all DOT regulations, CONTRACTOR shall, at its sole cost and expense, make the Equipment available for inspection by CARRIER upon reasonable request by CARRIER. CONTRACTOR shall, at its sole cost and expense, have the Equipment inspected annually, as required by 49 C.F.R. § 396.17, at CARRIER's maintenance facility or at another maintenance facility which CARRIER may, in its sole discretion, authorize. CONTRACTOR shall, as directed by CARRIER, forward to CARRIER all inspection, maintenance and repair records for the Equipment.

**(c)** **Fines.** CONTRACTOR or its drivers (as professional drivers engaged in a separate and distinct profession) agree to pay all fines, including but not limited to parking and traffic fines and penalties, imposed for violation of any law or regulation by the state or any locality in which CONTRACTOR operates, or the DOT, where such violation results, at least partially, from the acts or omissions of CONTRACTOR.

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**(d)** **Overweight and Oversized Shipments.** CONTRACTOR or CONTRACTOR's drivers (as professional drivers engaged in a separate and distinct profession) shall have the duty to determine that all shipments are in compliance with the size and weight laws of the states in which or through which the Equipment will travel and to notify CARRIER if the vehicle is overweight, oversized or in need of permits before commencing the haul. Except when the violation results from the acts or omissions of CONTRACTOR, CARRIER shall assume the risks and costs of fines for overweight and oversize trailers when such trailers are preloaded and sealed, or the load is containerized, or for improperly permitted oversized and overweight loads, or the trailer or lading is otherwise outside of CONTRACTOR's control. CONTRACTOR shall pay, or reimburse CARRIER, for any costs or penalties due to CONTRACTOR's failure to weigh each shipment or to notify CARRIER that the vehicle is overweight, oversized or in need of permits.

**(e)** **License Plates.** CONTRACTOR agrees to obtain and display on the Equipment the base plates necessary to operate the Equipment lawfully on CARRIER's behalf. If CONTRACTOR chooses to have CARRIER obtain the base plates and deduct the expense from CONTRACTOR's gross compensation, by indicating such in Appendix A, CARRIER shall obtain a base plate under the International Registration Plan ("IRP") in CARRIER's name for use by CONTRACTOR, the cost of which shall be deducted from CONTRACTOR's settlement compensation in the amount set forth in Appendix A until the cost of the plate is paid in full. CONTRACTOR shall remove and return such plate to CARRIER upon the termination of this Agreement and, in the event CONTRACTOR fails or refuses to do so, CARRIER shall, and is hereby authorized to, deduct the full cost of the plate from CONTRACTOR's final settlement and escrow funds. If CARRIER receives a refund or credit for an IRP plate registered in the name of CARRIER or such base plate is authorized for CONTRACTOR to be resold by CARRIER to another contractor, CARRIER shall refund to CONTRACTOR a pro-rata share of the amount received by CARRIER. CONTRACTOR shall not be entitled to reimbursement for any unused portion of a base plate, however, unless CARRIER is able to reuse or resale the plate to another contractor.

**(f)** **Fuel and Mileage Taxes.** CONTRACTOR is responsible for obtaining an International Fuel Tax Agreement ("IFTA") permit and performing fuel and mileage tax reporting for the operation of the Equipment. CONTRACTOR agrees to be solely responsible for calculating, reporting, and paying all fuel taxes owed for the operation of the Equipment; and agrees to indemnify, defend, and hold harmless CARRIER from all claims arising out of or relating to the fuel tax reporting and payment (not subject to the indemnity limit). This notwithstanding, if CONTRACTOR chooses to have CARRIER perform fuel and mileage tax reporting on CONTRACTOR's behalf and deduct the expense from CONTRACTOR's gross compensation, by indicating such in Appendix A, CARRIER will be deemed the reporting entity with respect to the Equipment and the fuel consumed by it. For the purposes of computing and paying all state fuel and mileage taxes owed for the Equipment, CARRIER shall issue CONTRACTOR a fuel card that may be used for fuel purchases. In the event CONTRACTOR or its drivers fail to use CARRIER's fuel card, CONTRACTOR shall be responsible for providing CARRIER with an accurate accounting of all fuel purchases and miles traveled for the purposes of computing state fuel and mileage tax liability, and CONTRACTOR shall provide CARRIER with all original fuel receipts. In addition to the flat amount(s) stated in Section 5 of Appendix A, CARRIER will quarterly, with respect to CONTRACTOR's operations in all taxing jurisdictions combined, either: (i) deduct or otherwise recover any net fuel use tax owed; or (ii) credit CONTRACTOR for any net fuel use tax credit or refund due CONTRACTOR.    CARRIER will compute CONTRACTOR's fuel use and mileage taxes on a fleet wide-average basis. If CONTRACTOR fails to provide CARRIER complete and accurate fuel-tax-related records in time for CARRIER's computation of CARRIER's fuel tax reports and payments for the preceding month, CARRIER will compute CONTRACTOR's fuel use taxes based on total miles dispatched by CARRIER at the miles-per-gallon rate stated in Section 5 of Appendix A.

**10.** **CARGO CLAIMS.** CONTRACTOR shall immediately report all cargo claims, including all shortages, overages or other exceptions to the cargo, to CARRIER. CONTRACTOR shall be liable for, and CARRIER shall charge back to CONTRACTOR, the first $5,000 of each cargo claim, including but not limited to, delay, shortages, misdelivery, and any direct damage claim relating to lost, damaged or

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

contaminated loads, arising out of, or in connection with CONTRACTOR's services. The dollar limit in this paragraph shall not apply to damages arising out of or in connection with such claims if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') gross negligence, willful misconduct, breach of this Agreement, or other culpable acts or omissions. Before deducting any cargo claim from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization for each such claim.

**11.**    **USE OF CARRIER'S TRAILER.**    CONTRACTOR agrees to return any trailer, trailer equipment of any kind or purpose, or chassis provided for its use by CARRIER in the same good condition as received by CONTRACTOR, reasonable wear and tear excepted, along with any and all other equipment and property belonging to CARRIER immediately upon CARRIER's request or upon termination of this Agreement. In the event the trailer is not in as good as condition as it was delivered by CARRIER, CONTRACTOR hereby authorizes CARRIER to restore the trailer to proper condition and to charge back to CONTRACTOR the costs of such repairs or reconditioning. In the event CONTRACTOR for any reason fails to comply with this provision and return CARRIER's trailer, CONTRACTOR agrees to reimburse CARRIER for all reasonable expense and costs, including attorney fees, incurred by CARRIER in recovery of its trailer or property from CONTRACTOR or its drivers. CONTRACTOR agrees that in the event it is necessary for CARRIER to enter upon private property or remove private property in order to recover its trailer and property, CONTRACTOR does hereby irrevocably grant CARRIER or its duly authorized agents, permission to do so and further agrees to indemnify and hold harmless CARRIER, and its duly authorized agents, from any form of liability whatsoever in connection with such repossession. CONTRACTOR shall be liable for, and pay, the entire amount for each incident involving direct, indirect and consequential damage, including but not limited to, towing charges, replacement costs for a total loss, arising out of, or in connection with, CONTRACTOR's use of CARRIER's trailers, CARRIER's customer's trailers, other CARRIER equipment, or equipment of any other carrier. Before deducting any such damage from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization of such damage. CONTRACTOR agrees and warrants that any trailer provided for use by CARRIER will only be used by CONTRACTOR and its drivers to transport shipments tendered to CONTRACTOR by CARRIER.

**12.**    **ACCIDENTS AND CLAIMS.**    CONTRACTOR shall immediately report any accident or potential claim to CARRIER involving operations under this Agreement. CONTRACTOR and its drivers shall cooperate fully with CARRIER with respect to any legal action, regulatory hearing or other similar proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder. CONTRACTOR shall, upon CARRIER's request and at CONTRACTOR's sole expense, provide written reports or affidavits, attend hearings and trials and assist in securing evidence or obtaining the attendance of witnesses. CONTRACTOR shall provide CARRIER with any assistance as may be necessary for CARRIER or CARRIER's representatives or insurers to investigate, settle or litigate any accident, claim or potential claim by or against CARRIER.

**13.**    **HOLD HARMLESS.**    Except to the extent CONTRACTOR's acts or omissions are covered under the parties' respective insurance policies as set forth in Appendix B with no expense to CARRIER, CONTRACTOR agrees to defend, indemnify and hold harmless CARRIER from any direct, indirect and consequential loss, damage, fine, expense, including reasonable attorney's fees, action, claim for injury to persons, including death, and damage to property which CARRIER may incur arising out of or in connection with the operation of the Equipment, CONTRACTOR's obligations under this Agreement, or any breach by CONTRACTOR, or its drivers or workers, of the terms of this Agreement. This provision shall remain in full force and effect both during and after the termination of this Agreement. **PARAGRAPH 15 AND OTHER PROVISIONS OF THIS AGREEMENT REFLECT THAT CONTRACTOR IS, AND BOTH CONTRACTOR AND CARRIER INTEND CONTRACTOR TO BE, AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE OF CARRIER. IN LIGHT OF THIS FACT AND INTENT: CONTRACTOR agrees to indemnify and hold CARRIER harmless from all reasonable attorneys' fees and litigation expenses CARRIER incurs in defending against any claims, suits, actions, or administrative proceedings brought by CONTRACTOR, CONTRACTOR's owner (if any), or any employees or other personnel engaged by CONTRACTOR to perform services under this Agreement – or, at CONTRACTOR's instance or with CONTRACTOR's consent, by any union or other private organization or member of**

the public – that allege that **CONTRACTOR** or any of **CONTRACTOR's workers is an employee of CARRIER, but fail to result in any final (upon completion of all appeals or the running of all applicable appeal periods) judicial or administrative decision holding the allegation to be true.**

14.    **CARRIER RESPONSIBILITIES.**

    (a)    **Exclusive Possession and Responsibility.**

        i.    The Equipment shall be for CARRIER's exclusive possession, control, and use for the duration of this Agreement. As such, CONTRACTOR shall not operate the Equipment for any other motor carrier or entity during the term of this Agreement without prior written consent from CARRIER. CARRIER shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement. This subparagraph is set forth solely to conform with DOT regulations and shall not be used for any other purposes, including any attempt to classify CONTRACTOR as an employee of CARRIER. Nothing in the provisions required by 49 C.F.R. § 376.12(c) (1) is intended to affect whether CONTRACTOR or its drivers are an independent contractor or an employee of CARRIER. An independent contractor relationship may exist when a carrier complies with 49 U.S.C. § 14102 and attendant administrative requirements. As provided by 49 C.F.R. § 376.12(c) (4), "an independent contractor relationship may exist when a carrier complies with 49 U.S.C. § 14102 and attendant administrative requirements."

        ii.    Because of the limitations of 49 C.F.R. §§ 376.12(c) (1) and (2), CONTRACTOR may operate the Equipment for another motor carrier or entity during the Agreement only with the prior written consent of CARRIER pursuant to this subsection. At CONTRACTOR's request, CARRIER may, with respect to any trip or trips, approve uses of the Equipment to perform transportation services other than on behalf of CARRIER only under the terms and conditions set forth in this subsection. The other uses may consist of (together, "Alternative Uses of Equipment"): (i) Sublease – CARRIER subleases the Equipment (including services furnished by CONTRACTOR's driver) to another authorized for-hire motor carrier of property ("Sublease Carrier") for the provision of for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to Sublease Carrier's customers pursuant to Sublease Carrier's operating authority; (ii) CONTRACTOR Motor Carriage – CONTRACTOR uses CONTRACTOR's own motor carrier operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper (directly or through a motor freight broker), in which event, the provisions of this subsection relating to CONTRACTOR Motor Carriage shall be deemed to constitute the sublease required by 49 C.F.R. § 376.12(c)(2); and (iii) Exempt Motor Carriage – CONTRACTOR, lacking motor carrier operating authority of CONTRACTOR's own but possessing a validly issued DOT Number, lawfully provides for hire motor carriage, exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper (directly or through a motor freight broker). CARRIER assumes no responsibility for the collection of freight charges or payment to CONTRACTOR for any Alternative Uses of Equipment-related revenue. During the term of Alternative Uses of Equipment, CONTRACTOR will remove or cover up all of CARRIER's identification on the Equipment and display instead CONTRACTOR's or the trip-lease carrier's identification and, as between CONTRACTOR and CARRIER, CARRIER will have no responsibility for, and CONTRACTOR will fully indemnify CARRIER regarding, the operation of the Equipment.

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

7

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**(b)** **Identification of Equipment.** CARRIER shall identify the Equipment in accordance with the requirements of the DOT and appropriate state regulatory agencies. CARRIER shall have the right to place and maintain on the Equipment CARRIER's name and any lettering, advertisement, slogans or designs as CARRIER may choose. CONTRACTOR shall remove such identification at the termination of this Agreement or while operating such Equipment for any purpose other than conducting CARRIER's business. At its discretion, CONTRACTOR may have the identification permanently painted on the Equipment. CONTRACTOR further agrees to keep the Equipment in clean appearance and identified as described herein, at its sole cost and expense. CARRIER agrees that CONTRACTOR may display CONTRACTOR's name and address on the Equipment where required by applicable state law.

15. **CONTRACTOR NOT EMPLOYEE OF CARRIER.**

**(a)** **In General**. This Agreement is between two independent businesses that are separately owned and operated. It is expressly understood and agreed that CONTRACTOR is an independent contractor for the Equipment and driver services provided under this Agreement. CONTRACTOR agrees to provide necessary documentation and apply for certification of CONTRACTOR's independent contractor status where mandated by Applicable Law (as defined in Paragraph 16 below).

**(b)** **Equipment, Maintenance, and Routes.** Subject only to Applicable Law, it will be the sole responsibility of CONTRACTOR to: (i) select, purchase or lease, and finance the Equipment; (ii) to decide when, where, and how maintenance and repairs are to be performed; and (iii) to select all routes and decide all meal, rest, and refueling stops, provided that to meet CARRIER's Customers' demands, CONTRACTOR agrees to make timely and safe deliveries of all loads, and to notify CARRIER when delivery has been made or will be delayed for any reason.

**(c)** **CONTRACTOR's Workers.** Subject only to Applicable Law and safety considerations, CONTRACTOR assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, meal and rest breaks, wages, and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, coverage of worker injuries, adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of or relating to CONTRACTOR's use or employment of agents, drivers, drivers' helpers, and other workers to perform any aspect of this Agreement. In addition, CONTRACTOR agrees to be solely responsible for complying with Applicable Law governing the terms and conditions of employment of CONTRACTOR's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and other required withholdings for CONTRACTOR's employees.

**(d)** **Taxes.** CONTRACTOR is free to choose the form in which to operate CONTRACTOR's business. CONTRACTOR agrees to file all tax forms and returns that CONTRACTOR may be required by law to file, on account of CONTRACTOR's workers used in the performance of this Agreement, and to pay when due all taxes and contributions reported in the forms and returns. In that regard, CONTRACTOR knows: (i) of CONTRACTOR's responsibilities to pay estimated social security taxes and state and federal income taxes with respect to remuneration received from CARRIER; (ii) that the social security tax CONTRACTOR must pay is higher than the social security tax the individual would pay if he or she were an employee; and (iii) that the service provided by CONTRACTOR to CARRIER under this Agreement is not work covered by the unemployment compensation laws of any State, including Georgia; provided, however, that should CONTRACTOR employ or use drivers, helpers, or other workers to fulfill CONTRACTOR's obligations under this Agreement, and the drivers, helpers, or other workers are covered by the unemployment laws of any State, including Georgia, CONTRACTOR is solely responsible for providing unemployment insurance for the drivers, helpers, or other workers. CONTRACTOR agrees to furnish CARRIER such evidence of compliance with the foregoing as CARRIER may

reasonably require, including but not limited to proof of income and payroll taxes currently paid by CONTRACTOR or withheld by CONTRACTOR from the wages of CONTRACTOR's workers. CARRIER will file a Form 1099 with the Internal Revenue Service with respect to CONTRACTOR as required by Applicable Law.

**16.**     **BREACH.** Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated immediately, at any time, by either party in the event of a party's actual or threatened commitment of a felony or intentional tort; violation of, or failure to comply fully with, the requirements of any applicable federal, state, local, and foreign authorities, including but not limited to DOT, state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"); material breach of this Agreement; or the occurrence of an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5, that, in CARRIER's reasonable judgment, was caused in whole or in part by CONTRACTOR's negligence, gross negligence, or willful misconduct. In the event of a breach, the non-breaching party may elect to terminate the Agreement by giving immediate oral, followed by written, notice of termination to the offending party. If, in CARRIER's judgment, CONTRACTOR has subjected CARRIER to liability because of CONTRACTOR's acts or omissions, CARRIER may take possession of the shipment entrusted to CONTRACTOR and complete performance. In such event, CONTRACTOR shall waive any recourse against CARRIER for such action and CONTRACTOR shall reimburse CARRIER for all direct or indirect costs, expenses, or damages, including attorney's fees, incurred by CARRIER as a result of CARRIER's taking possession of the shipment and completing performance.

**17.**     **CONTRACTOR NOT REQUIRED TO PURCHASE PRODUCTS, EQUIPMENT, OR SERVICES FROM CARRIER.** CONTRACTOR is not required to purchase or rent any products, equipment, or services from CARRIER as a condition of entering into this Agreement. In the event CONTRACTOR elects to purchase or rent equipment from CARRIER or from any third party, for which the purchase or rental contract gives CARRIER the right to make deductions from CONTRACTOR's settlement, then the parties mutually agree to attach and incorporate each such contract, specifying all terms thereof, to this Agreement as a separate addendum.

**18.**     **PASSENGER AUTHORIZATION.** As required by 49 C.F.R. § 392.60, CONTRACTOR shall not allow any passengers to ride in the Equipment unless authorized in writing by CARRIER as required by law. Before passenger authorization will be given by CARRIER, CONTRACTOR (or its driver) and the passenger requesting authorization shall submit a fully executed Passenger Authorization and Release of Liability form to CARRIER for prior approval.

**19.**     **LOADING AND UNLOADING.** In the event the shipper or consignee does not assume loading and unloading responsibilities, CONTRACTOR shall be responsible for the loading or unloading of property transported on behalf of CARRIER at CONTRACTOR's expense.

**20.**     **COMMUNICATIONS.**

(a) **Electronic Logging Device.** To serve CARRIER's customers' shipment-tracking demands and help fulfill government requirements, including compliance with the hours-of-service regulations, CONTRACTOR must maintain in the Equipment an Electronic Logging Device ("ELD"). CONTRACTOR must either provide an ELD that is fully interoperable with CARRIER's platform or elect to obtain one through CARRIER by making such an election in Appendix A. If CONTRACTOR elects to obtain an ELD through Carrier, CARRIER will, at CONTRACTOR's expense, furnish, install, and maintain in an operable condition an ELD in the Equipment. CONTRACTOR will be responsible for the cost of the ELD and any monthly usage fees charged by the ELD vendor chosen by CARRIER and such cost and fees shall be charged back to CONTRACTOR pursuant to Paragraph 5 and Appendix A. CONTRACTOR will immediately return the ELD to CARRIER upon CARRIER's request or the termination of this Agreement if the ELD has not been fully paid for, and therefore not purchased, by CONTRACTOR. If the ELD is lost, damaged as a result of CONTRACTOR's negligence, or not returned upon request or upon termination of this Agreement, and the ELD has not been fully paid for and therefore not purchased by CONTRACTOR,

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

CONTRACTOR authorizes CARRIER to deduct or otherwise recover the entire expense incurred by CARRIER in recovering, repairing, or replacing the ELD. CARRIER will not be responsible for any loss or damage to the Equipment arising or resulting from the installation, use, or removal of the ELD. If CONTRACTOR replaces the unit(s) of Equipment, CONTRACTOR will bear the expense of removal and re-installation of the ELD in the replacement Equipment, and CONTRACTOR authorizes CARRIER to deduct or otherwise recover all such expense.

(b) **Event Recorder**. To help record evidence relating to highway accidents or cargo damage for purposes of assessing contractual liabilities, CONTRACTOR must maintain in the Equipment a front-facing event recorder with the capability of recording video of the road in front of the Equipment ("Event Recorder"). CONTRACTOR may either provide an Event Recorder that is fully interoperable with CARRIER's platform or elect to obtain one through CARRIER by making such an election in Appendix A. If CONTRACTOR elects to obtain an Event Recorder through Carrier, CARRIER will, at CONTRACTOR's expense, furnish, install, and maintain in an operable condition an Event Recorder in the Equipment. CONTRACTOR will be responsible for the cost of the Event Recorder and any usage fees charged by the Event Recorder vendor chosen by CARRIER and such cost and fees shall be charged back to CONTRACTOR pursuant to Paragraph 5 and Appendix A. CONTRACTOR will immediately return the Event Recorder to CARRIER upon CARRIER's request or the termination of this Agreement if the Event Recorder has not been fully paid for, and therefore not purchased, by CONTRACTOR. If the Event Recorder is lost, damaged as a result of CONTRACTOR's negligence, or not returned upon request or upon termination of this Agreement, and the Event Recorder has not been fully paid for and therefore not purchased by CONTRACTOR, CONTRACTOR authorizes CARRIER to deduct or otherwise recover the entire expense incurred by CARRIER in recovering, repairing, or replacing the Event Recorder. CARRIER will not be responsible for any loss or damage to the Equipment arising or resulting from the installation, use, or removal of the Event Recorder. If CONTRACTOR replaces the unit(s) of Equipment, CONTRACTOR will bear the expense of removal and re-installation of the Event Recorder in the replacement Equipment, and CONTRACTOR authorizes CARRIER to deduct or otherwise recover all such expense.

(c) **Privacy Disclosures and Consent Form.** Appendix E describes the categories of data collected by the ELD and Event Recorder, the uses to be made of such data by CARRIER, and the right of CONTRACTOR's driver(s) to review certain of the data upon request.

21.                              **CONFIDENTIALITY AND TRADE SECRETS**.

(a) CONTRACTOR hereby recognizes and acknowledges that any list of CARRIER's customers, as it may exist now or from time to time, is a valuable, special and unique asset of the business of CARRIER. CONTRACTOR agrees, during and after the term of this Agreement, not to disclose the list of CARRIER's customers or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever without CARRIER's prior written consent. CONTRACTOR agrees to preserve as "Confidential Matters", all trade secrets, knowhow and information relating to CARRIER's business, forms, processes, developments, sales and promotional systems, prices and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, or other contractors, and other sources of any kind resulting from this Agreement. CONTRACTOR agrees to regard such Confidential Matters as the sole property of CARRIER, and shall not publish, disclose or disseminate the same to others without the written consent of CARRIER. In the event of any breach or threatened breach by CONTRACTOR of the provisions of this paragraph, CARRIER shall be entitled to an injunction, restraining CONTRACTOR from disclosing, in whole or in part, the list of CARRIER's customers, and all other Confidential Matters. CONTRACTOR agrees that CARRIER will be irreparably damaged in the event of any breach of this provision by CONTRACTOR. Accordingly, in addition to any other legal or equitable remedies that may be available to CARRIER, CONTRACTOR agrees that CARRIER will be able to seek and obtain immediate injunctive relief in the form of a

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

temporary restraining order without notice, preliminary injunction, or permanent injunction against CONTRACTOR to enforce this confidentiality provision. CARRIER shall not be required to post any bond or other security and shall not be required to demonstrate any actual injury or damage to obtain injunctive relief from the courts. Nothing hereunder shall be construed as prohibiting CARRIER from pursuing any remedies available to CARRIER at law or in equity for such breach, including the recovery of monetary damages from CONTRACTOR.

**(b)** To the extent the Confidential Matters constitute "trade secrets" under 18 U.S.C. § 1839(3), CARRIER provides the following notice to CONTRACTOR pursuant to 18 U.S.C. § 1833(b)(3): An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

**22.**         **BENEFIT AND ASSIGNMENT.** This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors. CONTRACTOR may not assign or subcontract all or a portion of its obligations to another party without the prior written consent of CARRIER.

**23.**         **NOTICE.** All notices required or permitted by this Agreement shall be in writing delivered personally, by postage prepaid, first class mail, by facsimile machine to the addresses or fax number shown at the end of this Agreement, or by appropriate electronic means as outlined in Appendix D.

**24.**         **NON-WAIVER.** The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement, or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a customary practice contrary to such provision or right.

**25.**         **SEVERABILITY.** If any Agreement or its appendices is deemed invalid for any reason whatsoever, the Agreement shall be void only as to such provision, and this Agreement shall remain otherwise binding between the parties. Any provision voided by operation of the foregoing shall be replaced with provisions which shall be as close as the parties' original intent as permitted under applicable law.

**26.**         **GOVERNING LAW AND CHOICE OF FORUM.** This Agreement is to be governed by the laws of the United States and of the State of Illinois, without regard to the choice-of-law rules of Illinois or any other jurisdiction. The parties further agree that any claim or dispute arising from or in connection with this Agreement or otherwise with respect to the overall relationship between the parties, whether under federal, state, local, or foreign law, shall be brought exclusively in state or federal courts located in Cook County, Illinois.

**27.**         **COMPLETE AGREEMENT.** The Agreement (including the Appendices and any addendums) constitute the entire agreement between CARRIER and CONTRACTOR pertaining to the subject matter contained herein and fully replaces and supersedes all prior and contemporaneous agreements, representations, and understandings. No supplement, modification, or amendment to the Agreement shall be binding unless in writing and signed by both CARRIER and CONTRACTOR, except as otherwise provided with respect to deductions in Section 3 of Appendix A and insurance deductions in Section 6 of Appendix B. No waiver of any of the provisions of the Agreement shall constitute a waiver of any other provisions whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

shall be deemed effective or binding upon the CONTRACTOR unless executed in writing by the party making the waiver.

**IN WITNESS WHEREOF,** CARRIER and CONTRACTOR hereby sign this Agreement as of the date stated above.

**CARRIER:**

**POLMAX FLEET, LLC**

Address: 12161 South Central
Alsip, IL 60803

Fax:708-843-8301
Phone:

By:

Printed Name

**CONTRACTOR:**

Address:

Fax:
Phone:
Cell Phone:
FEIN or SSN:
E-Mail Address:

By:

Printed Name

12

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## RECEIPT FOR POSSESSION OF CONTRACTED VEHICLE(S)

Received from CONTRACTOR the vehicle or vehicles described in this Agreement.

Equipment received at 12161 S. CENTRAL AVE, ALSIP, IL 60803 on NOVEMBER 25TH, 20 19 at 2 : 00 o'clock P .M.

By: _____
   (CARRIER Representative)

JAROSLAVA TELEPUN
Printed Name

## RECEIPT FOR RETURN OF CONTRACTED VEHICLE(S)

Received from CARRIER the vehicle or vehicles described in this Agreement in good order.

Equipment received at _____ on _____, 20____ at ____:____ o'clock ____.M.

By:_____
   (CONTRACTOR Representative)

_____
Printed Name

**RECEIPTS**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## Appendix A

1. **COMPENSATION**. Unless otherwise agreed to in writing between the parties, CARRIER shall pay CONTRACTOR based upon the following schedule:

   a) For haulage of loads tendered by CARRIER: 80% of Gross Revenue ("GR").

   b) Definition of Gross Revenue (GR). GR means revenue billed by CARRIER to shippers, consignees, consignors, brokers, logistics companies, freight forwarders, other carriers, or other customers in connection with shipments CONTRACTOR accepts under this Agreement for line haul transportation, hourly work, accessorial services, detention, and all other services, fuel surcharges, and other charges and surcharges for a particular shipment.

   c) Accessorial Service Charges. The percentages of accessorial charges, including but not limited to, detention, tarping, loading and unloading charges, shall be paid to CONTRACTOR based upon the same percentage of GR listed above.

2. **ELECTIONS**.

i) License Plate.

CONTRACTOR must elect **ONE** of the following options pursuant to Section 9(e) of this Agreement.

**OPTION 1** CONTRACTOR will obtain plate(s) for the Equipment.

**OPTION 2** CARRIER will obtain apportioned plate(s) under the International Registration Plan for the Equipment (whichever is applicable) and deduct or otherwise recover the amount stated in Section 5 of this Appendix A.

ii) Fuel and Mileage Tax Reporting.

CONTRACTOR must elect **ONE** of the following options pursuant to Section 9(f) of this Agreement.

**OPTION 1** CONTRACTOR will obtain and pay any required fee for IFTA permits and will perform all fuel and mileage tax reporting with respect to the Equipment at CONTRACTOR's expense.

**OPTION 2** CARRIER will obtain and pay any required fee for the IFTA permit and will perform all fuel and mileage tax reporting services with respect to the Equipment.

iii) ELD.

CONTRACTOR must elect **ONE** of the following options pursuant to Section 20(a) of this Agreement.

**OPTION 1** CONTRACTOR will furnish an ELD for use in the Equipment.

**OPTION 2** CARRIER will furnish, at CONTRACTOR's expense, an ELD to CONTRACTOR for use in the Equipment.

iv) Event Recorder.

CONTRACTOR must elect **ONE** of the following options pursuant to Section 20(b) of this Agreement.

**OPTION 1** CONTRACTOR will furnish an Event Recorder for use in the Equipment.

**OPTION 2** CARRIER will furnish, at CONTRACTOR's expense, an Event Recorder to CONTRACTOR for use in the Equipment.

**APPENDIX A**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

3.   **CHANGES IN COMPENSATION**.

i)   Temporary Change.   CARRIER and CONTRACTOR may make a temporary change in CONTRACTOR's compensation to be paid for one or more services relating to a shipment or shipments under this Agreement, CARRIER by both parties' signing (either manually or, as indicated in Subsection (ii) below, electronically) an addendum, setting forth the change in advance of any hauling assignments to which the change will apply.   CONTRACTOR shall be under no obligation to accept the change in compensation by signing such an addendum, and CARRIER shall not terminate this Agreement for CONTRACTOR's failure to do so (except to the extent the procedure below for an "Ongoing Change" is followed), although, in this event, CARRIER is hereby authorized not to assign CONTRACTOR loads covered by the change in the meantime.   The temporary change shall not be effective for more than fifteen (15) days.

ii)   Ongoing Change. If any aspect of CONTRACTOR's compensation will be changing on an ongoing basis, CARRIER shall provide CONTRACTOR a proposed addendum containing the change at least fifteen (15) days in advance by hand, fax, overnight delivery, U.S. First Class Mail, or if the parties have agreed to these forms of communication by both signing Appendix D of, or a similar addendum to, this Agreement, by the electronic means specified in that appendix.   If CONTRACTOR wishes to continue operating on CARRIER's behalf, CONTRACTOR shall, by the effective date and time shown on the addendum, consent to the change by either manually signing the addendum and delivering it to CARRIER by hand, fax, overnight delivery, OR, if both parties have signed Appendix D of, or a similar addendum to, this Agreement, by signing the addendum by the electronic means specified in that appendix.   If CONTRACTOR does not take one of these actions consenting to the change within the time indicated on the addendum, the addendum shall operate as a notice of termination under Paragraph 2 of this Agreement, and this Agreement shall terminate as of the date and time set forth on the addendum, provided that, in this event, CONTRACTOR shall not be subject, either before or after termination, to the change(s) proposed in the addendum.

4.   **EARNINGS ADJUSTMENT**.

i)   Billing Error.   If CARRIER discovers and corrects an error in, or in CARRIER's sole judgment decides to retroactively increase or decrease, the amount of any item billed to CARRIER's customer on a shipment that CONTRACTOR hauled and for which CONTRACTOR was compensated pursuant to a percentage of Adjusted Gross Revenue, CARRIER shall credit to, or deduct from, CONTRACTOR's gross compensation at the next settlement a share – corresponding to the percentage of the revenue normally payable to CONTRACTOR for the shipment – of the additional amount CARRIER actually collects or refunds in remedying the error.   CARRIER shall provide CONTRACTOR, before or at the time of settlement, with a copy of the amended rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill, and shall otherwise meet the requirements of Paragraph 4 of this Agreement with respect to the shipment.

ii)   Billed Amounts Uncollected.   If, after making a commercially reasonable effort to do so, CARRIER is unable to collect from a customer the full amount of any item billed to the customer for a shipment that CONTRACTOR hauled and for which CONTRACTOR was compensated pursuant to a percentage of Adjusted Gross Revenue, CARRIER shall deduct from CONTRACTOR's gross compensation at the next settlement a share of the unpaid amount that corresponds to the percentage of the revenue normally payable to CONTRACTOR for the shipment.   CARRIER shall give CONTRACTOR, before or at the time of settlement, a written explanation of CARRIER's efforts to collect from CARRIER's customer and the computation of the amount being deducted from CONTRACTOR's gross compensation, Escrow Fund, and any other amounts due CONTRACTOR from CARRIER

**APPENDIX A**

FILED DATE: 6/4/2021 2:52 PM  2021CH01601

5. **CHARGE BACK ITEMS.** The following items shall be charged back and deducted from CONTRACTOR's compensation or from CONTRACTOR's escrow funds in the event that CONTRACTOR's compensation is insufficient. Where no dollar figure is listed, the deductions will vary in amount and will be computed as indicated. As used in this Agreement, "CARRIER Markup" means any amount that exceeds the actual cost incurred by CARRIER, whether such excess amount is retained by CARRIER to offset administrative costs, as profit, or for any other purpose.

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OR METHOD OF COMPUTATION OF DEDUCTION |
|---|---|
| Advances in Compensation | Amount CARRIER advanced to CONTRACTOR on CONTRACTOR's request, plus a per-transaction fee of two percent (2%) |
| Fuel Purchases Using Fuel Card | For fuel and oil purchases that CONTRACTOR elects to make from third-party fuel vendors using the fuel card issued by CARRIER, CARRIER will deduct (and show on CONTRACTOR's settlement statement) or otherwise recover an amount computed by multiplying the number of gallons or other units purchased by a price no greater than the price-per-unit posted at the fuel vendor's facility. The amount deducted, if less than the posted price, is the result of CARRIER sharing with CONTRACTOR some portion of the overall discount CARRIER has negotiated with the fuel vendor or fuel card issuer. CARRIER will retain the remainder of that discount, plus any other discounts or rebates it receives. |
| Fuel and Mileage Tax Reporting | CARRIER will deduct or otherwise recover a flat charge of $45 per calendar quarter, comprising the permit fees and a tax-reporting CARRIER Markup. Any additional fuel tax that CONTRACTOR may owe will be separately deducted or otherwise recovered by CARRIER. If CONTRACTOR fails to provide CARRIER complete and accurate fuel-tax records in time for CARRIER's computation, on the seventh day of each month, of CARRIER's fuel and mileage tax reports and payments for the preceding month, CARRIER will compute CONTRACTOR's fuel use taxes based on total miles dispatched by CARRIER at a rate of _ miles-per-gallon. |
| Operating expenses not otherwise listed in this table which are the responsibility of CONTRACTOR under this Agreement and which CONTRACTOR requests that CARRIER pay initially on CONTRACTOR's behalf. | Amount CARRIER paid or otherwise incurred |
| IRP Plate | If CONTRACTOR elects CARRIER to obtain an apportioned plate under the International Registration Plan, CARRIER will deduct or otherwise recover the annual estimated amount CARRIER will owe the issuing jurisdiction for the plate, computed on the basis of actual cost per year, which will be adjusted to match the actual amount billed to CARRIER, plus a CARRIER Markup of $80 per year. |
| Cargo Claims (See Section 10) | Amount CARRIER paid or incurred, up to $5,000 |
| Fines and penalties, including traffic tickets and related court costs, attorneys' fees, and | Amount CARRIER paid or otherwise incurred |

**APPENDIX A**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OR METHOD OF COMPUTATION OF DEDUCTION | |
|---|---|---|
| other legal expenses, pursuant to Sections 9(c) and 9(d) of this Agreement | | |
| Trailer Damage | Amount CARRIER paid or incurred, up to $10,000 | |
| Insurance Costs | See Appendix B | |
| Hold Harmless/Accident Claims | See Section 13 | |
| ELD | | |
| 1. Cost of ELD | 1. | $9.25 per week (includes CARRIER markup) |
| 2. Charges for loss of or damage to ELD | 2. | Amount paid to third-party vendor or otherwise incurred by CARRIER |
| Event Recorder | | |
| 1. Cost of Event Recorder | 1. | $6 per week (includes CARRIER markup) |
| 2. Charges for loss of or damage to Event Recorder | 2. | Amount paid to third-party vendor or otherwise incurred by CARRIER |
| CARRIER's legally required public liability insurance | $145 per week, amount represents CONTRACTOR's pro rata share of the cost of such insurance | |

CONTRACTOR agrees that CARRIER may charge back to CONTRACTOR any other expenses or cost incurred by CARRIER for which CONTRACTOR is responsible for under this Agreement or as otherwise agreed to by the parties. CONTRACTOR hereby waives any objection to any charge back item unless CONTRACTOR notifies CARRIER of CONTRACTOR's disagreement with such charge back within thirty (30) days of the charge back.

6. **CHANGES IN EXISTING DEDUCTION ITEMS.** If an item in any of the above columns will be changing, CONTRACTOR shall be so notified by personal delivery, fax, or other written notice. In any event, CONTRACTOR shall not be subject to any such change until ten (10) calendar days after such notice or such later time as is set forth in the notice. **CONTRACTOR's failure, by the end of ten calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's Settlement Compensation, beginning immediately after the ten-day period.** Such modified amounts shall replace and supersede those shown in the table in Section 3 above. If CONTRACTOR fails to notify CARRIER of CONTRACTOR's objection within the ten-day period – or if CONTRACTOR notifies CARRIER of CONTRACTOR's objection within the ten-day period and the parties are then unable to resolve the matter, the parties shall each have the right to terminate the Agreement immediately thereafter. Once the change becomes effective, CONTRACTOR still retains the right to terminate the Agreement in accordance with the procedures set forth in Section 2 of the Agreement (although CONTRACTOR shall remain subject to the change until the effective date and time of CONTRACTOR's termination).

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**APPENDIX A**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**CARRIER:**

**POLMAX FLEET, LLC**

By: _____

JAROSLAVA TELERUN
Printed Name

11 25 19
Date

**CONTRACTOR:**

By: _____

TNARDZINSKI  MICHAL
Printed Name

11-25-19
Date

**APPENDIX A**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## Appendix B

### INSURANCE AND ALLOCATION OF LIABILITY

1.    **CARRIER'S INSURANCE OBLIGATIONS.** It shall be CARRIER's responsibility, pursuant to DOT regulations promulgated under 49 U.S.C. § 13906 and pursuant to applicable state laws, to provide public liability and property damage liability insurance for the Equipment at all times while the Equipment is being operated on behalf of CARRIER. However, CARRIER's possession of such insurance shall in no way affect CARRIER's rights of indemnification against CONTRACTOR as provided for in this Agreement.

2.    **CONTRACTOR'S INSURANCE OBLIGATIONS.** CONTRACTOR shall maintain, at its sole cost and expense, the following minimum insurance coverages during this Agreement:

   **(a)    NON-TRUCKING LIABILITY.** CONTRACTOR shall procure, carry, and maintain public liability and property damage insurance which shall provide coverage to CONTRACTOR whenever the Equipment (as well as any CARRIER trailer) is not being operated on behalf of CARRIER (including, but not limited to, whenever the Equipment is being operated on behalf of others pursuant to a Trip Lease or whenever the Equipment is being operated on behalf of CONTRACTOR alone) in a combined single limit of not less than One Million Dollars ($1,000,000) for injury or death to any person or for damages to property in any one occurrence. Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix. In addition, such coverage shall be primary to any other insurance that may be available from CARRIER. CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

   **(b)    WORKERS' COMPENSATION/OCCUPATIONAL ACCIDENT INSURANCE.** CONTRACTOR shall provide workers' compensation insurance coverage for CONTRACTOR (if a natural person), all of its employees and agents, anyone driving the Equipment, and any other persons required to be covered under the worker's compensation law of any state that is reasonably likely to have jurisdiction over CONTRACTOR's business operations and in amounts not less than the statutory limits required by such applicable state law. The worker's compensation insurance policy shall provide principal coverage in Illinois as well as the state in which the work is principally localized, and shall provide "other states coverage" that excludes only North Dakota, Ohio, Washington, and Wyoming. As evidence of such coverage, CONTRACTOR shall provide CARRIER with a copy of the insurance policy declarations page for CARRIER's verification before operating the Equipment under this Agreement. Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.   If (a) CONTRACTOR is the sole owner and the sole and exclusive operator of the Equipment and (b) the state in which the work is principally localized is not California, Colorado, Illinois, Massachusetts, Nevada, New Hampshire, New Jersey, or North Carolina, then CONTRACTOR may, as an alternative to obtaining workers' compensation coverage, obtain occupational accident insurance policy that includes either an endorsement or a separate policy provision whereby the insurer provides, or agrees to provide, workers' compensation coverage that becomes effective for a claim by CONTRACTOR alleging employee status. Such occupational accident insurance coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.

   **(c)    PASSENGER INSURANCE.** CONTRACTOR shall procure, carry, and maintain passenger liability insurance that shall provide coverage to CONTRACTOR whenever the

**APPENDIX B**

FILED DATE: 6/4/2021 2:52 PM 2021CH01601

Equipment is being operated (whether or not on behalf of CARRIER) in a combined single limit of not less than One Hundred Thousand Dollars ($100,000) for injury or death to any person riding as a passenger in the Equipment or for damages to that person's property in any one occurrence. Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix. In addition, such coverage shall be primary to any other insurance that may be available from CARRIER. CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

**(d)** **OTHER INSURANCE**. In addition to the insurance coverages required under this Agreement, it is CONTRACTOR'S responsibility to procure, carry and maintain any fire, theft, uninsured and/or underinsured motorist, and physical damage (collision), or other insurance coverage that CONTRACTOR may desire for the Equipment or for CONTRACTOR's health care or other needs. As provided in this Agreement, CONTRACTOR holds CARRIER harmless with respect to loss of or damage to CONTRACTOR's Equipment, trailer, or other property, and CARRIER has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to CONTRACTOR's Equipment, trailer, or other property. CONTRACTOR acknowledges that CARRIER may, and CONTRACTOR hereby authorizes CARRIER to, waive and reject no-fault, uninsured, and underinsured motorist coverage from CARRIER's insurance policies to the extent allowed under Illinois law (or such other state law where the Equipment is principally garaged), and CONTRACTOR shall cooperate in the completion of all necessary documentation for such waiver, election, or rejection.

3. **REQUIREMENTS APPLICABLE TO ALL OF CONTRACTOR'S INSURANCE COVERAGES**. CONTRACTOR shall procure insurance policies providing the above-described coverages solely from insurance carriers that are A.M. Best "A"-rated, and CONTRACTOR shall not operate the Equipment under this Agreement unless and until CARRIER has determined that the policies are acceptable (CARRIER's approval shall not be unreasonably withheld). CONTRACTOR shall furnish to CARRIER written certificates obtained from CONTRACTOR'S insurance carriers showing that all insurance coverages required above have been procured from A.M. Best "A" rated insurance carriers, that the coverages are being properly maintained, and that the premiums thereof are paid. Each insurance certificate shall specify the name of the insurance carrier, the policy number, and the expiration date; list CARRIER as an additional insured with primary coverage; and show that written notice of cancellation or modification of the policy shall be given to CARRIER at least thirty (30) days prior to such cancellation or modification.

4. **CONTRACTOR'S LIABILITY IF REQUIRED COVERAGES ARE NOT MAINTAINED**. In addition to CONTRACTOR's hold harmless/indemnity obligations to CARRIER under the Agreement, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that CARRIER may incur arising out of or in connection with CONTRACTOR'S failure to maintain the insurance coverages required by this Agreement. In addition, CONTRACTOR, on behalf of its insurer, expressly waives all subrogation rights against CARRIER, and, in the event of a subrogation action brought by CONTRACTOR's insurer, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from such claim.

5. **AVAILABILITY OF INSURANCE FACILITATED BY CARRIER**. CONTRACTOR may, if it so chooses by initialing one or more boxes in the right-hand column of the attached "CERTIFICATE OF INSURANCE," authorize CARRIER to facilitate, on CONTRACTOR'S behalf, the insurance coverages required or made optional by this Agreement. In any such case, CARRIER shall deduct, from CONTRACTOR settlement compensation, amounts reflecting all of CARRIER's expense and cost in obtaining and administering such coverage. In addition, if CONTRACTOR fails to provide proper evidence of the purchase or maintenance of the insurance required above, then CARRIER is authorized but not required to obtain such insurance at CONTRACTOR's expense and deduct, from CONTRACTOR's

**APPENDIX B**

settlement compensation, amounts reflecting all of CARRIER's expense in obtaining and administering such coverage. CONTRACTOR recognizes that CARRIER is not in the business of selling insurance, and any insurance coverage requested by CONTRACTOR from CARRIER is subject to all of the terms, conditions, and exclusions of the actual policy issued by the insurance underwriter. CARRIER shall ensure that CONTRACTOR is provided with a certificate of insurance (as required by 49 C.F.R. § 376.12(j)(2)) for each insurance policy under which the CONTRACTOR has authorized CARRIER to facilitate insurance coverage from the insurance underwriter (each such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to CONTRACTOR for each type of coverage, and the deductible amount for each type of coverage for which CONTRACTOR may be liable), and CARRIER shall provide CONTRACTOR with a copy of each policy upon request.

6. **CHANGES IN COST OR OTHER DETAILS OF COVERAGES.** If CARRIER is facilitating any insurance coverages for CONTRACTOR pursuant to Section 5 of this Appendix and the cost to CONTRACTOR for, or other details of, a coverage changes from the information listed in the attached "CERTIFICATE OF INSURANCE", CONTRACTOR will be so notified by personal delivery, fax, other written notice, or by appropriate electronic means as outlined in Appendix D. In any event, CONTRACTOR shall not be subject to any such change until ten (10) calendar days after such notice or such later time as is set forth in the notice. **CONTRACTOR's failure, by the end of ten (10) calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's settlement compensation, beginning immediately after the 10-day period. Such modified amounts shall replace and supersede those shown in the Certificate of Insurance and CARRIER shall not have an obligation to also provide a revised Certificate of Insurance.** If CONTRACTOR fails to notify CARRIER of any objection within the 10-day period -- or if CONTRACTOR notifies CARRIER of its objection within the 10-day period and CONTRACTOR and CARRIER are then unable to resolve the matter to their mutual satisfaction -- CONTRACTOR and CARRIER shall each have the right to terminate this Agreement effective immediately upon the change becoming effective (although CONTRACTOR shall remain subject to the change until CONTRACTOR's termination's effective date and time).

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**

**POLMAX FLEET LLC**

By: _____

JAROSLAVA TELEPUN

Printed Name

11 25 19

Date

**CONTRACTOR:**

MT TM TRANSPORT

By: _____

TWARDOWSKI MICHAL

Printed Name

11-25-19

Date

**APPENDIX B**

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## CERTIFICATE OF INSURANCE

CONTRACTOR hereby requests CARRIER, through its insurer, to facilitate on CONTRACTOR's behalf (if they are available) the insurance coverages CONTRACTOR has selected by placing CONTRACTOR's initials in the right-hand column below:

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| 1. **Non-Trucking Liability Insurance:** | |
| Name of Insurer: **American Hallmark Insurance Company** | ___ YES |
| Policy No: AHI-N3212-110269 | ___ NO |
| Effective Date(s) of Coverage: 04/21/2018 to 04/21/2019 | |
| Amount of Coverage: $1,000,000 combined single limit | |
| Current Cost to CONTRACTOR: $6.78 per unit of Equipment per week  *Includes CARRIER Markup* | |
| Deductible for Which CONTRACTOR Is Liable: $1,000 per occurrence | |
| 2. **Occupational Accident Insurance:** | |
| Name of Insurer: Zurich American Insurance Company | ___ YES |
| Policy No: OCA-0117320 | ___ NO |
| Effective Date(s) of Coverage: 06/01/2018 to 06/01/2019 | |
| Amount of Coverage: Varies, see coverage forms | |
| Current Cost to CONTRACTOR: $31.26 per week  *Includes CARRIER Markup* | |
| **[COVERAGE IS AVAILABLE ONLY TO A SOLE-PROPRIETOR CONTRACTOR WHO IS EXCLUSIVE DRIVER OF THE EQUIPMENT.]** | |
| Deductible for Which CONTRACTOR Is Liable: n/a | |



**APPENDIX B**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| 3. **Physical Damage Insurance on Tractor:** | |
| *Name of Insurer: Arch Insurance Company* | _____ YES |
| *Policy No: ZACAT6010801* | _____ NO |
| *Effective Date(s) of Coverage: 01/01/2019 to 01/01/2020* | |
| *Amount of Coverage: Insured value, as specified by CONTRACTOR, of $_____* | |
| *Current Cost to CONTRACTOR: ___% annually, billed weekly, of Contractor-specified value of Equipment: $_____* ***Includes CARRIER Markup*** | |
| *Deductible for Which CONTRACTOR Is Liable: _____* | |
| 4. **Cargo Insurance:** | |
| *Name of Insurer: AGCS Marine* | _____ YES |
| *Policy No: MZI9307754* | _____ NO |
| *Effective Date(s) of Coverage: 01/01/2019 to 01/01/2020* | |
| *Amount of Coverage: $250,000* | |
| *Current Cost to CONTRACTOR: $30.45 per unit of Equipment per week* ***Includes CARRIER Markup*** | |
| *Deductible for Which CONTRACTOR Is Liable: $5000 per occurrence* | |

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**

**POLMAX FLEET, LLC**

By: _____

JAROSLAVA TELEPUN
Printed Name

11/25/19
Date

**CONTRACTOR:**

MT TM TRANSPORT

By: _____

TWARDOWSKI MICHAL
Printed Name

11-25-19
Date

_____

**APPENDIX B**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**Appendix D**

**CONSENT TO CONDUCT BUSINESS USING ELECTRONIC METHODS**

Pursuant to Regulatory Guidance Concerning Electronic Signatures and Documents, 74 Fed. Reg. 411 (Jan. 4, 2011), issued by the Federal Motor Carrier Safety Administration ("FMCSA"), Polmax Fleet, LLC ("CARRIER") and the contractor who completes the signature block below ("CONTRACTOR") hereby consent and agree to conduct business using electronic methods. This consent encompasses the use of electronic methods to transmit and effect the signature of any document, including, without limitation, any supplement, modification, amendment, notice, consent and/or waiver, required by this Agreement or required by FMCSA regulations to be generated and maintained (or exchanged by private parties), including, without limitation, applications, driver histories and other qualification records, leases formed under 49 C.F.R. Part 376, driver-vehicle inspection reports, and records of duty status. CONTRACTOR agrees that the above electronic method, which CARRIER has adopted to effect electronic signatures: (1) identifies and authenticates CONTRACTOR as the source of the electronic communication; (2) indicates CONTRACTOR's approval of the information contained in the electronic communication; and (3) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature. Either party may elect, with respect to any document, to use a manual/hardcopy signature, provided that such election shall not preclude the other party from applying an electronic signature to the same document.

**CONTRACTOR:** _MT TM TRANSPORT_

Name (Typed or Printed)

**If Sole Proprietor:**

_____
Social Security No.

**If Corp., Partnership, or LLC:**
_84-1365926_

_____
Fed. Taxpayer ID No.

By: _____

Signature

Authorized Representative's Name (Typed or Printed)

_____

Title
_2157 WALNUT Rd_

Address (Street, P.O. Box)
_AURORA      IL    60504_

City, State & Zip Code
_630-362-0115_

Telephone Number       Fax Number
_travdy 0714 @ gmail. com_

Email Address

**CARRIER:**

**POLMAX FLEET, LLC**

By: _____

Signature

Title
_1201 S. CENTRAL AVE,_

Address (Street, P.O. Box)
_60808_

_ALSIP IL_

City, State & Zip Code
_708-843-8500      708-843-8301_

Telephone Number       Fax Number
_CONRAD@ GOEXPERIOR.COM_

Email Address

---

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## Appendix E

### COMMUNICATIONS

### PRIVACY DISCLOSURE AND CONSENT FORM

**1.   ELD, Event Recorder Requirements and Their Purposes.** CONTRACTOR agrees to maintain in each unit of Equipment (as defined in Section 1 of this Agreement) a compliant and functioning ELD and Event Recorder. The principal purpose of the ELD requirement is to assist CONTRACTOR's drivers and CARRIER in complying with any applicable hours-of-service regulations and other Applicable Law and in avoiding adverse safety scores and FMCSA interventions under CSA. The ELD may also assist in providing load dispatching and tracking services to meet the specifications of CARRIER's customers.  The principal purpose of the Event Recorder requirement is to help record evidence relating to highway accidents or cargo damage for purposes of assessing contractual liabilities and meet customer requirements.

**2.   Categories of Electronic Information Collected.** The ELD is capable of collecting various categories of data regarding the Equipment and its operation (collectively "ELD Electronic Information"), including but not limited to the: name of the driver and any co-driver(s), and corresponding driver identification information; duty status (that is, "Off Duty," "Sleeper Berth," "Driving," and "On-Duty Not Driving"); date and time the Equipment is in operation; location of the Equipment; distance travelled (including when the Equipment crosses state lines); name and DOT number of CARRIER; 24-hour period starting time; multiday basis used by CARRIER to compute cumulative duty hours and driving time; hours in each duty status for the 24-hour period, and total hours; Equipment number; load information, such as shipping document number(s), or name of shipper and commodity(ies); fuel use, including when the Equipment is refueled; speed of the Equipment; hard-braking events; and power-on self-tests and diagnostic error codes. The ELD Electronic Information is transmitted from the Equipment to the third-party vendor of the ELD (as identified below) and then from the third-party vendor to CARRIER. CARRIER may access certain categories of the ELD Electronic Information in furtherance of its efforts to comply with Applicable Law, including hours-of-service regulations, or to meet CARRIER's customers' specifications. The Event Recorder is capable of collecting various categories of data regarding the Equipment and its operation (collectively "Event Recorder Electronic Information"), including, without limitation: forward-facing video of unordinary shocks, decelerating/braking, accelerating, swerving, turning, and manual event recording. The Event Recorder Electronic Information is transmitted from the Equipment to the third-party Event Recorder vendor (see below) and then from the vendor to CARRIER. CARRIER may access certain categories of the Event Recorder Electronic Information in furtherance of its efforts to comply with Applicable Law, assess contractual liabilities, or to meet customer specifications.

**3.   Carrier Uses of Electronic Information.** The third-party ELD vendor – Samsara Networks Inc. – and the third-party Event Recorder vendor – Samsara Networks Inc. – are responsible for the collection and storage of the ELD Electronic Information and the Event Recorder Electronic Information, respectively. CARRIER does not collect or store the Electronic Information, but has access to the Electronic Information and reserves the right to request that the third-party vendor collect and store the Electronic Information for as long as the Equipment with the installed ELD and Event Recorder operates under lease to CARRIER, and for a reasonable time thereafter. Contractors or their drivers who have questions about the safeguards Samsara Networks Inc., and Samsara Networks Inc. have put in place to protect against the loss, unauthorized access, use, destruction, or improper disclosure of the Electronic Information may contact Samsara Networks Inc., at www.samsara.com. CARRIER has reasonable safeguards in place to secure the Electronic Information it receives from the third-party vendor, and limits access to the Electronic Information to authorized individuals who need to know the information in order to ensure compliance with Applicable Law, including the hours-of-service regulations, and to meet CARRIER's customers' specifications.

**4.   Right to Review Electronic Information.** CONTRACTOR's workers will have the right, on written request to CARRIER, to review the collected Electronic Information that CARRIER itself continues to have access to, but only Electronic Information relating to the person making the request. A written request for

---

**APPENDIX E**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

such a review should be addressed to CARRIER and sent by email or U.S. Mail to the address listed on the signature page following the main text of this Agreement.

**This Appendix E is agreed to by the undersigned parties on the latest date set forth below.**

**CONTRACTOR:** *TRANSPORT*
*MI TM*

By: _____
*IVARDOUSKI MICHAL*

Printed Name

*1L-25-19*

Date

**CONTRACTOR's Driver (if applicable):**

_____

By: _____

Printed Name

_____

Date

**APPENDIX E**

Return Date: No return date scheduled
Hearing Date: 8/3/2021 10:00 AM - 10:00 AM
Courtroom Number: 2510
Location: District 1 Court
Cook County, IL

FILED
6/4/2021 2:52 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH01601

13574498

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

# EXHIBIT C

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## INDEPENDENT CONTRACTOR AGREEMENT

Polmax Fleet, LLC ("CARRIER"), an authorized motor carrier, and *MILMAEC COGOTICS* ("CONTRACTOR"), in consideration of the covenants and agreements contained herein and pursuant to the federal leasing regulations under 49 C.F.R. Part 376, enter into this Independent Contractor Agreement ("Agreement") on *SEPTEMBER 15,* 20___.

1. **PROVISION OF SERVICES AND EQUIPMENT.** During the term of this Agreement, CONTRACTOR shall provide CARRIER professional truck driving services, other incidental transportation related services, and the use of the equipment set forth below or in an appendix (the 'Equipment'). CONTRACTOR represents and warrants that CONTRACTOR has title to or is authorized to contract the Equipment and services to CARRIER. Upon taking possession of the Equipment from CONTRACTOR, CARRIER shall furnish to CONTRACTOR a receipt for Equipment, which shall constitute the receipt required by 49 C.F.R. § 376.11(b). Upon termination of this Agreement, CONTRACTOR shall execute a similar receipt for equipment as the written receipt for the return of the Equipment by CARRIER to CONTRACTOR; provided, however, that the Agreement and CARRIER's obligations thereunder shall expire upon the written notice of termination regardless of whether CONTRACTOR submits the receipt required under this provision.

| Year | Make | Serial No. | Unit # |
|------|------|-----------|--------|
| 2015 | INTERNATIONAL | ...643... | |
| | | | |
| | | | |

2. **DURATION OF AGREEMENT AND TERMINATION.** This Agreement shall begin on the date set forth above and end exactly one (1) year thereafter. Either party may terminate this Agreement for any reason by giving fifteen (15) days written notice to that effect to the other party either personally, by mail, by fax machine at the address or fax number shown at the end of this Agreement, or by appropriate electronic means as outlined in Appendix D. The ability of either party to terminate this Agreement shall in no way be interpreted as an at-will employment provision and shall not otherwise affect CONTRACTOR's status as an independent contractor under this Agreement. The effective date and time of termination shall be as set forth in the written notice or the receipt for Equipment issued by CONTRACTOR, whichever date is earlier. CONTRACTOR shall, upon the termination of this Agreement, remove all CARRIER identification from the Equipment and return it to CARRIER, via hand delivery or certified mail, together with all of CARRIER's property, including trailers, paperwork, load securement equipment and freight, to CARRIER's nearest terminal. If CONTRACTOR fails to return CARRIER's property or freight to CARRIER or remove and return all CARRIER identification from the Equipment upon termination of this Agreement, CONTRACTOR shall pay CARRIER, all collections costs incurred by CARRIER, including reasonable attorney fees, and CARRIER may pursue all other remedies allowed by law or authorized in the Agreement against CONTRACTOR.

3. **GROSS COMPENSATION.** It is expressly understood and agreed that CONTRACTOR's gross compensation shall be as set forth in Appendix A, and such gross compensation shall constitute the total compensation for everything furnished, provided, or done by CONTRACTOR in connection with this Agreement, including driver's services, including but not limited to driving of the Equipment and all non-driving activities such as conducting pre- and post-trip inspections of the Equipment, waiting to load or unload (detention), loading or unloading if required, fueling, repairing and maintaining the Equipment, hooking and unhooking empty trailers, preparing logbooks and other paperwork, and other activities and services. **As indicated in this Agreement, CONTRACTOR – as an independent contractor, not an employee – agrees to pay all of CONTRACTOR's operating expenses (including but not limited to those that CARRIER initially advances and later charges back to CONTRACTOR) out of the gross compensation provided under this Paragraph and Appendix A and any other CONTRACTOR assets. Under no circumstances shall CARRIER be responsible for these operating expenses.** All mileage computations shall be based on the most recent edition of CARRIER's Mileage Guide. Although CARRIER

1

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

shall use reasonable efforts to make shipments available to CONTRACTOR for transportation during the term of this Agreement, CONTRACTOR acknowledges and agrees that CARRIER does not guarantee any specific number of shipments or amount of revenue to CONTRACTOR during the term of this Agreement. CONTRACTOR may refuse any specific shipment offered by CARRIER.  CONTRACTOR is not prohibited from entering into separate agreements to provide equipment and other professional truck drivers not identified as Equipment above or in an attachment and drivers not used to service this Agreement, to other motor carriers.

4.      **SETTLEMENT PERIOD.**  CARRIER shall settle with CONTRACTOR with respect to services provided under this Agreement within 15 calendar days after CONTRACTOR's submission, in proper form, of those documents necessary for CARRIER to secure payment from its customers, including the signed freight bill, delivery receipt or bill of lading, and properly completed logs as required by the U.S. Department of Transportation ("DOT"). Where CONTRACTOR is paid a percentage of revenue, CARRIER will provide CONTRACTOR with a copy of the rated freight bill (or a computer-generated summary) before or at the time of settlement.  CONTRACTOR may examine CARRIER's tariffs, or other contracts or documents, if any, from which charges and rates are computed; provided, however, only that information that would appear on a rated freight bill will be disclosed by CARRIER.  The parties agree that all debit and credit entries detailed in each settlement statement are conclusively presumed to be correct and proper if not disputed by CONTRACTOR within 180 days of CARRIER's issuance of the settlement statement. CARRIER shall have the right, but not as a condition of settlement and payment, to review all of CONTRACTOR's documents and records relating to the use of the Equipment and the services provided under this Agreement and CONTRACTOR agrees to provide CARRIER with access to such documents and records upon reasonable notice. With respect to final settlement upon termination of this Agreement, the failure on the part of CONTRACTOR to remove and return to CARRIER all identification devices of CARRIER or a letter certifying their removal shall entitle CARRIER to withhold any payments owed to CONTRACTOR until such obligation is met.  **All information from CARRIER's documents examined pursuant to this Paragraph shall be considered "Confidential Matters" protected from unauthorized disclosure by Paragraph 20 of this Agreement, provided that CONTRACTOR may disclose such information (but only if marked "CONFIDENTIAL – NOT FOR FURTHER DISCLOSURE" and accompanied by the text of this Paragraph making clear the information's confidentiality) to CONTRACTOR's attorney solely to aid in the attorney's counseling or representation of CONTRACTOR, or, under seal, to a court, administrative agency, or party in litigation pursuant to valid legal process.**

5.      **CHARGE BACK.**  CARRIER shall deduct from CONTRACTOR's compensation, at the time of payment to or settlement with CONTRACTOR, any liability or expense CARRIER has incurred or paid that, under this Agreement or any addendum to this Agreement, CONTRACTOR is obligated to bear.  Such expenses shall be deducted from the amount of CONTRACTOR's settlement compensation and shall include those expenses set forth in Appendix A of this Agreement.  The amount of each item to be charged back to CONTRACTOR shall be computed based on the actual cost or expense incurred by CARRIER and any administrative fee or mark-up disclosed in Appendix A or elsewhere in this Agreement or any addendum thereto. CARRIER shall provide CONTRACTOR written itemization and documentation of all charge backs where such documentation is necessary to verify the validity of the charge.

6.      **INSURANCE.**  The respective obligations of the parties shall be as set forth in Appendix B. CARRIER shall maintain public liability, property damage and cargo insurance in such amounts as are required by the DOT and applicable state regulatory agencies.  CARRIER shall maintain insurance coverage for the protection of the public pursuant to 49 U.S.C. § 13906. Such insurance shall be maintained at Contractor's expense, as provided in Section 5 of Appendix A. CARRIER's possession of legally required insurance shall in no way restrict CARRIER's right of indemnification from CONTRACTOR as provided under this Agreement.  It shall be considered a material breach of this Agreement where CONTRACTOR is determined by CARRIER or CARRIER's insurer to be uninsurable for any reason.

7.      **ESCROW FUND.**      CONTRACTOR authorizes CARRIER to establish and administer an escrow fund in accordance with the provisions of Appendix C.

---

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**8.    COMPLIANCE WITH PERTINENT LAWS AND REGULATIONS BY CONTRACTOR.**
CONTRACTOR recognizes that CARRIER's separate and distinct business of providing motor carrier freight transportation service to the public is subject to regulation by the federal government acting through the DOT, and by various other federal, state, local, and foreign governing bodies.  As such, CONTRACTOR hereby acknowledges that he/she possesses full and complete understanding and knowledge of the DOT's CSA program.  CONTRACTOR shall adhere to the following provisions of this Agreement to aid CARRIER in discharging its legal duties:

(a)    **Contractor's Drivers.**  CONTRACTOR shall provide competent professional drivers who meet CARRIER's minimum driver qualification standards and all of the requirements of the DOT, including but not limited to, familiarity and compliance with state and federal motor carrier safety laws and regulations.   As part of the driver qualification process, CONTRACTOR, and CONTRACTOR's drivers, shall authorize CARRIER to access applicable driver files, Pre-Qualification Screening Program ('PSP') data from the DOT, and any other driver data or information available as part of DOT's CSA program.  The parties agree that CARRIER shall have the right to disqualify any driver provided by CONTRACTOR in the event that the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law or the criteria established by the PSP, in violation of CARRIER's minimum qualification standards, or in violation of any policies of CARRIER's customers.  Drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet CARRIER's minimum qualification standards.  Upon a driver's disqualification by CARRIER, CONTRACTOR shall be obligated to furnish another competent, reliable and qualified professional driver that meets the minimum qualification standards established by CARRIER.

(b)    **Paperwork Requirements.**  CONTRACTOR shall submit to CARRIER, on a timely basis, all driver logs and supporting documents (including original toll receipts for CARRIER's reproduction), physical examination certificates, accident reports, and any other required data, documents or reports, including any documentary evidence that CARRIER requests proving CONTRACTOR has paid all taxes legally due and owing to any government body.  As required by 49 C.F.R. § 376.12(I), CARRIER will keep the original of this Agreement with a copy to be maintained by CONTRACTOR, and a second copy to be carried in the Equipment during the term of this Agreement.

(c)    **Shipping Documents.**  CONTRACTOR agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of CARRIER, or as authorized by CARRIER, and shall indicate that the property transported is under the responsibility of CARRIER or a carrier with which the Equipment has been subcontracted.

(d)    **Drug and Alcohol Testing.**  CONTRACTOR and its drivers shall, as required by 49 C.F.R. § 382.103, comply with CARRIER's Drug and Alcohol Policy, including participation in CARRIER's random drug and alcohol testing program, and any addendums or revisions thereto.

(e)    **Safe Operations.**  CONTRACTOR agrees to operate the Equipment in a safe and prudent manner at all times so as to avoid endangering the public, the driver, and/or the property being transported and in accordance with this Agreement, the laws of the various jurisdictions in which the Equipment will be operated and pursuant to the operating authorities of CARRIER, and in accordance with all rules related to traffic safety, highway protection and road requirements.  Moreover, CONTRACTOR agrees that all drivers and/or workers employed by CONTRACTOR will comply with the terms of this Agreement, including the requirement of safe operations, while operating the Equipment on behalf of CONTRACTOR.   CONTRACTOR agrees that any driver utilized by CONTRACTOR will comply with CARRIER's policies and procedures and any subsequent revisions thereto, which will be provided by CARRIER.

(f)    **CSA Compliance**.  CONTRACTOR shall ensure that CONTRACTOR, and any drivers of CONTRACTOR, and CONTRACTOR's Equipment shall at all times meet CSA safety standards sufficient to enable CARRIER to (a) achieve and maintain a "satisfactory" or similar rating that

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

enables CARRIER to operate without FMCSA intervention or restriction pertaining to driver, equipment, and other CSA performance measures; (b) obtain insurance coverage without increased costs associated with driver, equipment, or other performance measures under CSA; and (c) be and remain competitive with similarly situated carriers with regard to safety performance measures under CSA.  CONTRACTOR further agrees to notify CARRIER in writing within two (2) business days of receiving notification from the FMCSA that CONTRACTOR or any of its drivers have been deemed "unfit" or "marginal" based on their safety and compliance performance.

**(g)** **Duty to Notify.**  CONTRACTOR has an ongoing duty to notify CARRIER's Safety Department immediately if (i) an adverse medical or physical condition develops or worsens, (ii) in accordance with 49 C.F.R. § 382.213(d), a new medication (whether prescription or over-the-counter), is taken, (iii) CONTRACTOR, or CONTRACTOR's driver, receives notice of criminal charge(s) brought against it and/or receives criminal conviction(s), and/or (iv) CONTRACTOR, or CONTRACTOR's driver, receives an adverse federal, state or local safety performance rating or report. At any time after CONTRACTOR notifies CARRIER of such information, CARRIER's Safety Department may suspend CONTRACTOR's carrier qualification to drive under CARRIER's motor carrier authority.  If the information relates to subparts (i) or (ii) above, the suspension may remain, pending CARRIER obtaining from CONTRACTOR's physician or other licensed health care provider and/or from CARRIER's designated medical examiner (after, if CARRIER so requires, a new medical examination of CONTRACTOR by such medical examiner) of information on CONTRACTOR's medications and adverse physical conditions, including whether a medication or condition may adversely affect CONTRACTOR's ability to safely operate CONTRACTOR's commercial motor vehicle equipment and whether CONTRACTOR should continue to be qualified by CARRIER to drive the Equipment.  CARRIER shall then decide whether to qualify, or restore the qualification of, CONTRACTOR to drive the Equipment and shall notify CONTRACTOR of the decision.

**9.** **OPERATIONAL EXPENSES.**

**(a)** **Operating Expenses.**  CONTRACTOR shall, at its sole cost and expense, provide all the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, state base plates and shall furnish all necessary oil, fuel, tires, and other parts, supplies and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment, including repairs for the operation of such Equipment.  CONTRACTOR shall pay all expenses incident to the operation of the Equipment, including, but not limited to, empty mileage, lumper expenses, highway use taxes, weight taxes, state property or indefinite situs taxes, fuel taxes, registration fees, ferry and toll charges, and detention and accessorial charges not collected by CARRIER because of CONTRACTOR's failure to provide the required documentation.

**(b)** **Maintenance and Inspection.**  CONTRACTOR, at its sole cost and expense, shall maintain the Equipment in safe condition and in complete compliance with all laws and regulations of the states in which CONTRACTOR operates and the DOT.  In order to ensure compliance with all DOT regulations, CONTRACTOR shall, at its sole cost and expense, make the Equipment available for inspection by CARRIER upon reasonable request by CARRIER.  CONTRACTOR shall, at its sole cost and expense, have the Equipment inspected annually, as required by 49 C.F.R. § 396.17, at CARRIER's maintenance facility or at another maintenance facility which CARRIER may, in its sole discretion, authorize.  CONTRACTOR shall, as directed by CARRIER, forward to CARRIER all inspection, maintenance and repair records for the Equipment.

**(c)** **Fines.**  CONTRACTOR or its drivers (as professional drivers engaged in a separate and distinct profession) agree to pay all fines, including but not limited to parking and traffic fines and penalties, imposed for violation of any law or regulation by the state or any locality in which CONTRACTOR operates, or the DOT, where such violation results, at least partially, from the acts or omissions of CONTRACTOR.

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**(d)** **Overweight and Oversized Shipments.** CONTRACTOR or CONTRACTOR's drivers (as professional drivers engaged in a separate and distinct profession) shall have the duty to determine that all shipments are in compliance with the size and weight laws of the states in which or through which the Equipment will travel and to notify CARRIER if the vehicle is overweight, oversized or in need of permits before commencing the haul.   Except when the violation results from the acts or omissions of CONTRACTOR, CARRIER shall assume the risks and costs of fines for overweight and oversize trailers when such trailers are preloaded and sealed, or the load is containerized, or for improperly permitted oversized and overweight loads, or the trailer or lading is otherwise outside of CONTRACTOR's control.  CONTRACTOR shall pay, or reimburse CARRIER, for any costs or penalties due to CONTRACTOR's failure to weigh each shipment or to notify CARRIER that the vehicle is overweight, oversized or in need of permits.

**(e)** **License Plates.** CONTRACTOR agrees to obtain and display on the Equipment the base plates necessary to operate the Equipment lawfully on CARRIER's behalf. If CONTRACTOR chooses to have CARRIER obtain the base plates and deduct the expense from CONTRACTOR's gross compensation, by indicating such in Appendix A, CARRIER shall obtain a base plate under the International Registration Plan ("IRP") in CARRIER's name for use by CONTRACTOR, the cost of which shall be deducted from CONTRACTOR's settlement compensation in the amount set forth in Appendix A until the cost of the plate is paid in full. CONTRACTOR shall remove and return such plate to CARRIER upon the termination of this Agreement and, in the event CONTRACTOR fails or refuses to do so, CARRIER shall, and is hereby authorized to, deduct the full cost of the plate from CONTRACTOR's final settlement and escrow funds.  If CARRIER receives a refund or credit for an IRP plate registered in the name of CARRIER or such base plate is authorized by CONTRACTOR to be resold by CARRIER to another contractor, CARRIER shall refund to CONTRACTOR a pro-rata share of the amount received by CARRIER.  CONTRACTOR shall not be entitled to reimbursement for any unused portion of a base plate, however, unless CARRIER is able to reuse or resale the plate to another contractor.

**(f)** **Fuel and Mileage Taxes.** CONTRACTOR is responsible for obtaining an International Fuel Tax Agreement ("IFTA") permit and performing fuel and mileage tax reporting for the operation of the Equipment. CONTRACTOR agrees to be solely responsible for calculating, reporting, and paying all fuel taxes owed for the operation of the Equipment; and agrees to indemnify, defend, and hold harmless CARRIER from all claims arising out of or relating to the fuel tax reporting and payment (not subject to the indemnity limit). This notwithstanding, if CONTRACTOR chooses to have CARRIER perform fuel and mileage tax reporting on CONTRACTOR's behalf and deduct the expense from CONTRACTOR's gross compensation, by indicating such in Appendix A, CARRIER will be deemed the reporting entity with respect to the Equipment and the fuel consumed by it. For the purposes of computing and paying all state fuel and mileage taxes owed for the Equipment, CARRIER shall issue CONTRACTOR a fuel card that may be used for fuel purchases. In the event CONTRACTOR or its drivers fail to use CARRIER's fuel card, CONTRACTOR shall be responsible for providing CARRIER with an accurate accounting of all fuel purchases and miles traveled for the purposes of computing state fuel and mileage tax liability, and CONTRACTOR shall provide CARRIER with all original fuel receipts. In addition to the flat amount(s) stated in Section 5 of Appendix A, CARRIER will quarterly, with respect to CONTRACTOR's operations in all taxing jurisdictions combined, either: (i) deduct or otherwise recover any net fuel use tax owed; or (ii) credit CONTRACTOR for any net fuel use tax credit or refund due CONTRACTOR.    CARRIER will compute CONTRACTOR's fuel use and mileage taxes on a fleet wide-average basis.  If CONTRACTOR fails to provide CARRIER complete and accurate fuel-tax-related records in time for CARRIER's computation of CARRIER's fuel tax reports and payments for the preceding month, CARRIER will compute CONTRACTOR's fuel use taxes based on total miles dispatched by CARRIER at the miles-per-gallon rate stated in Section 5 of Appendix A.

**10.** **CARGO CLAIMS.**  CONTRACTOR shall immediately report all cargo claims, including all shortages, overages or other exceptions to the cargo, to CARRIER.  CONTRACTOR shall be liable for, and CARRIER shall charge back to CONTRACTOR, the first $5,000 of each cargo claim, including but not limited to, delay, shortages, misdelivery, and any direct damage claim relating to lost, damaged or

5



FILED DATE: 6/4/2021 2:52 PM   2021CH01601

contaminated loads, arising out of, or in connection with CONTRACTOR's services. The dollar limit in this paragraph shall not apply to damages arising out of or in connection with such claims if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') gross negligence, willful misconduct, breach of this Agreement, or other culpable acts or omissions. Before deducting any cargo claim from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization for each such claim.

**11.     USE OF CARRIER'S TRAILER.**  CONTRACTOR agrees to return any trailer, trailer equipment of any kind or purpose, or chassis provided for its use by CARRIER in the same good condition as received by CONTRACTOR, reasonable wear and tear excepted, along with any and all other equipment and property belonging to CARRIER immediately upon CARRIER's request or upon termination of this Agreement.  In the event the trailer is not in as good as condition as it was delivered by CARRIER, CONTRACTOR hereby authorizes CARRIER to restore the trailer to proper condition and to charge back to CONTRACTOR the costs of such repairs or reconditioning.  In the event CONTRACTOR for any reason fails to comply with this provision and return CARRIER's trailer, CONTRACTOR agrees to reimburse CARRIER for all reasonable expense and costs, including attorney fees, incurred by CARRIER in recovery of its trailer or property from CONTRACTOR or its drivers.  CONTRACTOR agrees that in the event it is necessary for CARRIER to enter upon private property or remove private property in order to recover its trailer and property, CONTRACTOR does hereby irrevocably grant CARRIER or its duly authorized agents, permission to do so and further agrees to indemnify and hold harmless CARRIER, and its duly authorized agents, from any form of liability whatsoever in connection with such repossession. CONTRACTOR shall be liable for, and pay, the entire amount for each incident involving direct, indirect and consequential damage, including but not limited to, towing charges, replacement costs for a total loss, arising out of, or in connection with, CONTRACTOR's use of CARRIER's trailers, CARRIER's customer's trailers, other CARRIER equipment, or equipment of any other carrier. Before deducting any such damage from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization of such damage.  CONTRACTOR agrees and warrants that any trailer provided for use by CARRIER will only be used by CONTRACTOR and its drivers to transport shipments tendered to CONTRACTOR by CARRIER.

**12.     ACCIDENTS AND CLAIMS.**  CONTRACTOR shall immediately report any accident or potential claim to CARRIER involving operations under this Agreement.   CONTRACTOR and its drivers shall cooperate fully with CARRIER with respect to any legal action, regulatory hearing or other similar proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder.  CONTRACTOR shall, upon CARRIER's request and at CONTRACTOR's sole expense, provide written reports or affidavits, attend hearings and trials and assist in securing evidence or obtaining the attendance of witnesses.  CONTRACTOR shall provide CARRIER with any assistance as may be necessary for CARRIER or CARRIER's representatives or insurers to investigate, settle or litigate any accident, claim or potential claim by or against CARRIER.

**13.     HOLD HARMLESS.**  Except to the extent CONTRACTOR's acts or omissions are covered under the parties' respective insurance policies as set forth in Appendix B with no expense to CARRIER, CONTRACTOR agrees to defend, indemnify and hold harmless CARRIER from any direct, indirect and consequential loss, damage, fine, expense, including reasonable attorney's fees, action, claim for injury to persons, including death, and damage to property which CARRIER may incur arising out of or in connection with the operation of the Equipment, CONTRACTOR's obligations under this Agreement, or any breach by CONTRACTOR, or its drivers or workers, of the terms of this Agreement. This provision shall remain in full force and effect both during and after the termination of this Agreement. **PARAGRAPH 15 AND OTHER PROVISIONS OF THIS AGREEMENT REFLECT THAT CONTRACTOR IS, AND BOTH CONTRACTOR AND CARRIER INTEND CONTRACTOR TO BE, AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE OF CARRIER.  IN LIGHT OF THIS FACT AND INTENT: CONTRACTOR agrees to indemnify and hold CARRIER harmless from all reasonable attorneys' fees and litigation expenses CARRIER incurs in defending against any claims, suits, actions, or administrative proceedings brought by CONTRACTOR, CONTRACTOR's owner (if any), or any employees or other personnel engaged by CONTRACTOR to perform services under this Agreement – or, at CONTRACTOR's instance or with CONTRACTOR's consent, by any union or other private organization or member of**



FILED DATE: 6/4/2021 2:52 PM   2021CH01601

the public – that allege that **CONTRACTOR** or any of **CONTRACTOR's** workers is an employee of **CARRIER**, but fail to result in any final (upon completion of all appeals or the running of all applicable appeal periods) judicial or administrative decision holding the allegation to be true.

14.     <u>**CARRIER RESPONSIBILITIES.**</u>

      (a)     <u>**Exclusive Possession and Responsibility.**</u>

           i.    The Equipment shall be for CARRIER's exclusive possession, control, and use for the duration of this Agreement.  As such, CONTRACTOR shall not operate the Equipment for any other motor carrier or entity during the term of this Agreement without prior written consent from CARRIER.  CARRIER shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement. This subparagraph is set forth solely to conform with DOT regulations and shall not be used for any other purposes, including any attempt to classify CONTRACTOR as an employee of CARRIER.  Nothing in the provisions required by 49 C.F.R. § 376.12(c) (1) is intended to affect whether CONTRACTOR or its drivers are an independent contractor or an employee of CARRIER.  An independent contractor relationship may exist when a carrier complies with 49 U.S.C. § 14102 and attendant administrative requirements. As provided by 49 C.F.R. § 376.12(c) (4), "an independent contractor relationship may exist when a carrier complies with 49 U.S.C. § 14102 and attendant administrative requirements."

           ii.    Because of the limitations of 49 C.F.R. §§ 376.12(c) (1) and (2), CONTRACTOR may operate the Equipment for another motor carrier or entity during the Agreement only with the prior written consent of CARRIER pursuant to this subsection. At CONTRACTOR's request, CARRIER may, with respect to any trip or trips, approve uses of the Equipment to perform transportation services other than on behalf of CARRIER only under the terms and conditions set forth in this subsection.  The other uses may consist of (together, "Alternative Uses of Equipment"): (i) Sublease – CARRIER subleases the Equipment (including services furnished by CONTRACTOR's driver) to another authorized for-hire motor carrier of property ("Sublease Carrier") for the provision of for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to Sublease Carrier's customers pursuant to Sublease Carrier's operating authority; (ii) CONTRACTOR Motor Carriage – CONTRACTOR uses CONTRACTOR's own motor carrier operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper (directly or through a motor freight broker), in which event, the provisions of this subsection relating to CONTRACTOR Motor Carriage shall be deemed to constitute the sublease required by 49 C.F.R. § 376.12(c)(2); and (iii) Exempt Motor Carriage – CONTRACTOR, lacking motor carrier operating authority of CONTRACTOR's own but possessing a validly issued DOT Number, lawfully provides for hire motor carriage, exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper (directly or through a motor freight broker). CARRIER assumes no responsibility for the collection of freight charges or payment to CONTRACTOR for any Alternative Uses of Equipment-related revenue.  During the term of Alternative Uses of Equipment, CONTRACTOR will remove or cover up all of CARRIER's identification on the Equipment and display instead CONTRACTOR's or the trip-lease carrier's identification and, as between CONTRACTOR and CARRIER, CARRIER will have no responsibility for, and CONTRACTOR will fully indemnify CARRIER regarding, the operation of the Equipment.

FILED DATE: 6/4/2021 2:52 PM  2021CH01601

**(b)** **Identification of Equipment.** CARRIER shall identify the Equipment in accordance with the requirements of the DOT and appropriate state regulatory agencies. CARRIER shall have the right to place and maintain on the Equipment CARRIER's name and any lettering, advertisement, slogans or designs as CARRIER may choose. CONTRACTOR shall remove such identification at the termination of this Agreement or while operating such Equipment for any purpose other than conducting CARRIER's business. At its discretion, CONTRACTOR may have the identification permanently painted on the Equipment. CONTRACTOR further agrees to keep the Equipment in clean appearance and identified as described herein, at its sole cost and expense. CARRIER agrees that CONTRACTOR may display CONTRACTOR's name and address on the Equipment where required by applicable state law.

15. **CONTRACTOR NOT EMPLOYEE OF CARRIER.**

**(a)** **In General.** This Agreement is between two independent businesses that are separately owned and operated. It is expressly understood and agreed that CONTRACTOR is an independent contractor for the Equipment and driver services provided under this Agreement. CONTRACTOR agrees to provide necessary documentation and apply for certification of CONTRACTOR's independent contractor status where mandated by Applicable Law (as defined in Paragraph 16 below).

**(b)** **Equipment, Maintenance, and Routes.** Subject only to Applicable Law, it will be the sole responsibility of CONTRACTOR to: (i) select, purchase or lease, and finance the Equipment; (ii) to decide when, where, and how maintenance and repairs are to be performed; and (iii) to select all routes and decide all meal, rest, and refueling stops, provided that to meet CARRIER's Customers' demands, CONTRACTOR agrees to make timely and safe deliveries of all loads, and to notify CARRIER when delivery has been made or will be delayed for any reason.

**(c)** **CONTRACTOR's Workers.** Subject only to Applicable Law and safety considerations, CONTRACTOR assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, meal and rest breaks, wages, and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, coverage of worker injuries, adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of or relating to CONTRACTOR's use or employment of agents, drivers, drivers' helpers, and other workers to perform any aspect of this Agreement. In addition, CONTRACTOR agrees to be solely responsible for complying with Applicable Law governing the terms and conditions of employment of CONTRACTOR's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and other required withholdings for CONTRACTOR's employees.

**(d)** **Taxes.** CONTRACTOR is free to choose the form in which to operate CONTRACTOR's business. CONTRACTOR agrees to file all tax forms and returns that CONTRACTOR may be required by law to file, on account of CONTRACTOR's workers used in the performance of this Agreement, and to pay when due all taxes and contributions reported in the forms and returns. In that regard, CONTRACTOR knows: (i) of CONTRACTOR's responsibilities to pay estimated social security taxes and state and federal income taxes with respect to remuneration received from CARRIER; (ii) that the social security tax CONTRACTOR must pay is higher than the social security tax the individual would pay if he or she were an employee; and (iii) that the service provided by CONTRACTOR to CARRIER under this Agreement is not work covered by the unemployment compensation laws of any State, including Georgia; provided, however, that should CONTRACTOR employ or use drivers, helpers, or other workers to fulfill CONTRACTOR's obligations under this Agreement, and the drivers, helpers, or other workers are covered by the unemployment compensation laws of any State, including Georgia, CONTRACTOR is solely responsible for providing unemployment insurance for the drivers, helpers, or other workers. CONTRACTOR agrees to furnish CARRIER such evidence of compliance with the foregoing as CARRIER may



FILED DATE: 6/4/2021 2:52 PM   2021CH01601

reasonably require, including but not limited to proof of income and payroll taxes currently paid by CONTRACTOR or withheld by CONTRACTOR from the wages of CONTRACTOR's workers. CARRIER will file a Form 1099 with the Internal Revenue Service with respect to CONTRACTOR as required by Applicable Law.

16.     **BREACH.**  Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated immediately, at any time, by either party in the event of a party's actual or threatened commitment of a felony or intentional tort; violation of, or failure to comply fully with, the requirements of any applicable federal, state, local, and foreign authorities, including but not limited to DOT, state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"); material breach of this Agreement; or the occurrence of an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5, that, in CARRIER's reasonable judgment, was caused in whole or in part by CONTRACTOR's negligence, gross negligence, or willful misconduct.  In the event of a breach, the non-breaching party may elect to terminate the Agreement by giving immediate oral, followed by written, notice of termination to the offending party.  If, in CARRIER's judgment, CONTRACTOR has subjected CARRIER to liability because of CONTRACTOR's acts or omissions, CARRIER may take possession of the shipment entrusted to CONTRACTOR and complete performance.  In such event, CONTRACTOR shall waive any recourse against CARRIER for such action and CONTRACTOR shall reimburse CARRIER for all direct or indirect costs, expenses, or damages, including attorney's fees, incurred by CARRIER as a result of CARRIER's taking possession of the shipment and completing performance.

17.     <u>**CONTRACTOR NOT REQUIRED TO PURCHASE PRODUCTS, EQUIPMENT, OR SERVICES FROM CARRIER.**</u>  CONTRACTOR is not required to purchase or rent any products, equipment, or services from CARRIER as a condition of entering into this Agreement.   In the event CONTRACTOR elects to purchase or rent equipment from CARRIER or from any third party, for which the purchase or rental contract gives CARRIER the right to make deductions from CONTRACTOR's settlement, then the parties mutually agree to attach and incorporate each such contract, specifying all terms thereof, to this Agreement as a separate addendum.

18.     **PASSENGER AUTHORIZATION.**  As required by 49 C.F.R. § 392.60, CONTRACTOR shall not allow any passengers to ride in the Equipment unless authorized in writing by CARRIER as required by law.  Before passenger authorization will be given by CARRIER, CONTRACTOR (or its driver) and the passenger requesting authorization shall submit a fully executed Passenger Authorization and Release of Liability form to CARRIER for prior approval.

19.     <u>**LOADING AND UNLOADING.**</u>  In the event the shipper or consignee does not assume loading and unloading responsibilities, CONTRACTOR shall be responsible for the loading or unloading of property transported on behalf of CARRIER at CONTRACTOR's expense.

20.     <u>**COMMUNICATIONS.**</u>

(a) <u>Electronic Logging Device.</u>  To serve CARRIER's customers' shipment-tracking demands and help fulfill government requirements, including compliance with the hours-of-service regulations, CONTRACTOR must maintain in the Equipment an Electronic Logging Device ("ELD"). CONTRACTOR may either provide an ELD that is fully interoperable with CARRIER's platform or elect to obtain one through CARRIER by making such an election in Appendix A. If CONTRACTOR elects to obtain an ELD through Carrier, CARRIER will, at CONTRACTOR's expense, furnish, install, and maintain in an operable condition an ELD in the Equipment. CONTRACTOR will be responsible for the cost of the ELD and any monthly usage fees charged by the ELD vendor chosen by CARRIER and such cost and fees shall be charged back to CONTRACTOR pursuant to Paragraph 5 and Appendix A. CONTRACTOR will immediately return the ELD to CARRIER upon CARRIER's request or the termination of this Agreement   if the ELD has not been fully paid for, and therefore not purchased, by CONTRACTOR. If the ELD is lost, damaged as a result of CONTRACTOR's negligence, or not returned upon request or upon termination of this Agreement, and the ELD has not been fully paid for and therefore not purchased by CONTRACTOR,

CONTRACTOR authorizes CARRIER to deduct or otherwise recover the entire expense incurred by CARRIER in recovering, repairing, or replacing the ELD. CARRIER will not be responsible for any loss or damage to the Equipment arising or resulting from the installation, use, or removal of the ELD. If CONTRACTOR replaces the unit(s) of Equipment, CONTRACTOR will bear the expense of removal and re-installation of the ELD in the replacement Equipment, and CONTRACTOR authorizes CARRIER to deduct or otherwise recover all such expense.

(b) <u>Event Recorder</u>. To help record evidence relating to highway accidents or cargo damage for purposes of assessing contractual liabilities, CONTRACTOR must maintain in the Equipment a front-facing event recorder with the capability of recording video of the road in front of the Equipment ("Event Recorder"). CONTRACTOR may either provide an Event Recorder that is fully interoperable with CARRIER's platform or elect to obtain one through CARRIER by making such an election in Appendix A. If CONTRACTOR elects to obtain an Event Recorder through Carrier, CARRIER will, at CONTRACTOR's expense, furnish, install, and maintain in an operable condition an Event Recorder in the Equipment. CONTRACTOR will be responsible for the cost of the Event Recorder and any usage fees charged by the Event Recorder vendor chosen by CARRIER and such cost and fees shall be charged back to CONTRACTOR pursuant to Paragraph 5 and Appendix A. CONTRACTOR will immediately return the Event Recorder to CARRIER upon CARRIER's request or the termination of this Agreement if the Event Recorder has not been fully paid for, and therefore not purchased, by CONTRACTOR. If the Event Recorder is lost, damaged as a result of CONTRACTOR's negligence, or not returned upon request or upon termination of this Agreement, and the Event Recorder has not been fully paid for and therefore not purchased by CONTRACTOR, CONTRACTOR authorizes CARRIER to deduct or otherwise recover the entire expense incurred by CARRIER in recovering, repairing, or replacing the Event Recorder. CARRIER will not be responsible for any loss or damage to the Equipment arising or resulting from the installation, use, or removal of the Event Recorder. If CONTRACTOR replaces the unit(s) of Equipment, CONTRACTOR will bear the expense of removal and re-installation of the Event Recorder in the replacement Equipment, and CONTRACTOR authorizes CARRIER to deduct or otherwise recover all such expense.

(c) <u>Privacy Disclosures and Consent Form</u>. Appendix E describes the categories of data collected by the ELD and Event Recorder, the uses to be made of such data by CARRIER, and the right of CONTRACTOR's driver(s) to review certain of the data upon request.

21. <u>CONFIDENTIALITY AND TRADE SECRETS.</u>

(a) CONTRACTOR hereby recognizes and acknowledges that any list of CARRIER's customers, as it may exist now or from time to time, is a valuable, special and unique asset of the business of CARRIER. CONTRACTOR agrees, during and after the term of this Agreement, not to disclose the list of CARRIER's customers or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever without CARRIER's prior written consent. CONTRACTOR agrees to preserve as "Confidential Matters", all trade secrets, knowhow and information relating to CARRIER's business, forms, processes, developments, sales and promotional systems, prices and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, or other contractors, and other sources of any kind resulting from this Agreement. CONTRACTOR agrees to regard such Confidential Matters as the sole property of CARRIER, and shall not publish, disclose or disseminate the same to others without the written consent of CARRIER. In the event of any breach or threatened breach by CONTRACTOR of the provisions of this paragraph, CARRIER shall be entitled to an injunction, restraining CONTRACTOR from disclosing, in whole or in part, the list of CARRIER's customers, and all other Confidential Matters. CONTRACTOR agrees that CARRIER will be irreparably damaged in the event of any breach of this provision by CONTRACTOR. Accordingly, in addition to any other legal or equitable remedies that may be available to CARRIER, CONTRACTOR agrees that CARRIER will be able to seek and obtain immediate injunctive relief in the form of a



FILED DATE: 6/4/2021 2:52 PM   2021CH01601

temporary restraining order without notice, preliminary injunction, or permanent injunction against CONTRACTOR to enforce this confidentiality provision. CARRIER shall not be required to post any bond or other security and shall not be required to demonstrate any actual injury or damage to obtain injunctive relief from the courts. Nothing hereunder shall be construed as prohibiting CARRIER from pursuing any remedies available to CARRIER at law or in equity for such breach, including the recovery of monetary damages from CONTRACTOR.

**(b)** To the extent the Confidential Matters constitute "trade secrets" under 18 U.S.C. § 1839(3), CARRIER provides the following notice to CONTRACTOR pursuant to 18 U.S.C. § 1833(b)(3): An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

**22.** **BENEFIT AND ASSIGNMENT.** This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors. CONTRACTOR may not assign or subcontract all or a portion of its obligations to another party without the prior written consent of CARRIER.

**23.** **NOTICE.** All notices required or permitted by this Agreement shall be in writing delivered personally, by postage prepaid, first class mail, by facsimile machine to the addresses or fax number shown at the end of this Agreement, or by appropriate electronic means as outlined in Appendix D.

**24.** **NON-WAIVER.** The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement, or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a customary practice contrary to such provision or right.

**25.** **SEVERABILITY.** If any Agreement or its appendices is deemed invalid for any reason whatsoever, the Agreement shall be void only as to such provision, and this Agreement shall remain otherwise binding between the parties. Any provision voided by operation of the foregoing shall be replaced with provisions which shall be as close as the parties' original intent as permitted under applicable law.

**26.** **GOVERNING LAW AND CHOICE OF FORUM.** This Agreement is to be governed by the laws of the United States and of the State of Illinois, without regard to the choice-of-law rules of Illinois or any other jurisdiction. The parties further agree that any claim or dispute arising from or in connection with this Agreement or otherwise with respect to the overall relationship between the parties, whether under federal, state, local, or foreign law, shall be brought exclusively in state or federal courts located in Cook County, Illinois.

**27.** **COMPLETE AGREEMENT.** The Agreement (including the Appendices and any addendums) constitute the entire agreement between CARRIER and CONTRACTOR pertaining to the subject matter contained herein and fully replaces and supersedes all prior and contemporaneous agreements, representations, and understandings. No supplement, modification, or amendment to the Agreement shall be binding unless in writing and signed by both CARRIER and CONTRACTOR, except as otherwise provided with respect to deductions in Section 3 of Appendix A and insurance deductions in Section 6 of Appendix B. No waiver of any of the provisions of the Agreement shall constitute a waiver of any other provisions whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver

11



FILED DATE: 6/4/2021 2:52 PM   2021CH01601

shall be deemed effective or binding upon the CONTRACTOR unless executed in writing by the party making the waiver.

     **IN WITNESS WHEREOF,** CARRIER and CONTRACTOR hereby sign this Agreement as of the date stated above.

**CARRIER:**

**POLMAX FLEET, LLC**

Address: 12161 South Central
Alsip, IL 60803

Fax:<u>708-843-8301</u>
Phone: _____

By:_____

_____
Printed Name

**CONTRACTOR:**

_MICHAL LOGISTICS_

Address: _5100 N MARINE apt 11a_

_____

_____

Fax:_____
Phone: _847 730 9320_
Cell Phone:_____
FEIN or SSN:_83-3060419_
E-Mail Address: _kom michal@gmail.com_

By:_____

_MICHAL KOMORSKI_
Printed Name

12

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**RECEIPT FOR POSSESSION OF CONTRACTED VEHICLE(S)**

Received from CONTRACTOR the vehicle or vehicles described in this Agreement.

Equipment received at _2401 S. CENTRAL AVE, ASHILGREE_ on _SEPTEMBER 14TH_, 20_20_ at _8_ : _45_ o'clock _A_.M.

By: _____
    (CARRIER Representative)

_JAROSLAVA TELEPIN_
Printed Name

---

**RECEIPT FOR RETURN OF CONTRACTED VEHICLE(S)**

Received from CARRIER the vehicle or vehicles described in this Agreement in good order.

Equipment received at _____ on _____, 20____ at ____:____ o'clock ____.M.

By: _____
    (CONTRACTOR Representative)

_____
Printed Name

**RECEIPTS**

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

## Appendix A

1.  **COMPENSATION**.  Unless otherwise agreed to in writing between the parties, CARRIER shall pay CONTRACTOR based upon the following schedule:

    a)    For haulage of loads tendered by CARRIER: 80% of Gross Revenue ("GR").

    b)    <u>Definition of Gross Revenue (GR)</u>. GR means revenue billed by CARRIER to shippers, consignees, consignors, brokers, logistics companies, freight forwarders, other carriers, or other customers in connection with shipments CONTRACTOR accepts under this Agreement for line haul transportation, hourly work, accessorial services, detention, and all other services, fuel surcharges, and other charges and surcharges for a particular shipment.

    c)    <u>Accessorial Service Charges</u>.  The percentages of accessorial charges, including but not limited to, detention, tarping, loading and unloading charges, shall be paid to CONTRACTOR based upon the same percentage of GR listed above.

2.  **ELECTIONS**.

i)    License Plate.

CONTRACTOR must elect **ONE** of the following options pursuant to Section 9(e) of this Agreement.

        _____    **OPTION 1**    CONTRACTOR will obtain plate(s) for the Equipment.

                **OPTION 2**    CARRIER will obtain apportioned plate(s) under the International Registration Plan for the Equipment (whichever is applicable) and deduct or otherwise recover the amount stated in Section 5 of this Appendix A.

ii)    Fuel and Mileage Tax Reporting.

CONTRACTOR must elect **ONE** of the following options pursuant to Section 9(f) of this Agreement.

        _____    **OPTION 1**    CONTRACTOR will obtain and pay any required fee for IFTA permits and will perform all fuel and mileage tax reporting with respect to the Equipment at CONTRACTOR's expense.

                **OPTION 2**    CARRIER will obtain and pay any required fee for the IFTA permit and will perform all fuel and mileage tax reporting services with respect to the Equipment.

iii)    ELD.

CONTRACTOR must elect **ONE** of the following options pursuant to Section 20(a) of this Agreement.

        _____    **OPTION 1**    CONTRACTOR will furnish an ELD for use in the Equipment.

                **OPTION 2**    CARRIER will furnish, at CONTRACTOR's expense, an ELD to CONTRACTOR for use in the Equipment.

iv)    Event Recorder.

CONTRACTOR must elect **ONE** of the following options pursuant to Section 20(b) of this Agreement.

        _____    **OPTION 1**    CONTRACTOR will furnish an Event Recorder for use in the Equipment.

                **OPTION 2**    CARRIER will furnish, at CONTRACTOR's expense, an Event Recorder to CONTRACTOR for use in the Equipment.

---

**APPENDIX A**



FILED DATE: 6/4/2021 2:52 PM 2021CH01601

**3.**          <u>**CHANGES IN COMPENSATION**</u>.

i)     Temporary Change. CARRIER and CONTRACTOR may make a temporary change in CONTRACTOR's compensation to be paid for one or more services relating to a shipment or shipments under this Agreement, CARRIER by both parties' signing (either manually or, as indicated in Subsection (ii) below, electronically) an addendum, setting forth the change in advance of any hauling assignments to which the change will apply. CONTRACTOR shall be under no obligation to accept the change in compensation by signing such an addendum, and CARRIER shall not terminate this Agreement for CONTRACTOR's failure to do so (except to the extent the procedure below for an "Ongoing Change" is followed), although, in this event, CARRIER is hereby authorized not to assign CONTRACTOR loads covered by the change in the meantime. The temporary change shall not be effective for more than fifteen (15) days.

ii)     Ongoing Change. If any aspect of CONTRACTOR's compensation will be changing on an ongoing basis, CARRIER shall provide CONTRACTOR a proposed addendum containing the change at least fifteen (15) days in advance by hand, fax, overnight delivery, U.S. First Class Mail, or if the parties have agreed to these forms of communication by both signing Appendix D of, or a similar addendum to, this Agreement, by the electronic means specified in that appendix. If CONTRACTOR wishes to continue operating on CARRIER's behalf, CONTRACTOR shall, by the effective date and time shown on the addendum, consent to the change by either manually signing the addendum and delivering it to CARRIER by hand, fax, overnight delivery, OR, if both parties have signed Appendix D of, or a similar addendum to, this Agreement, by signing the addendum by the electronic means specified in that appendix. If CONTRACTOR does not take one of these actions consenting to the change within the time indicated on the addendum, the addendum shall operate as a notice of termination under Paragraph 2 of this Agreement, and this Agreement shall terminate as of the date and time set forth on the addendum, provided that, in this event, CONTRACTOR shall not be subject, either before or after termination, to the change(s) proposed in the addendum.

**4.**          <u>**EARNINGS ADJUSTMENT**</u>.

i)     Billing Error. If CARRIER discovers and corrects an error in, or in CARRIER's sole judgment decides to retroactively increase or decrease, the amount of any item billed to CARRIER's customer on a shipment that CONTRACTOR hauled and for which CONTRACTOR was compensated pursuant to a percentage of Adjusted Gross Revenue, CARRIER shall credit to, or deduct from, CONTRACTOR's gross compensation at the next settlement a share – corresponding to the percentage of the revenue normally payable to CONTRACTOR for the shipment – of the additional amount CARRIER actually collects or refunds in remedying the error. CARRIER shall provide CONTRACTOR, before or at the time of settlement, with a copy of the amended rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill, and shall otherwise meet the requirements of Paragraph 4 of this Agreement with respect to the shipment.

ii)     Billed Amounts Uncollected. If, after making a commercially reasonable effort to do so, CARRIER is unable to collect from a customer the full amount of any item billed to the customer for a shipment that CONTRACTOR hauled and for which CONTRACTOR was compensated pursuant to a percentage of Adjusted Gross Revenue, CARRIER shall deduct from CONTRACTOR's gross compensation at the next settlement a share of the unpaid amount that corresponds to the percentage of the revenue normally payable to CONTRACTOR for the shipment. CARRIER shall give CONTRACTOR, before or at the time of settlement, a written explanation of CARRIER's efforts to collect from CARRIER's customer and the computation of the amount being deducted from CONTRACTOR's gross compensation, Escrow Fund, and any other amounts due CONTRACTOR from CARRIER

---

**APPENDIX A**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

5.    **CHARGE BACK ITEMS.**  The following items shall be charged back and deducted from CONTRACTOR's compensation or from CONTRACTOR's escrow funds in the event that CONTRACTOR's compensation is insufficient.  Where no dollar figure is listed, the deductions will vary in amount and will be computed as indicated. As used in this Agreement, "CARRIER Markup" means any amount that exceeds the actual cost incurred by CARRIER, whether such excess amount is retained by CARRIER to offset administrative costs, as profit, or for any other purpose.

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OR METHOD OF COMPUTATION OF DEDUCTION |
|---|---|
| Advances in Compensation | Amount CARRIER advanced to CONTRACTOR on CONTRACTOR's request, plus a per-transaction fee of two percent (2%) |
| Fuel Purchases Using Fuel Card | For fuel and oil purchases that CONTRACTOR elects to make from third-party fuel vendors using the fuel card issued by CARRIER, CARRIER will deduct (and show on CONTRACTOR's settlement statement) or otherwise recover an amount computed by multiplying the number of gallons or other units purchased by a price no greater than the price-per-unit posted at the fuel vendor's facility. The amount deducted, if less than the posted price, is the result of CARRIER sharing with CONTRACTOR some portion of the overall discount CARRIER has negotiated with the fuel vendor or fuel card issuer. CARRIER will retain the remainder of that discount, plus any other discounts or rebates it receives. |
| Fuel and Mileage Tax Reporting | CARRIER will deduct or otherwise recover a flat charge of $45 per calendar quarter, comprising the permit fees and a tax-reporting CARRIER Markup. Any additional fuel tax that CONTRACTOR may owe will be separately deducted or otherwise recovered by CARRIER. If CONTRACTOR fails to provide CARRIER complete and accurate fuel-tax records in time for CARRIER's computation, on the seventh day of each month, of CARRIER's fuel and mileage tax reports and payments for the preceding month, CARRIER will compute CONTRACTOR's fuel use taxes based on total miles dispatched by CARRIER at a rate of _ miles-per-gallon. |
| Operating expenses not otherwise listed in this table which are the responsibility of CONTRACTOR under this Agreement and which CONTRACTOR requests that CARRIER pay initially on CONTRACTOR's behalf. | Amount CARRIER paid or otherwise incurred |
| IRP Plate | If CONTRACTOR elects CARRIER to obtain an apportioned plate under the International Registration Plan, CARRIER will deduct or otherwise recover the annual estimated amount CARRIER will owe the issuing jurisdiction for the plate, computed on the basis of actual cost per year, which will be adjusted to match the actual amount billed to CARRIER, plus a CARRIER Markup of $80 per year. |
| Cargo Claims (See Section 10) | Amount CARRIER paid or incurred, up to $5,000 |
| Fines and penalties, including traffic tickets and related court costs, attorneys' fees, and | Amount CARRIER paid or otherwise incurred |

**APPENDIX A**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OR METHOD OF COMPUTATION OF DEDUCTION |
|---|---|
| other legal expenses, pursuant to Sections 9(c) and 9(d) of this Agreement | |
| Trailer Damage | Amount CARRIER paid or incurred, up to $10,000 |
| Insurance Costs | See Appendix B |
| Hold Harmless/Accident Claims | See Section 13 |
| ELD<br><br>1. Cost of ELD<br><br>2. Charges for loss of or damage to ELD | 1.    $9.25 per week (includes CARRIER markup)<br><br>2.    Amount paid to third-party vendor or otherwise incurred by CARRIER |
| Event Recorder<br><br>1. Cost of Event Recorder<br><br>2. Charges for loss of or damage to Event Recorder | 1.    $6 per week (includes CARRIER markup)<br><br>2.    Amount paid to third-party vendor or otherwise incurred by CARRIER |
| CARRIER's legally required public liability insurance | $145 per week, amount represents CONTRACTOR's pro rata share of the cost of such insurance |

CONTRACTOR agrees that CARRIER may charge back to CONTRACTOR any other expenses or cost incurred by CARRIER for which CONTRACTOR is responsible for under this Agreement or as otherwise agreed to by the parties.  CONTRACTOR hereby waives any objection to any charge back item unless CONTRACTOR notifies CARRIER of CONTRACTOR's disagreement with such charge back within thirty (30) days of the charge back.

6. **CHANGES IN EXISTING DEDUCTION ITEMS.**  If an item in any of the above columns will be changing, CONTRACTOR shall be so notified by personal delivery, fax, or other written notice.  In any event, CONTRACTOR shall not be subject to any such change until ten (10) calendar days after such notice or such later time as is set forth in the notice.  **CONTRACTOR's failure, by the end of ten calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's Settlement Compensation, beginning immediately after the ten-day period.**  Such modified amounts shall replace and supersede those shown in the table in Section 3 above.  If CONTRACTOR fails to notify CARRIER of CONTRACTOR's objection within the ten-day period – or if CONTRACTOR notifies CARRIER of CONTRACTOR's objection within the ten-day period and the parties are then unable to resolve the matter, the parties shall each have the right to terminate the Agreement immediately thereafter.  Once the change becomes effective, CONTRACTOR still retains the right to terminate the Agreement in accordance with the procedures set forth in Section 2 of the Agreement (although CONTRACTOR shall remain subject to the change until the effective date and time of CONTRACTOR's termination).

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**APPENDIX A**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**CARRIER:**

**POLMAX FLEET, LLC**

By: _____

~~JAROSLAVA   TELELIN~~
Printed Name

09/15/20
Date

**CONTRACTOR:**

MICHAEC   LOGISTICS

By: _____

MICHAE   KAMORSU
Printed Name

09/15/20
Date

**APPENDIX A**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## Appendix B

### INSURANCE AND ALLOCATION OF LIABILITY

1.    **CARRIER'S INSURANCE OBLIGATIONS.**  It shall be CARRIER's responsibility, pursuant to DOT regulations promulgated under 49 U.S.C. § 13906 and pursuant to applicable state laws, to provide public liability and property damage liability insurance for the Equipment at all times while the Equipment is being operated on behalf of CARRIER.  However, CARRIER's possession of such insurance shall in no way affect CARRIER's rights of indemnification against CONTRACTOR as provided for in this Agreement.

2.    **CONTRACTOR'S INSURANCE OBLIGATIONS.**  CONTRACTOR shall maintain, at its sole cost and expense, the following minimum insurance coverages during this Agreement:

(a)    **NON-TRUCKING LIABILITY.**  CONTRACTOR shall procure, carry, and maintain public liability and property damage insurance which shall provide coverage to CONTRACTOR whenever the Equipment (as well as any CARRIER trailer) is not being operated on behalf of CARRIER (including, but not limited to, whenever the Equipment is being operated on behalf of others pursuant to a Trip Lease or whenever the Equipment is being operated on behalf of CONTRACTOR alone) in a combined single limit of not less than One Million Dollars ($1,000,000) for injury or death to any person or for damages to property in any one occurrence.  Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.  In addition, such coverage shall be primary to any other insurance that may be available from CARRIER.  CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

(b)    **WORKERS' COMPENSATION/OCCUPATIONAL ACCIDENT INSURANCE**.  CONTRACTOR shall provide workers' compensation insurance coverage for CONTRACTOR (if a natural person), all of its employees and agents, anyone driving the Equipment, and any other persons required to be covered under the worker's compensation law of any state that is reasonably likely to have jurisdiction over CONTRACTOR's business operations and in amounts not less than the statutory limits required by such applicable state law.  The worker's compensation insurance policy shall provide principal coverage in Illinois as well as the state in which the work is principally localized, and shall provide "other states coverage" that excludes only North Dakota, Ohio, Washington, and Wyoming.  As evidence of such coverage, CONTRACTOR shall provide CARRIER with a copy of the insurance policy declarations page for CARRIER's verification before operating the Equipment under this Agreement.  Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.    If (a) CONTRACTOR is the sole owner and the sole and exclusive operator of the Equipment and (b) the state in which the work is principally localized is not California, Colorado, Illinois, Massachusetts, Nevada, New Hampshire, New Jersey, or North Carolina, then CONTRACTOR may, as an alternative to obtaining workers' compensation coverage, obtain occupational accident insurance policy that includes either an endorsement or a separate policy provision whereby the insurer provides, or agrees to provide, workers' compensation coverage that becomes effective for a claim by CONTRACTOR alleging employee status.  Such occupational accident insurance coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.

(c)    **PASSENGER INSURANCE.**  CONTRACTOR shall procure, carry, and maintain passenger liability insurance that shall provide coverage to CONTRACTOR whenever the

---

**APPENDIX B**

FILED DATE: 6/4/2021 2:52 PM    2021CH01601

Equipment is being operated (whether or not on behalf of CARRIER) in a combined single limit of not less than One Hundred Thousand Dollars ($100,000) for injury or death to any person riding as a passenger in the Equipment or for damages to that person's property in any one occurrence.  Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.  In addition, such coverage shall be primary to any other insurance that may be available from CARRIER.  CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

**(d)** **OTHER INSURANCE**.  In addition to the insurance coverages required under this Agreement, it is CONTRACTOR'S responsibility to procure, carry and maintain any fire, theft, uninsured and/or underinsured motorist, and physical damage (collision), or other insurance coverage that CONTRACTOR may desire for the Equipment or for CONTRACTOR's health care or other needs.   As provided in this Agreement, CONTRACTOR holds CARRIER harmless with respect to loss of or damage to CONTRACTOR's Equipment, trailer, or other property, and CARRIER has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to CONTRACTOR's Equipment, trailer, or other property.   CONTRACTOR acknowledges that CARRIER may, and CONTRACTOR hereby authorizes CARRIER to, waive and reject no-fault, uninsured, and underinsured motorist coverage from CARRIER's insurance policies to the extent allowed under Illinois law (or such other state law where the Equipment is principally garaged), and CONTRACTOR shall cooperate in the completion of all necessary documentation for such waiver, election, or rejection.

3.      **REQUIREMENTS APPLICABLE TO ALL OF CONTRACTOR'S INSURANCE COVERAGES.**  CONTRACTOR shall procure insurance policies providing the above-described coverages solely from insurance carriers that are A.M. Best "A"-rated, and CONTRACTOR shall not operate the Equipment under this Agreement unless and until CARRIER has determined that the policies are acceptable (CARRIER's approval shall not be unreasonably withheld).  CONTRACTOR shall furnish to CARRIER written certificates obtained from CONTRACTOR'S insurance carriers showing that all insurance coverages required above have been procured from A.M. Best "A" rated insurance carriers, that the coverages are being properly maintained, and that the premiums thereof are paid.   Each insurance certificate shall specify the name of the insurance carrier, the policy number, and the expiration date; list CARRIER as an additional insured with primary coverage; and show that written notice of cancellation or modification of the policy shall be given to CARRIER at least thirty (30) days prior to such cancellation or modification.

4.      **CONTRACTOR'S LIABILITY IF REQUIRED COVERAGES ARE NOT MAINTAINED.**  In addition to CONTRACTOR's hold harmless/indemnity obligations to CARRIER under the Agreement, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that CARRIER may incur arising out of or in connection with CONTRACTOR'S failure to maintain the insurance coverages required by this Agreement. In addition, CONTRACTOR, on behalf of its insurer, expressly waives all subrogation rights against CARRIER, and, in the event of a subrogation action brought by CONTRACTOR's insurer, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from such claim.

5.      **AVAILABILITY OF INSURANCE FACILITATED BY CARRIER.**  CONTRACTOR may, if it so chooses by initialing one or more boxes in the right-hand column of the attached "CERTIFICATE OF INSURANCE," authorize CARRIER to facilitate, on CONTRACTOR'S behalf, the insurance coverages required or made optional by this Agreement.   In any such case, CARRIER shall deduct, from CONTRACTOR settlement compensation, amounts reflecting all of CARRIER's expense and cost in obtaining and administering such coverage. In addition, if CONTRACTOR fails to provide proper evidence of the purchase or maintenance of the insurance required above, then CARRIER is authorized but not required to obtain such insurance at CONTRACTOR's expense and deduct, from CONTRACTOR's

**APPENDIX B**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

settlement compensation, amounts reflecting all of CARRIER's expense in obtaining and administering such coverage. CONTRACTOR recognizes that CARRIER is not in the business of selling insurance, and any insurance coverage requested by CONTRACTOR from CARRIER is subject to all of the terms, conditions, and exclusions of the actual policy issued by the insurance underwriter. CARRIER shall ensure that CONTRACTOR is provided with a certificate of insurance (as required by 49 C.F.R. § 376.12(j)(2)) for each insurance policy under which the CONTRACTOR has authorized CARRIER to facilitate insurance coverage from the insurance underwriter (each such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to CONTRACTOR for each type of coverage, and the deductible amount for each type of coverage for which CONTRACTOR may be liable), and CARRIER shall provide CONTRACTOR with a copy of each policy upon request.

6.   **CHANGES IN COST OR OTHER DETAILS OF COVERAGES.**  If CARRIER is facilitating any insurance coverages for CONTRACTOR pursuant to Section 5 of this Appendix and the cost to CONTRACTOR for, or other details of, a coverage changes from the information listed in the attached "CERTIFICATE OF INSURANCE", CONTRACTOR will be so notified by personal delivery, fax,  other written notice, or by appropriate electronic means as outlined in Appendix D.  In any event, CONTRACTOR shall not be subject to any such change until ten (10) calendar days after such notice or such later time as is set forth in the notice. **CONTRACTOR's failure, by the end of ten (10) calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's settlement compensation, beginning immediately after the 10-day period. Such modified amounts shall replace and supersede those shown in the Certificate of Insurance and CARRIER shall not have an obligation to also provide a revised Certificate of Insurance.**  If CONTRACTOR fails to notify CARRIER of any objection within the 10-day period -- or if CONTRACTOR notifies CARRIER of its objection within the 10-day period and CONTRACTOR and CARRIER are then unable to resolve the matter to their mutual satisfaction -- CONTRACTOR and CARRIER shall each have the right to terminate this Agreement effective immediately upon the change becoming effective (although CONTRACTOR shall remain subject to the change until CONTRACTOR's termination's effective date and time).

THIS APPENDIX is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**                                          **CONTRACTOR:**

**POLMAX FLEET LLC**                                  MICHAEL   LOGISTICS

By: _____            By: _____

JAROSLAVA TELEPIN                                    MICHAL KOMARSKI

Printed Name                                         Printed Name

09/15/20                                             09/15/20

Date                                                 Date

_____

**APPENDIX B**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

## CERTIFICATE OF INSURANCE

CONTRACTOR hereby requests CARRIER, through its insurer, to facilitate on CONTRACTOR's behalf (if they are available) the insurance coverages CONTRACTOR has selected by placing CONTRACTOR's initials in the right-hand column below:

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| **1.   Non-Trucking Liability Insurance:**<br><br>*Name of Insurer:  **American Hallmark Insurance Company***<br><br>*Policy No:  AHI-N3212-110269*<br><br>*Effective Date(s) of Coverage:  04/21/2019 to 04/21/2020*<br><br>*Amount of Coverage:  $1,000,000 combined single limit*<br><br>*Current Cost to CONTRACTOR:  $6.78 per unit of Equipment per week*<br>**Includes CARRIER Markup**<br><br>*Deductible for Which CONTRACTOR Is Liable:  $1,000 per occurrence* |  YES<br><br>_____ NO |
| **2.   Occupational Accident Insurance:**<br><br>*Name of Insurer:  Zurich American Insurance Company*<br><br>*Policy No:  OCA-0117320*<br><br>*Effective Date(s) of Coverage: 06/01/2019 to 06/01/2020*<br><br>*Amount of Coverage:  Varies, see coverage forms*<br><br>*Current Cost to CONTRACTOR:  $31.26 per week*<br>**Includes CARRIER Markup**<br><br>**[COVERAGE IS AVAILABLE ONLY TO A SOLE-PROPRIETOR CONTRACTOR WHO IS EXCLUSIVE DRIVER OF THE EQUIPMENT.]**<br><br>*Deductible for Which CONTRACTOR Is Liable:  n/a* | YES<br><br>_____ NO |

**APPENDIX B**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| **3.  Physical Damage Insurance on Tractor:**<br><br>*Name of Insurer:  Arch Insurance Company*<br><br>*Policy No:  ZACAT6010801*<br><br>*Effective Date(s) of Coverage:  01/01/2020 to 01/01/2021*<br><br>*Amount of Coverage: Insured value, as specified by CONTRACTOR, of*<br>*$_____*<br><br>*Current Cost to CONTRACTOR:  ___% annually, billed weekly, of Contractor-specified value of Equipment: $_____*<br>**Includes CARRIER Markup**<br><br>*Deductible for Which CONTRACTOR Is Liable:  _____* | _MK_ YES<br><br>_____ NO |
| **4.  Cargo Insurance:**<br><br>*Name of Insurer:  AGCS Marine*<br><br>*Policy No: MZI9307754*<br><br>*Effective Date(s) of Coverage:  01/01/2020 to 01/01/2021*<br><br>*Amount of Coverage:  $250,000*<br><br>*Current Cost to CONTRACTOR:  $30.45 per unit of Equipment per week*<br>**Includes CARRIER Markup**<br><br>*Deductible for Which CONTRACTOR Is Liable:  $5000 per occurrence* | _MK_ YES<br><br>_____ NO |

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**                                          **CONTRACTOR:**

**POLMAX FLEET, LLC**                    _MICHAEL LOGISTICS_

By:_____          By:_MUET Kemelu_

_JAROSLAVA TELEPUN_            _MICHAL KAMUDESKI_
Printed Name                                      Printed Name

_09/15/20_                                       _09/16/20_
Date                                                    Date

**APPENDIX B**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**Appendix C**

**ESCROW**

As authorized by Paragraph 7 of this Agreement, CARRIER shall establish and administer an Escrow Fund, which CONTRACTOR and CARRIER agree shall be governed by the following terms and conditions:

1.   **PRINCIPAL.**  The amount of principal to be held in the Escrow Fund shall be a minimum of $2000, which amount is to be deducted from CONTRACTOR's compensation at $250 per week beginning the first week of services provided by CONTRACTOR under the Agreement.  If, at any time, the principal amount in escrow falls below $2000, CONTRACTOR authorizes CARRIER to deduct from CONTRACTOR's compensation a maximum amount of $250 per week until the full principal amount is replenished.

2.   **SPECIFIC ITEMS TO WHICH ESCROW FUND MAY BE APPLIED.**  The Escrow Fund shall be held by CARRIER for the purpose of insuring compliance with the provisions of the Agreement. The specific items to which the Escrow Fund shall apply are all advances, expenses, taxes, fees, fines, penalties, damages, losses, or other amounts paid, owed, or incurred by CARRIER, or owed by CONTRACTOR to a third party under a purchase or rental contract, that are CONTRACTOR's responsibility under the Agreement-- specifically, the charge-back and deduction items set forth in Appendix A and other appendixes (hereafter "Escrow Items") -- to the extent that the amounts owed by CONTRACTOR for such Escrow Items exceed CONTRACTOR's earned and payable compensation at the time of any settlement or final accounting.

3.   **ACCOUNTINGS.**  While the Escrow Fund is under CARRIER's control, CARRIER shall provide an accounting to CONTRACTOR, no less frequently than monthly, of all transactions involving such funds by clearly indicating on individual settlement sheets the amount and description of any deduction or addition made to the Escrow Fund.   In addition, upon CONTRACTOR's request, CARRIER shall provide CONTRACTOR with an accounting of any transactions involving CONTRACTOR's Escrow Fund.

4.   **INTEREST.**  CARRIER shall pay interest to CONTRACTOR on the Escrow Fund on at least a quarterly basis ("interest period") beginning with receipt of the first CONTRACTOR contribution of principal.  The interest rate shall be established on the date the interest period begins and shall be equal to the average yield of 91-day, 13-week U.S. Treasury bills, as established in the weekly auction by the Department of Treasury.  For purposes of calculating the balance of the Escrow Fund on which interest is paid, CARRIER may deduct a sum equal to the average advance (including all charge-backs and other deductions) made to CONTRACTOR during the period of time for which interest is paid.

5.   **FINAL SETTLEMENT.**   To have any remaining balance in the Escrow Fund returned following termination of the Agreement, CONTRACTOR must first comply with all of the specific obligations set forth in the Agreement, and make payments to CARRIER for all Escrow Items.  At the time of the return of any remaining balance in the Escrow Fund, CARRIER may deduct monies for all Escrow Items.  Such deductions shall be limited to amounts CARRIER actually spends, incurs, or owes to a third party, or that CONTRACTOR owes to CARRIER or a third party under a purchase or rental contract, before termination of this Agreement or, with respect to any CONTRACTOR obligation triggered by termination, including any expenses (including reasonable attorneys' fees) incurred by CARRIER in seeking the return of its identification devices and other property, all amounts CARRIER actually spends, incurs, or owes to a third party upon termination or within forty-five (45) days thereafter. CARRIER shall not make deductions from the Escrow Fund for items for which, by the end of forty-five (45) days after termination, neither CONTRACTOR nor CARRIER has yet made an expenditure or incurred a quantified, legally binding obligation to pay.  CARRIER shall provide a final accounting to CONTRACTOR of all such final deductions made from the Escrow Fund within forty-five (45) days from the date of termination of the Agreement.

6.   **RETURN OF ESCROW BALANCE.**  In no event shall the Escrow Fund, less any final deductions pursuant to the above provision, be returned to CONTRACTOR later than forty-five (45) days

---

**APPENDIX C**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

from the date of termination of this Agreement.   CARRIER's use, or post-termination return to CONTRACTOR, of any balance in the Escrow Fund shall not constitute a waiver of CARRIER's right to recover, through arbitration or other available legal means, any additional amounts CONTRACTOR owes, or comes to owe, CARRIER under this Agreement.

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**

**POLMAX FLEET, LLC**

By: _____

_____
Printed Name

_____
Date

**CONTRACTOR:**

MICHAEL logistics

By: _____

MICHAL KOMORSKI
Printed Name

09/15/20
Date

**APPENDIX C**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

**Appendix D**

**CONSENT TO CONDUCT BUSINESS USING ELECTRONIC METHODS**

Pursuant to Regulatory Guidance Concerning Electronic Signatures and Documents, 74 Fed. Reg. 411 (Jan. 4, 2011), issued by the Federal Motor Carrier Safety Administration ("FMCSA"), Polmax Fleet, LLC ("CARRIER") and the contractor who completes the signature block below ("CONTRACTOR") hereby consent and agree to conduct business using electronic methods. This consent encompasses the use of electronic methods to transmit and effect the signature of any document, including, without limitation, any supplement, modification, amendment, notice, consent and/or waiver, required by this Agreement or required by FMCSA regulations to be generated and maintained (or exchanged by private parties), including, without limitation, applications, driver histories and other qualification records, leases formed under 49 C.F.R. Part 376, driver-vehicle inspection reports, and records of duty status. CONTRACTOR agrees that the above electronic method, which CARRIER has adopted to effect electronic signatures: (1) identifies and authenticates CONTRACTOR as the source of the electronic communication; (2) indicates CONTRACTOR's approval of the information contained in the electronic communication; and (3) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature. Either party may elect, with respect to any document, to use a manual/hardcopy signature, provided that such election shall not preclude the other party from applying an electronic signature to the same document.

**CONTRACTOR:** _MICHAEL LOGISTICS_
Name (Typed or Printed)

**If Sole Proprietor:**

_____
Social Security No.

**If Corp., Partnership, or LLC:**
_83-3662419_
Fed. Taxpayer ID No.

By: _____
Signature

Authorized Representative's Name (Typed or Printed)
_____

Title _____
_365 E DUNDEE Rd_

Address (Street, P.O. Box)
_WHEELING    60090_

City, State & Zip Code
_847 730 4320_

Telephone Number    Fax Number
_Roun.michal @ gmail . com_

Email Address

**CARRIER:**

**POLMAX FLEET, LLC**

By: _____
Signature

Title _____

Address (Street, P.O. Box)
_4161 S. CENTRAL AVE._
_ALSIP, IL 60803_

City, State & Zip Code
_708-843-8561_

Telephone Number    Fax Number
_POLMAXFLEETEXPEDIORE.COM_

Email Address

**APPENDIX D**



FILED DATE: 6/4/2021 2:52 PM   2021CH01601

### Appendix E

### COMMUNICATIONS

### PRIVACY DISCLOSURE AND CONSENT FORM

**1.   ELD, Event Recorder Requirements and Their Purposes.** CONTRACTOR agrees to maintain in each unit of Equipment (as defined in Section 1 of this Agreement) a compliant and functioning ELD and Event Recorder. The principal purpose of the ELD requirement is to assist CONTRACTOR's drivers and CARRIER in complying with any applicable hours-of-service regulations and other Applicable Law in avoiding adverse safety scores and FMCSA interventions under CSA. The ELD may also assist in providing load dispatching and tracking services to meet the specifications of CARRIER's customers.  The principal purpose of the Event Recorder requirement is to help record evidence relating to highway accidents or cargo damage for purposes of assessing contractual liabilities and meet customer requirements.

**2.   Categories of Electronic Information Collected.** The ELD is capable of collecting various categories of data regarding the Equipment and its operation (collectively "ELD Electronic Information"), including but not limited to the: name of the driver and any co-driver(s), and corresponding driver identification information; duty status (that is, "Off Duty," "Sleeper Berth," "Driving," and "On-Duty Not Driving"); date and time the Equipment is in operation; location of the Equipment; distance travelled (including when the Equipment crosses state lines); name and DOT number of CARRIER; 24-hour period starting time; multiday basis used by CARRIER to compute cumulative duty hours and driving time; hours in each duty status for the 24-hour period, and total hours; Equipment number; load information, such as shipping document number(s), or name of shipper and commodity(ies); fuel use, including when the Equipment is refueled; speed of the Equipment; hard-braking events; and power-on self-tests and diagnostic error codes. The ELD Electronic Information is transmitted from the Equipment to the third-party vendor of the ELD (as identified below) and then from the third-party vendor to CARRIER. CARRIER may access certain categories of the ELD Electronic Information in furtherance of its efforts to comply with Applicable Law, including hours-of-service regulations, or to meet CARRIER's customers' specifications. The Event Recorder is capable of collecting various categories of data regarding the Equipment and its operation (collectively "Event Recorder Electronic Information"), including, without limitation: forward-facing video of unordinary shocks, decelerating/braking, accelerating, swerving, turning, and manual event recording. The Event Recorder Electronic Information is transmitted from the Equipment to the third-party Event Recorder vendor (see below) and then from the vendor to CARRIER. CARRIER may access certain categories of the Event Recorder Electronic Information in furtherance of its efforts to comply with Applicable Law, assess contractual liabilities, or to meet customer specifications.

**3.   Carrier Uses of Electronic Information.** The third-party ELD vendor – Samsara Networks Inc. – and the third-party Event Recorder vendor – Samsara Networks Inc. – are responsible for the collection and storage of the ELD Electronic Information and the Event Recorder Electronic Information, respectively. CARRIER does not collect or store the Electronic Information, but has access to the Electronic Information and reserves the right to request that the third-party vendor collect and store the Electronic Information for as long as the Equipment with the installed ELD and Event Recorder operates under lease to CARRIER, and for a reasonable time thereafter. Contractors or their drivers who have questions about the safeguards Samsara Networks Inc., and Samsara Networks Inc. have put in place to protect against the loss, unauthorized access, use, destruction, or improper disclosure of the Electronic Information may contact Samsara Networks Inc., at www.samsara.com. CARRIER has reasonable safeguards in place to secure the Electronic Information it receives from the third-party vendor, and limits access to the Electronic Information to authorized individuals who have reason to know the information in order to ensure compliance with Applicable Law, including the hours-of-service regulations, and to meet CARRIER's customers' specifications.

**4.   Right to Review Electronic Information.** CONTRACTOR's workers will have the right, on written request to CARRIER, to review the collected Electronic Information that CARRIER itself continues to have access to, but only Electronic Information relating to the person making the request. A written request for

---

**APPENDIX E**

FILED DATE: 6/4/2021 2:52 PM   2021CH01601

such a review should be addressed to CARRIER and sent by email or U.S. Mail to the address listed on the signature page following the main text of this Agreement.

**This Appendix E is agreed to by the undersigned parties on the latest date set forth below.**

**CONTRACTOR:**

MICHAEL LOGISTICS

By: _Michael Komorski_

Printed Name MICHAEL Komorski

Date    09/15/20

**CONTRACTOR's Driver (if applicable):**

By: _____

Printed Name

Date

**APPENDIX E**



FILED
6/25/2021 6:35 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH01601

13834113

FILED DATE: 6/25/2021 6:35 PM   2021CH01601

**CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| MICHAL TWARDOWSKI and MICHAL KOMORSKI, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 2021-CH-01601 |
| | ) | |
| v. | ) | Hon. Michael T. Mullen |
| | ) | |
| POLMAX LOGISTICS, LLC, an Illinois limited liability company, POLMAX FLEET, LLC, an Illinois limited liability company, | ) ) ) | |
| | ) | |
| *Defendants* . | ) ) | |

**PLAINTIFFS' REPLY TO DEFENDANTS POLMAX LOGISTICS, LLC'S**
**AND POLMAX FLEET, LLC'S AFFIRMATIVE DEFENSES**

Plaintiffs, Michal Twardowski and Michal Komorski, by and through their undersigned counsel, submit the following reply to the Affirmative Defenses of Defendants Polmax Logistics, LLC and Polmax Fleet, LLC (collectively, "Defendants").

Plaintiffs state that they deny, generally and specifically, any and all allegations in Defendants' Affirmative Defenses that are not specifically admitted in the paragraphs below. Plaintiffs further state that their investigation of this matter is ongoing and the following replies are based on their present knowledge and available information. Accordingly, Plaintiffs reserve the right to amend this Reply.

**AFFIRMATIVE DEFENSES**

1.    Defendants incorporate by reference, as if fully set forth herein, their answers to the allegations in paragraphs 1 through 85 of the Complaint.

**REPLY:** Paragraph 1 of Defendants' Affirmative Defenses is a prefatory paragraph that does not assert any factual allegations or defenses, and no response is required. To the extent that a response to Paragraph 1 is required, Plaintiffs, for their reply, incorporate by reference the allegations in Paragraphs 1 – 85 of their Class Action Complaint and deny any

FILED DATE: 6/25/2021 6:35 PM   2021CH01601

and all of the remaining allegations in Paragraph 1.

2.     In June of 2015, Plaintiff Michal Twardowski executed an Independent Contractor Agreement with Polmax Fleet, LLC. A copy of that agreement is attached as <u>Exhibit A</u>.

**REPLY:** Plaintiffs admit that Defendants have attached as Exhibit A to their Answer and Affirmative Defenses a copy of a document entitled "POLMAX FLEET INDEPENDENT CONTRACTOR AGREEMENT," which was signed by Plaintiff Twardowski and a representative for Polmax Fleet, LLC in June 2015. Responding further, Plaintiffs deny that Exhibit A is a complete, correct, or accurate reflection of the relationship between the Parties and deny that Exhibit A supports or establishes any of Defendants' allegations or affirmative defenses. Plaintiffs were employed by Defendants to provide transportation services for Defendants' customers, and Defendants exerted complete control and supervision over Plaintiffs and other drivers, including the manner and method of payment; the skills and qualifications required to be a driver for Defendants; the source of equipment and trucks; drivers' work schedules; the manner and method in which drivers carried out transportation services; and the right of discharge. Plaintiffs deny any and all of the remaining allegations in Paragraph 2.

3.     In November of 2019, after Plaintiff Twardowski formed MTTM Transport Inc., MTTM Transport entered into an Independent Contractor Agreement with Polmax Fleet, LLC. A copy of that agreement is attached as <u>Exhibit B</u>. Plaintiff Twardowski worked as a truck driver for MTTM Transport to fulfill the transportation services it contracted to provide.

**REPLY:** Plaintiffs admit that Defendants have attached as Exhibit B to their Answer and Affirmative Defenses a copy of a document entitled "INDEPENDENT CONTRACTOR AGREEMENT," which was signed by Plaintiff Twardowski and a representative for Polmax Fleet, LLC in November 2019 after the formation of MTTM Transport Inc. Responding further,

FILED DATE: 6/25/2021 6:35 PM   2021CH01601

Plaintiffs deny that Exhibit B is a complete, correct, or accurate reflection of the relationship between the Parties and deny that Exhibit B supports or establishes any of Defendants' allegations or affirmative defenses. Plaintiffs were employed by Defendants to provide transportation services for Defendants' customers, and Defendants exerted complete control and supervision over Plaintiffs and other drivers, including the manner and method of payment; the skills and qualifications required to be a driver for Defendants; the source of equipment and trucks; drivers' work schedules; the manner and method in which drivers carried out transportation services; and the right of discharge. Plaintiffs deny any and all of the remaining allegations in Paragraph 3.

4.      In September of 2020, Plaintiff Michal Komorski's company, Michael Logistics Inc., entered into an Independent Contractor Agreement with Polmax Fleet, LLC. A copy of that agreement is attached as <u>Exhibit C</u>. Plaintiff Komorski worked as a truck driver for Michael Logistics to fulfill the transportation services it contracted to provide.

**REPLY:** Plaintiffs admit that Defendants have attached as Exhibit C to their Answer and Affirmative Defenses a copy of a document entitled "INDEPENDENT CONTRACTOR AGREEMENT," which was signed by Plaintiff Komorski and a representative for Polmax Fleet, LLC in September 2020. Responding further, Plaintiffs deny that Exhibit C is a complete, correct, or accurate reflection of the relationship between the Parties and deny that Exhibit C supports or establishes any of Defendants' allegations or affirmative defenses. Plaintiffs were employed by Defendants to provide transportation services for Defendants' customers, and Defendants exerted complete control and supervision over Plaintiffs and other drivers, including the manner and method of payment; the skills and qualifications required to be a driver for Defendants; the source of equipment and trucks; drivers' work schedules; the manner and method in which drivers carried out transportation services; and the right of discharge. Plaintiffs deny any and all of the remaining allegations in Paragraph 4.

FILED DATE: 6/25/2021 6:35 PM   2021CH01601

5.      The Independent Contractor Agreements attached as Exhibits A through C dictated the services provided by Plaintiffs and their respective companies, as well as the terms and conditions of payment for those services.

**REPLY:** Denied.

6.      Plaintiff Twardowski, MTTM Transport Inc. and Michael Logistics Inc. were paid in accordance with their respective contractual agreements.

**REPLY:** Denied.

7.      As part of their respective agreements with Polmax Fleet, LLC, Plaintiff Twardowski, MTTM Transport Inc. and Michael Logistics Inc. agreed to bear the cost of operational expenses and authorized Polmax Fleet, LLC to take certain deductions from their compensation.

**REPLY:** Plaintiffs state that the "Independent Contractor Agreements" speak for themselves. Responding further, Plaintiffs deny that Defendants were authorized under applicable law to require Plaintiffs to bear the cost of operational expenses and excessive deductions from their compensation. Plaintiffs deny any and all of the remaining allegations in Paragraph 7.

8.      Both Plaintiffs were aware of what settlement deductions would be taken from them or their respective business entities' compensation under the terms of the Independent Contractor Agreements those entities entered into and consented to such settlement deductions.

**REPLY:** Denied. Responding further, Plaintiffs state that Defendants had complete and unilateral control over the wages, fees, and deductions from Plaintiffs' compensation. Plaintiffs deny any and all of the remaining allegations in Paragraph 8.

9.      Both Plaintiffs were aware of the contractual settlement compensation rate they or their respective companies received under the terms of the Independent Contractor Agreements their companies entered into, accepted pay through their respective companies for

4

FILED DATE: 6/25/2021 6:35 PM  2021CH01601

the services provided at the time they entered into the agreements, and continued to accept pay under the terms of the respective agreements throughout the period of time that their companies provided services to Polmax Fleet, LLC.

**REPLY:** Plaintiffs admit that they received partial compensation during the period of time they were employed by Defendants. Responding further, Plaintiffs incorporate their reply to Paragraph 8 and deny any and all of the remaining allegations in Paragraph 9.

10.     At all times that they provided transportation services to Polmax Fleet, LLC, Plaintiffs were free from the control and direction over the performance of their work. Because Plaintiffs, on behalf of their respective business entities, performed their work driving throughout much of the United States, Plaintiffs performed their work outside Defendants' places of business.

**REPLY:** Plaintiffs admit that they were employed by Defendants to provide transportation services for Defendants, and that they drove throughout much of the United States in the course of their employment. Plaintiffs deny that they were free from control and direction and deny any and all of the remaining allegations in Paragraph 10.

11.     As drivers qualified to perform transportation services under the terms of the applicable Independent Contractor Agreements, Plaintiffs were trained and licensed to drive commercial motor vehicles.

**REPLY:** Plaintiffs admit that they were trained and licensed to drive commercial motor vehicles and that they were qualified to perform transportation services, but deny that the "Independent Contractor Agreements" are "applicable" or otherwise a complete, correct, or accurate reflection of the relationship between the Parties. Plaintiffs deny any and all of the remaining allegations in Paragraph 11.

12.     Plaintiffs owned their own businesses. MTTM Transport Inc. was incorporated on June 3, 2019, before it entered into an Independent Contractor Agreement with Polmax

Fleet, LLC in November of 2019.

**REPLY:** Plaintiffs admit that they formed their respective business entities and admit that MTTM Transport Inc. was incorporated on June 3, 2019. Responding further, Plaintiff Twardowski states that, as part of the renewal of his employment, Polmax Fleet, LLC advised him to sign the "Independent Contractor Agreement" on behalf of MTTM Transport Inc. and not in his individual capacity, because that was the policy and practice of Polmax Fleet, LLC. Plaintiffs deny any and all of the remaining allegations in Paragraph 12.

13.     Similarly, Michael Logistics Inc. was incorporated on January 2, 2019, before it entered into an Independent Contractor Agreement with Polmax Fleet, LLC in September of 2020.

**REPLY:** Plaintiffs admit that Michael Logistics Inc. was incorporated on January 2, 2019 prior to execution of the "Independent Contractor Agreement." Responding further, Plaintiff Komorski states that, as a condition of his employment, he was required by Polmax Fleet, LLC to sign the "Independent Contractor Agreement" on behalf of Michael Logistics Inc. and not in his individual capacity. Plaintiffs deny any and all of the remaining allegations in Paragraph 13.

14.     Both entities remain registered with the Illinois Secretary of State as active corporations.

**REPLY:** Admitted.

15.     Neither Plaintiff, nor any company they owned, ever contracted with or provided transportation services to Polmax Logistics, LLC.

**REPLY:** Denied.

16.     Plaintiffs were not employees of either Defendant under the IWPCA.

**REPLY:** Denied.

17.     Defendants incorporate its answers contained in paragraphs 1 through 85, as

FILED DATE: 6/25/2021 6:35 PM   2021CH01601

FILED DATE: 6/25/2021 6:35 PM    2021CH01601

well as its factual pleading contained in paragraphs 1 through 16 of its Affirmative Defenses above, into each of the Affirmative Defenses set forth below, as follows:

**REPLY:** Paragraph 17 of Defendants' Affirmative Defenses is a prefatory paragraph that does not assert any factual allegations or defenses, and no response is required. To the extent that a response to Paragraph 17 is required, Plaintiffs incorporate by reference the allegations in Paragraphs 1 – 85 of their Class Action Complaint as well as their replies to the paragraphs above and deny any and all of the remaining allegations in Paragraph 17.

**FIRST AFFIRMATIVE DEFENSE**

18.     Plaintiffs' claims must be dismissed because they were not employed by either Defendant.

**REPLY:** Denied.

**SECOND AFFIRMATIVE DEFENSE**

19.     Plaintiffs' claims based on the allegation they were misclassified as independent contractors must be reduced by the doctrine of set off, rescission, and/or restitution. The amounts that have been paid to them covered both the expenses of providing a truck and a qualified driver and, to the extent Plaintiffs seek to be reclassified as employees instead of independent contractors, they in effect seek to rescind their contracts and be compensated as employees. This requires that the parties be put back into the position they were in before they entered into the contracts, with Plaintiffs only being entitled to restitution for driving services they provided.

**REPLY:** Plaintiffs make no reply to Defendants' Second Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 19.

FILED DATE: 6/25/2021 6:35 PM   2021CH01601

## THIRD AFFIRMATIVE DEFENSE

20.     Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' failure to mitigate their damages.

**REPLY:** Plaintiffs make no reply to Defendants' Third Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 20.

## FOURTH AFFIRMATIVE DEFENSE

21.     Plaintiffs' claims for improper deductions are barred, in whole or in part, because Plaintiffs gave Defendants written authorization to take the deductions from their settlement compensation.

**REPLY:** Denied.

## FIFTH AFFIRMATIVE DEFENSE

22.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands and/or the doctrine of waiver.

**REPLY:** Plaintiffs make no reply to Defendants' Fifth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 22.

## SIXTH AFFIRMATIVE DEFENSE

23.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

**REPLY:** Plaintiffs make no reply to Defendants' Sixth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in

Paragraph 23.

## SEVENTH AFFIRMATIVE DEFENSE

24.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of ratification and acquiescence.

**REPLY:** Plaintiffs make no reply to Defendants' Seventh Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 24.

## EIGHTH AFFIRMATIVE DEFENSE

25.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of avoidable consequences.

**REPLY:** Plaintiffs make no reply to Defendants' Eighth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 25.

## NINTH AFFIRMATIVE DEFENSE

26.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs consented to the alleged conduct of Defendants.

**REPLY:** Plaintiffs make no reply to Defendants' Ninth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 26.

## TENTH AFFIRMATIVE DEFENSE

27.     Plaintiffs' claims are barred, in whole or in part, because the recovery requested would not be a reasonable estimate of any actual damages but would instead amount to a

FILED DATE: 6/25/2021 6:35 PM   2021CH01601

FILED DATE: 6/25/2021 6:35 PM   2021CH01601

disparate penalty akin to punitive damages for strict liability, given that Plaintiff and the putative class members have not suffered any injury or incurred any harm to warrant such relief.

**REPLY:** Plaintiffs make no reply to Defendants' Tenth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 27.

## ELEVENTH AFFIRMATIVE DEFENSE

28.     Plaintiffs' claims are barred, in whole or in part, because Defendants have paid Plaintiffs in full.

**REPLY:** Plaintiffs make no reply to Defendants' Eleventh Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 28.

## TWELFTH AFFIRMATIVE DEFENSE

29.     Plaintiffs' claims are barred, in whole or in part, because they have been fully compensated for any wages or expenses owed, and, by accepting the payments made to them, have effectuated an accord and satisfaction of their claims.

**REPLY:** Plaintiffs make no reply to Defendants' Twelfth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 29.

## THIRTEENTH AFFIRMATIVE DEFENSE

30.     Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

FILED DATE: 6/25/2021 6:35 PM  2021CH01601

**REPLY:** Plaintiffs make no reply to Defendants' Thirteenth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 30.

### FOURTEENTH AFFIRMATIVE DEFENSE

31.     Plaintiffs' claims are barred, in whole or in part, because any award of statutory or punitive damages would constitute an unconstitutional penalty under the circumstances of this case, in violation of due process and equal protection guarantees.

**REPLY:** Plaintiffs make no reply to Defendants' Fourteenth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 31.

### FIFTEENTH AFFIRMATIVE DEFENSE

32.     Plaintiffs' claims are barred, in whole or in part, because the deductions were for Plaintiffs' benefit.

**REPLY:** Plaintiffs make no reply to Defendants' Fifteenth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 32.

### SIXTEENTH AFFIRMATIVE DEFENSE

33.     Plaintiffs' claims are barred, in whole or in part, because their independent contractor agreements are governed by the Illinois Leasing Regulations, 92 Ill. Admin. Code Part 1360, which authorize the deductions at issue.

**REPLY:** Plaintiffs make no reply to Defendants' Sixteenth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant

FILED DATE: 6/25/2021 6:35 PM   2021CH01601

to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 33.

## SEVENTEENTH AFFIRMATIVE DEFENSE

34.    Plaintiffs' claims are barred, in whole or in part, to the extent they seek recovery related to work performed outside the state of Illinois because Illinois law does not apply to work or activities performed outside the state.

**REPLY:** Denied.

## EIGHTEENTH AFFIRMATIVE DEFENSE

35.    To the extent that Plaintiffs lack standing, their claims should be dismissed.

**REPLY:** Plaintiffs make no reply to Defendants' Eighteenth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 35.

## NINETEENTH AFFIRMATIVE DEFENSE

36.    Plaintiffs' claims for pre-judgment interest may not be granted because the damages claimed by Plaintiffs are not sufficiently certain to allow an award of prejudgment interest.

**REPLY:** Plaintiffs make no reply to Defendants' Nineteenth Affirmative Defense at this time, because it is the subject of Plaintiffs' contemporaneously filed motion to strike pursuant to Section 5/2-615. To the extent that a reply is required, Plaintiffs deny the allegations in Paragraph 36.

## TWENTIETH AFFIRMATIVE DEFENSE

37.    Plaintiffs' claims regarding Defendants' alleged misclassification of Plaintiffs and the class they seek to represent under Illinois law are preempted under the Supremacy Clause of the U.S. Constitution, U.S. CONST. art. VI, cl. 2, because they affect Defendants'

FILED DATE: 6/25/2021 6:35 PM  2021CH01601

prices, routes, and services within the meaning of the express preemption provision of the Federal Aviation Administration Authorization Act.

**REPLY:** Denied.

<b><u>TWENTY-FIRST AFFIRMATIVE DEFENSE</u></b>

38.　　Plaintiffs' claims to recover deductions they specifically authorized in their federally regulated leases are preempted by the federal leasing regulations, 49 C.F.R. Part 376.

**REPLY:** Denied.

<b><u>APPLICATION OF DEFENSES IN EVENT OF CERTIFICATION</u></b>

39.　　Without waiving its ability to oppose class certification and explicitly asserting its opposition to the propriety of class treatment, if the Court does certify a class in this case over Defendants' objections, then Defendants asserts the affirmative defenses set forth above against each and every member of the certified class.

**REPLY:** Plaintiffs admit that in Paragraph 39 Defendants purport to assert their defenses listed above against the putative class members, but Plaintiffs deny that any such defenses are applicable, meritorious, or otherwise entitle Defendants to any relief whatsoever and deny any and all remaining allegations in Paragraph 39.

40.　　Defendants will rely on all defenses lawfully available to it at the time of trial and reserve the right to amend its answer and affirmative defenses to include additional defenses after the completion of discovery

**REPLY:** Paragraph 40 of Defendants' Affirmative Defenses is a purported reservation of rights, and it does not contain any factual allegations or defenses, so no response is required. To the extent that a response to Paragraph 40 is required, Plaintiffs deny any and all allegations in Paragraph 40.

Dated: June 25, 2021　　　　　　　　　Respectfully submitted,

MICHAL TWARDOWSKI and MICHAL KOMORSKI, individually and on behalf of a

FILED DATE: 6/25/2021 6:35 PM   2021CH01601

class of similarly situated individuals

By: /s/ *Andrew T. Heldut*
One of Plaintiffs' Attorneys

Myles McGuire
Paul Geske
Andrew Heldut
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
mmcguire@mcgpc.com
pgeske@mcgpc.com
aheldut@mcgpc.com

*Attorneys for Plaintiffs and the Putative Class*

FILED DATE: 6/25/2021 6:35 PM   2021CH01601

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on June 25, 2021, the foregoing

*Plaintiffs' Reply to Defendants Polmax Logistics, LLC's and Polmax Fleet, LLC's Affirmative*

*Defenses* was filed electronically and served on the following counsel of record by electronic

mail:

Andrew J. Butcher
Chip Andrewscavage
James S. Kramer
SCOPELITIS, GARVIN, LIGHT, HANSON
& FEARY, P.C.
30 W. Monroe Street, Suite 1600
Chicago, IL 60603
abutcher@scopelitis.com
candrewscavage@scopelitis.com
jskramer@scopelitis.com

*Counsel for Defendants*

Under penalties as provided by law, pursuant to Section 1-109 of the Code of Civil Procedure,
the undersigned certifies that the statements set forth in the above certificate of service are true
and correct, except as to matters therein stated to be on information and belief and as to such
matters the undersigned certifies as aforesaid that he verily believes the same to be true.

/s/ *Andrew T. Heldut*

15

FILED
6/25/2021 6:58 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH01601

13834187

FILED DATE: 6/25/2021 6:58 PM 2021CH01601

**CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

|  |  |  |
|---|---|---|
| MICHAL TWARDOWSKI and MICHAL KOMORSKI, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 2021-CH-01601 |
| | ) | |
| v. | ) | Hon. Michael T. Mullen |
| | ) | |
| POLMAX LOGISTICS, LLC, an Illinois limited liability company, POLMAX FLEET, LLC, an Illinois limited liability company, | ) ) ) | |
| | ) | |
| *Defendants* . | ) ) | |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on July 7, 2021 at 9:30 a.m., or as soon thereafter as this matter may be heard, counsel for Plaintiffs shall appear before the Honorable Michael T. Mullen, or any other judge sitting in that judge's stead, in courtroom 2510 at the Richard J. Daley Center, 50 W. Washington St., Chicago, Illinois, and present *Plaintiffs' Motion Pursuant to 2-615 to Strike Defendants' Affirmative Defenses*, a copy of which is attached hereto and herby served upon you. Pursuant to the Court's Standing Order, the hearing may be conducted digitally via Zoom or, alternatively, telephonically upon request by the parties.

Dated: June 25, 2021

MICHAL TWARDOWSKI and MICHAL
KOMORSKI, individually and on behalf of a class
of similarly situated individuals

By: /s/ *Andrew T. Heldut*
One of Plaintiffs' Attorneys

Myles McGuire
Paul T. Geske
Andrew Heldut
McGuire Law, P.C.
55 W. Wacker Dr., 9th Fl.

FILED DATE: 6/25/2021 6:58 PM   2021CH01601

Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
pgeske@mcgpc.com
aheldut@mcgpc.com

*Attorneys for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on June 25, 2021, a copy of the foregoing

*Notice of Motion* was served on the following counsel of record by electronic mail:

Andrew J. Butcher
Chip Andrewscavage
James S. Kramer
SCOPELITIS, GARVIN, LIGHT, HANSON
& FEARY, P.C.
30 W. Monroe Street, Suite 1600
Chicago, IL 60603
abutcher@scopelitis.com
candrewscavage@scopelitis.com
jskramer@scopelitis.com

*Counsel for Defendants*

Under penalties as provided by law, pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in the above certificate of service are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

/s/ *Andrew T. Heldut*

FILED DATE: 6/25/2021 6:58 PM   2021CH01601